No. 22-2168

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NTE CAROLINAS II, LLC; NTE CAROLINAS II HOLDINGS, LLC;
NTE ENERGY, LLC; NTE SOUTHEAST ELECTRIC COMPANY, LLC;
NTE ENERGY SERVICES COMPANY, LLC; AND
CASTILLO INVESTMENT HOLDINGS II, LLC,

*Counterclaimants-Appellants*,

v.

DUKE ENERGY CAROLINAS, LLC, DUKE ENERGY PROGRESS, LLC, AND DUKE
ENERGY CORPORATION

*Counterclaim Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of North Carolina at Charlotte,
No. 3:19-cv-00515-KDB-DSC, Hon. Kenneth D. Bell

### COUNTERCLAIMANTS-APPELLANTS' OPENING BRIEF

Derek T. Ho
Matthew J. Wilkins
Caroline A. Schechinger
Jonathan I. Liebman*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

* Admitted only in New York; supervised
by members of the firm
*Counsel for Counterclaimants-Appellants*

March 13, 2023

## CORPORATE DISCLOSURE STATEMENT

NTE Carolinas II, LLC is wholly owned by NTE Carolinas II Holdings, LLC, which in turn is wholly owned by Castillo Investment Holdings II, LLC. Castillo Investment Holdings II, LLC has no parent entity, is not a publicly held corporation or entity, and no entity owns 10% or more of its stock.

NTE Energy, LLC has no parent corporation, is not a publicly held corporation or entity, and no entity owns 10% or more of its stock.

NTE Southeast Electric Co., LLC has no parent corporation, is not a publicly held corporation or entity, and no entity owns 10% or more of its stock.

NTE Energy Services Co., LLC has no parent corporation, is not a publicly held corporation or entity, and no entity owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ...................................................................................v

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ...................................................................5

STATEMENT OF THE ISSUES...........................................................................5

STATEMENT OF THE CASE...............................................................................6

I.     Factual Background ........................................................................................6

     A.     Background On The Wholesale Electric Power Market ......................6

     B.     NTE Challenges Duke's Wholesale Monopoly In The Carolinas ........8

          1.     NTE Emerges As A More Efficient Competitor ........................8

          2.     NTE Plans To Construct A Second Plant .................................11

     C.     Duke Adopted ████████████ To Foreclose Competition ........13

          1.     Duke Precluded NTE From Competing For Fayetteville Through Exclusionary Pricing .................................................13

          2.     Duke Interfered With NTE's Access To Transmission ............16

          3.     Duke Undermined NTE To Customers, Investors, And Regulators ..............................................................................20

II.    Procedural History .....................................................................................21

     A.     Preliminary Proceedings ....................................................................21

     B.     The Summary Judgment Ruling..........................................................22

          1.     Monopoly Power...................................................................23

          2.     Anticompetitive Or Exclusionary Conduct.............................24

SUMMARY OF ARGUMENT ........................................................27

ARGUMENT ............................................................................30

I.   A REASONABLE JURY COULD CONCLUDE THAT DUKE'S
     CAMPAIGN AGAINST NTE, VIEWED AS A WHOLE, WAS
     EXCLUSIONARY ...............................................................30

     A.   The District Court Incorrectly Examined Duke's Numerous
          Anticompetitive Acts In Isolation, Rather Than As A Whole ...........30

     B.   A Reasonable Jury Could Conclude That Duke's Campaign
          Against NTE, Viewed As A Whole, Was Anticompetitive...............38

II.  THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
     REJECTING REFUSAL-TO-DEAL AND PREDATORY-PRICING
     LIABILITY......................................................................44

     A.   A Reasonable Jury Could Find Duke's Refusal To Deal
          Unlawful ..................................................................44

     B.   A Reasonable Jury Could Find That Duke Engaged In
          Exclusionary Pricing .....................................................49

III. THE DISTRICT COURT'S REFUSAL TO RECUSE WARRANTS
     VACATUR AND REMAND TO A DIFFERENT JUDGE .........................55

     A.   Judge Bell's 2019 Recusal Required His Recusal In 2021 .................56

     B.   Judge Bell's Refusal To Recuse Requires Remand To A New
          District Judge...............................................................57

CONCLUSION .........................................................................58

REQUEST FOR ORAL ARGUMENT ................................................58

CERTIFICATE OF SERVICE .........................................................61

iv

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
  910 F.2d 139 (4th Cir. 1990) ........................................................... 30, 37, 39, 42

*Arnold v. E. Air Lines, Inc.*,
  712 F.2d 899 (4th Cir. 1983) ...............................................................56

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)................................................................... 39, 40, 45

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)................................................... 25, 26, 40, 41, 52

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,
  613 F.2d 727 (9th Cir. 1979) ...............................................................37

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)............................................................................36

*California v. Am. Stores Co.*,
  495 U.S. 271 (1990)............................................................................36

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  38 F.4th 1025 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 487 (2022) .................56

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ....................................................... 33, 34

*City of Groton v. Conn. Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) ......................................................... 33, 34

*City of Mishawaka v. Am. Elec. Power Co.*,
  616 F.2d 976 (7th Cir. 1980) ........................................................ 32, 33

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)....................................................................... 31, 32

v

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ....................................................... 32, 44

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................... 22, 39

*El Fenix de P.R. v. M/Y JOHANNY*,
36 F.3d 136 (1st Cir. 1994)......................................................... 56, 57

*Greenville Publ'g Co. v. Daily Reflector, Inc.*,
496 F.2d 391 (4th Cir. 1974) ............................................... 43, 52, 54

*Henry v. Chloride, Inc.*,
809 F.2d 1334 (8th Cir. 1987) ...............................................................53

*ITCO Corp. v. Michelin Tire Corp., Com. Div.*,
722 F.2d 42 (4th Cir. 1983), *on reh'g*, 742 F.2d 170 (4th Cir. 1984) ...............43

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) .................................................................29

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ..................................................................33

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)................................................................................57

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
981 F.2d 160 (4th Cir. 1992) ................................................. 29, 37, 43

*McGahee v. N. Propane Gas Co.*,
858 F.2d 1487 (11th Cir. 1988) ............................................................53

*Md. & Va. Milk Producers Ass'n, Inc. v. United States*,
362 U.S. 458 (1960)................................................................................36

*Moody v. Simmons*,
858 F.2d 137 (3d Cir. 1988) ..................................................................56

*NCAA v. Alston*,
141 S. Ct. 2141 (2021)............................................................................35

vi

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ................................................................................ 42

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981) .................................................................... 34

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021),
   *appeal docketed*, No. 21-7078 (D.C. Cir. July 29, 2021) .................... 35

*New York v. FERC*,
   535 U.S. 1 (2002) ................................................................................... 48

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) .................................................................. 37

*Otter Tail Power Co. v. United States*,
   410 U.S. 366 (1973) ...................................................................... 8, 47, 48

*Pulse Network, L.L.C. v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) .................................................................. 58

*Robertson v. Sea Pines Real Est. Cos.*,
   679 F.3d 278 (4th Cir. 2012) ................................................................. 37

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ................................................................. 37

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
   431 F.3d 917 (6th Cir. 2005) ...................................................... 52, 53, 54

*Standard Oil Co. v. United States*,
   221 U.S. 1 (1911) ................................................................................... 36

*Stringer v. United States*,
   233 F.2d 947 (9th Cir. 1956) ................................................................. 56

*Swift & Co. v. United States*,
   196 U.S. 375 (1905) ............................................................................... 31

*Tops Markets, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998) .................................................................... 43

*United States v. Am. Tobacco Co.*,
    221 U.S. 106 (1911)..............................................................................36

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..............................................................................32

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................ 24, 37

*United States v. O'Keefe*,
    128 F.3d 885 (5th Cir. 1997) ....................................................... 56, 57

*U.S. Philips Corp. v. Windmere Corp.*,
    861 F.2d 695 (Fed. Cir. 1988) .............................................................52

*Verizon Commc'ns Inc. v. L. Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)......................................................... 25, 46, 49

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................. 37, 38, 41

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    668 F.2d 1014 (9th Cir. 1981) ................................................... 53, 54

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .................................................................51

## STATUTES

15 U.S.C. § 1 .........................................................................................36

15 U.S.C. § 2 ........................................... 3, 21, 22, 32, 36, 37, 40, 43, 46

16 U.S.C. § 824(b) ...............................................................................6

16 U.S.C. § 824k(e)(2).........................................................................8

28 U.S.C. § 455(a) ...............................................................................57

28 U.S.C. § 1291 ...................................................................................5

28 U.S.C. § 1332 ...................................................................................5

**RULE**

Fed. R. Civ. P. 56(c) ................................................................................29

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
    (4th ed. 2018) .............................................................. 32, 38, 40, 48

Black's Law Dictionary (11th ed. 2019) ...............................................56

Robert H. Bork, *The Antitrust Paradox* (1978) ............................... 39, 45

Brief of United States as *Amicus Curiae* Supporting Plaintiffs-Appellants,
    *New York v. Facebook, Inc.*, No. 21-7078 (D.C. Cir. Jan. 28, 2022),
    2022 WL 266802 ...........................................................................35

Brief of United States in Opposition to Summary Judgment,
    *United States v. Google LLC*, No. 20-03010 (D.D.C. Feb. 16, 2023),
    ECF No. 506 .................................................................................35

Herbert Hovenkamp, *Exclusion and the Sherman Act*,
    72 U. Chi. L. Rev. 147 (2005) ......................................................40

Jonathan M. Jacobson, *Towards a Consistent Antitrust Policy for Unilateral
    Conduct* (2009), https://www.wsgr.com/a/web/176/jacobson0209.pdf .............51

Robert H. Lande, *Should Predatory Pricing Rules Immunize Exclusionary
    Discounts?*, 2006 Utah L. Rev. 863 (2006) .......................................50

Model Jury Instructions in Civil Antitrust Cases
    (Am. Bar. Ass'n June 2016) ..........................................................48

Richard A. Posner, *Antitrust Law* (2d ed. 2001) .....................................40

Promoting Wholesale Competition Through Open Access Non-
    Discriminatory Transmission Services by Public Utilities,
    Order No. 888, 61 Fed. Reg. 21540 (May 10, 1996)...........................7

Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical
    Framework for Loyalty Rebates*, 81 Antitrust L.J. 777 (2017) ........................ 51

*TransSource, LLC v. PJM Interconnection, L.L.C.*,
    168 FERC ¶ 61,119 (2019) ................................................................7

13D Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*
    (3d ed. Apr. 2022 Update) ..............................................................56

## INTRODUCTION

This case involves Duke Energy's successful efforts to use its monopoly position to prevent NTE—a more efficient entrant—from gaining a foothold in the wholesale power generation market in the Carolinas.  For decades, Duke's monopoly deprived wholesale customers in the Carolinas of any meaningful choice of power provider.  The absence of competition resulted in higher electricity rates for those customers (and their residents) and in Duke's notorious ██████████████ approach.

In the mid-2010s, NTE emerged as the first—and so far only—company to threaten that monopoly and bring competition to the market.  Duke's fleet of power plants is old and inefficient.  NTE specializes in building highly efficient natural gas-powered electric generating facilities.  When NTE built its first plant in Kings Mountain, North Carolina, former Duke customers flocked to sign up.

Taken aback by NTE's initial success, Duke realized it could not compete with NTE on the merits.  Duke's costs—undisciplined by competition—were too high, exceeding NTE's by nearly 30%.  One internal email put it bluntly:  "Duke can't chase the price competition and earn a reasonable return."  So if NTE gained traction, it would continue to win customers at Duke's expense.

In the face of its "biggest threat" ever, Duke went into ███████ mode to ensure that NTE could never compete in the Carolinas—in Duke's words, to "stop" the "NTE train" and "ruin NTE's plans."

The first prong of Duke's multipronged attack was to prevent NTE from winning the upcoming renewal contract with the City of Fayetteville. Under the contract's notice provisions, Fayetteville had to decide years early—in 2017— whether to renew with Duke after 2024. If NTE won the Fayetteville contract, it would have a perfect "anchor customer" for a second plant—Reidsville—that would enable NTE's further expansion. But Duke found a way to exploit the advance-notice provision to make an offer NTE could never match, even though NTE had lower costs. Specifically, Duke offered Fayetteville a massive rate discount for the remaining period of the existing agreement, conditioned on Fayetteville's renewing at rates that were *higher* than NTE's offer for the renewal period. Duke did not win Fayetteville's business because it was the more efficient competitor. Rather, it leveraged its monopoly rents and the early termination provision to prevent NTE from competing on the merits. Indeed, with the discounts, Duke's offer to Fayetteville was below *both* its marginal and its average costs.

That was not all. Knowing that NTE needed access to its transmission infrastructure to deliver power to wholesale customers, Duke terminated NTE's interconnection agreement in violation of Federal Energy Regulatory Commission

("FERC") regulations, and then made numerous false statements about NTE's lack of transmission access. Those actions undermined Reidsville during the critical period in which Fayetteville was considering NTE as a potential alternative. Duke's actions also cast a cloud over Reidsville's viability in the eyes of NTE's counterparties, including investors whose capital was critical to funding Reidsville's construction and customers whose demand was critical to Reidsville's market success. Ultimately, Duke's campaign succeeded: NTE's expansion in the Carolinas stalled, and Duke preserved its monopoly.

NTE challenged Duke's conduct under Sherman Act § 2, but the district court granted Duke summary judgment, finding sufficient evidence of monopoly power but not of anticompetitive conduct. That was fundamentally mistaken. Duke's conduct bears multiple hallmarks of unlawful exclusion. Duke successfully blocked the expansion of a more efficient competitor whose costs and rates are lower than Duke's. It did so through a renewal offer to Fayetteville that was priced below marginal cost, and through termination of a profitable interconnection agreement. A reasonable jury could readily conclude that Duke's exclusionary campaign was designed not to compete with NTE, but to prevent that very competition. And the evidence shows Carolina consumers were harmed as a result, through higher electricity rates and reduced choice of providers.

The district court's analysis rests on several legal errors. First, the court refused to view Duke's anticompetitive conduct holistically, instead analyzing each prong of its campaign separately and concluding that none was independently unlawful. That holding contradicts decades of precedent holding that monopolization must be assessed holistically. Because of its myopic, compartmentalized analysis, the court missed the forest for the trees.

Second, the district court misinterpreted refusal-to-deal and predatory-pricing law. The court held that there could be no refusal-to-deal liability because NTE's interconnection agreement with Duke was mandated by FERC, not voluntary. But the Supreme Court's cases emphasize that voluntariness is important as a proxy for profitability, not for its own sake. Here, the interconnection agreement guaranteed Duke a profit, and its sacrifice of that profit to harm NTE is yet another classic indicator of anticompetitive conduct.

The district court also concluded that Duke's renewal offer to Fayetteville could not be unlawful because there was no evidence that Duke's prices were below marginal cost. That reasoning suffers from multiple flaws. The court's rigid use of a price-cost test missed the central exclusionary feature of Duke's renewal offer—namely, Duke's massive up-front discount, designed to prevent Fayetteville from choosing NTE despite its lower prices in the renewal period. At any rate, NTE had

admissible evidence of pricing below any proper measure of costs (including marginal costs).

This Court should reverse and remand for trial. When it does, it should remand to a new district judge, because Judge Bell should not have presided over this case. At the outset, he recused himself because his former law partners represented Duke below. But Judge Bell later took the case back. That was inappropriate: once recused, a judge is permanently recused. That salutary principle protects against both actual bias as well as its appearance. This Court should therefore direct that trial occur before a different district judge.

## JURISDICTIONAL STATEMENT

NTE appeals (1) Judge Bell's December 8, 2021, order denying NTE's motion to recuse, JA336; and (2) Judge Bell's June 24, 2022, order granting summary judgment to Duke on NTE's antitrust counterclaims, JA4157. Those orders became final when the parties voluntarily dismissed the remaining claims and counterclaims on October 13, 2022. JA4206. NTE timely appealed on November 11, 2022. JA4209. The district court had jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in granting summary judgment to Duke on NTE's monopolization and attempted monopolization claims under the Sherman

Act, despite evidence that Duke adopted a multipronged campaign, including below-cost discounting and termination of a profitable interconnection agreement, to exclude a more efficient rival from entering the market.

2.    Whether the district judge erred in refusing to recuse despite having earlier recused due to a conflict arising from his former law firm's representation of Duke in this case.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Background On The Wholesale Electric Power Market

The electric power industry has three components: (1) generation—producing electricity at a power plant; (2) transmission—sending electricity over high-voltage power lines to large, wholesale customers (including municipalities); and (3) distribution—sending electricity over local, low-voltage power lines to individual consumers. *See* FERC, *Energy Primer* 47 (2020) ("*Primer*"). This case concerns the wholesale electricity market, which FERC regulates. *See* 16 U.S.C. § 824(b).

Historically, vertically integrated companies owning generation, transmission, and distribution facilities held regulated monopoly rights to service specific regions. *See Primer* 38, 61. Duke is the incumbent monopolist in the Carolinas. *See infra* pp. 8, 23-24. Starting in the 1980s, state and federal regulators sought to unbundle generation and transmission to increase market-based

competition. *See Primer* 38-39. The deregulatory model prompted new entry into the generation market by independent power producers ("IPPs"). *Id.* NTE is an IPP.

IPPs own competing generation facilities but use incumbent monopolists' transmission infrastructure to deliver power to wholesale customers. JA4455. If incumbent monopolists could deny IPPs access to their transmission lines, IPPs would be unable to compete. JA4455, JA4496. To mitigate this problem, FERC regulations require incumbent monopolists to operate generation and transmission businesses independently, make transmission lines available to IPPs on equal terms as their own power plants via mandatory interconnection agreements, and obtain FERC's permission before terminating an interconnection agreement. JA4450, JA4456-4457, JA4496. FERC also established the online Open Access Same-Time Information System ("OASIS"), which makes information about transmission capacity available to industry participants and the general public.

Those regulations leave ample opportunities, however, for anticompetitive behavior by incumbent monopolists. JA4496. FERC has limited authority to remedy anticompetitive behavior. *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, Order No. 888, 61 Fed. Reg. 21540, 21568 (May 10, 1996) ("[W]e are not an antitrust court, and our responsibilities are not those of the Department of Justice."); *TransSource, LLC v. PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,119 at P 285

(2019) (FERC cannot grant money damages).  Federal law thus provides that neither FERC regulations nor the Federal Power Act (FERC's enabling statute) displace the antitrust laws.  16 U.S.C. § 824k(e)(2); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374-75 (1973).

IPPs are vulnerable to other forms of exclusionary conduct as well. *Primer* 74-75; JA4470-4471.  For example, financing new power plants often requires the commitment of a large "anchor" wholesale customer.  *See* JA4471, JA4484.  Opportunities for IPPs to compete for such customers are infrequent, because of the long duration of existing contracts. *See Primer* 71.  Here, Duke's contract with the Fayetteville Public Works Commission ("Fayetteville") lasted 20 years, and required Fayetteville to give seven years' notice of termination.  JA4163.  Thus, preventing an IPP from competing for even a single anchor customer may effectively foreclose it from bringing new generation capacity into the market.

**B.  NTE Challenges Duke's Wholesale Monopoly In The Carolinas**

**1.  NTE Emerges As A More Efficient Competitor**

Despite these forbidding obstacles, in the mid-2010s, NTE sought to introduce competition into the wholesale electricity market in the Carolinas.  Duke had been the incumbent monopolist there for decades, with more than 90% market share.  *See* JA4170-4172, JA4174, JA4477, JA4479-4482; *see infra* pp. 23-24.

NTE's initial entry into the generation market caught Duke flat-footed.  In early 2014, NTE announced the construction of a new plant in Kings Mountain, North Carolina.  JA4162 (citing JA4616). ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ The Kings Mountain project was a major success for NTE, which took a total of nine wholesale customers from Duke. *See* JA4162, JA4498, JA4616, JA4618.  That was bad for Duke, but it was good for Carolina consumers, which benefited from substantial savings.  *See* JA5894 (Stantonsburg's mayor stating a "9 percent rate cut will make Christmas a bit brighter for our citizens" thanks to NTE.); ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

NTE's unexpected threat quickly attracted the attention of Duke's most senior executives.  Alarmed, Duke's CEO requested and received regular briefing on NTE's activity in the Carolinas.  JA4832-4833, JA5064, JA5058, JA5704. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

9

████████████████████████████████████████████

████████████████████████████████████  And in February

2017, the same executive reported at an all-hands meeting that NTE was Duke's

"biggest threat."  JA212, JA4700-4701, JA5283.

Duke's alarm reflected its acute awareness that NTE is more efficient.

Because Duke has historically been insulated from competition, its generation

facilities are outdated, inefficient, and expensive.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Internally, Duke acknowledged that it would not be able to compete with NTE

on price for many years.  *See*, *e.g.*, JA4056, JA4888 ("Duke can't chase the price

competition and earn a reasonable return.");  ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

### 2. NTE Plans To Construct A Second Plant

In 2016, after being approached by other interested customers, and to Duke's dismay, NTE announced a second plant in Reidsville, North Carolina.  JA4162; *see* JA5295 ███████████████████████████████████

████████████████████████████████  Duke realized from Kings Mountain that it would continue to suffer competitive losses if NTE expanded. Duke's concerns escalated when, in 2018, NTE persuaded three more wholesale customers—including the City of Camden, North Carolina—to buy power from NTE rather than Duke.  JA4162, JA5395, JA5989, JA6071.  ████████████████████

████████████████████████████████  Duke needed to stop NTE's expansion in its tracks.  JA4700; *see also* JA5283.

Duke viewed Fayetteville—a large municipality that NTE was pursuing as Reidsville's anchor customer—as a crucial firewall.  JA4163.  Fayetteville's existing contract with Duke gave it a termination option in 2024 upon notice to Duke in 2017.

JA4163.  Duke viewed preventing NTE from securing the Fayetteville contract as critical to preventing the success of NTE's Reidsville plant and to maintaining its monopoly in the Carolinas. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Thus, stopping NTE from getting the Fayetteville contract would hobble Reidsville.  If Reidsville succeeded, however, Duke would have to offer "more competitive solutions" to keep its remaining customers.  JA2847.[1]

At a closed meeting, Fayetteville's then-CEO aptly described the stakes.  Before NTE, Duke's attitude toward Fayetteville was:  "[w]e're the big guys in town, we're your only option, it's our way or the highway."  JA2204-2205, JA6210.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] Duke viewed NTE as its only serious competition.  *See* JA6977, JA4700-4701. In asserting that Fayetteville received offers from "five viable potential suppliers," JA4163-4164, the district court failed to construe the record in the light most favorable to NTE.

███████████████████████████████████████████

██████████████████

**C.    Duke Adopted** ████████████████ **To Foreclose Competition**

With the battle lines drawn, Duke developed a series of ████████

████████ to prevent competition from NTE—in Duke's words, to "stop" the

"NTE train" and "ruin NTE's plans."  JA5390, JA5733, JA5906.  Those strategies

were a multipronged effort to avoid price competition by preventing NTE from

competing in the market.  And the record shows that those strategies have harmed,

and will continue to harm, Carolinians through increased prices and reduced

consumer choice.  JA4489, JA4491-4492, JA4494, JA4496, JA4498.

**1.    Duke Precluded NTE From Competing For Fayetteville Through Exclusionary Pricing**

The first prong in Duke's strategy was to use an exclusionary pricing

structure—which Duke called "blend and extend"—to foreclose NTE from

competing for Fayetteville's business.  *See* JA4663-4664, JA4486, JA6977, JA7297.

This was not consumer-welfare-enhancing price competition.  Instead, Duke's

pricing structure was designed to *prevent* competition from NTE and preserve

Duke's monopoly position.

As explained above, Fayetteville had to decide in 2017—later extended by

Duke to 2020—whether to renew, even though its contract did not end until 2024.

JA4163.  Because there was no competition for its existing contract, Duke was

13

charging Fayetteville supracompetitive prices. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

The summary-judgment record contains ample evidence that Duke's conditional rebate structure had anticompetitive effects, because it allowed Duke to leverage its prior monopoly profits to exclude more efficient, lower-cost competitors such as NTE. *See* JA4486-4487. A Duke executive admitted that its "blend-and-extend" strategy would enable it to charge Fayetteville an even "higher price than offered by the competition" once the renewed contract expired. *See* JA4068, JA4663-4664.

NTE's experts also opined that Duke's conditional rebate pricing structure resulted in Duke's prices for the Fayetteville renewal contract being below Duke's marginal costs for providing power to Fayetteville. As Dr. John Morris explained, in the wholesale power context, average total costs and long-run marginal costs tend to converge. *See* JA1807, JA4488-4489. That is true both because of FERC's cost-accounting regulations and because serving a large customer like Fayetteville

14

involves so much electricity over so long that costs that might in other contexts be fixed are properly considered variable. JA1807, JA4488-4489. Indeed, as Dr. Morris opined, "[t]he average cost of regulated sales establishing the marginal cost for sales in competition with others has long been recognized in the economic literature." JA1807, JA4488-4489.

Moreover, unlike a classic predatory-pricing scheme—which requires the monopolist to wait to recoup the losses associated with its below-cost prices—Duke devised a plan to recoup a substantial portion of those discounts by raising prices on *other* wholesale and retail customers. JA4421-4422 (expert opinion of Dr. Metin Celebi). ██████████████████████████████████████████████████

██████████████████████████████████████ Based on that whitepaper, Dr. Celebi calculated that Duke intended to increase prices for its other wholesale customers by up to $94 million, and increase prices for its retail customers by $233 million over an eight-year period. JA579.[2]

Duke's "blend-and-extend" scheme worked. In November 2019, Fayetteville renewed its contract with Duke without ever issuing an RFP. JA4164; *see* JA5476

██████████████████████████████████████████████████

---

[2] The district court ignored this evidence even though NTE cited it in its summary-judgment opposition. *Compare* JA4368, *with* JA4189 ("[T]here is no evidence that [Duke] would be able to charge improperly increased prices to other customers . . . to make up for 'losses' at FPWC.").

████████████████████████████ NTE thus

was never able to compete for the Fayetteville contract even though it offered lower-priced, more efficiently generated power.

### 2. Duke Interfered With NTE's Access To Transmission

The second prong of Duke's attack on NTE was to interfere with NTE's access to transmission lines that were necessary to compete in the generation market. FERC regulations mandated that Duke enter into an interconnection agreement with NTE, but those regulations nonetheless left NTE vulnerable to efforts by Duke to interfere with those interconnection rights. That is precisely what Duke did: it manufactured a false-flag contractual dispute as a pretext to unlawfully cancel the Reidsville interconnection agreement, and it then used that cancellation as a weapon to deter would-be customers from entering into contracts with NTE. By the time NTE was able to get relief from FERC months later—in May 2020—NTE's Reidsville expansion efforts had been irretrievably damaged.

Under the parties' interconnection agreement, signed on November 8, 2017, NTE would pay about $59 million for Duke to build the interconnection infrastructure for Reidsville. JA491. Duke would own the infrastructure, even though NTE would pay for it. JA465. The agreement also required NTE to make a series of security payments to Duke on a set schedule. JA467, JA575. By January 2019, NTE had paid Duke $1.6 million under the agreement. JA4165.

In January 2019, however, Duke instructed NTE not to make further payments until it received invoices from Duke.  JA5891-5892.  When the next payment due dates occurred, on March 1 and May 1, 2019, Duke admits it sent no invoices, so NTE made no payments.  JA4764-4767; JA6810.  It is undisputed that NTE obeyed Duke's instructions.

In May 2019, still having received no invoices, NTE exercised its right to temporarily suspend work on the interconnection project.  JA6239; *see* JA447 (Agreement § 5.16) (allowing NTE "to suspend *at any time*" so long as NTE paid Duke "for all reasonable and necessary costs" incurred "*prior* to the suspension") (emphases added).  Suspensions are routine in the industry, and are designed to give IPPs the flexibility to prioritize different pieces of a complex development process.  JA4468-4470.  Unlike termination, suspension does not affect an IPP's place in the interconnection queue—a publicly available list of projects whose developers seek to interconnect to the transmission system.  JA4468.[3]

NTE offered in June 2019 to pay Duke for the costs it had actually incurred on the Reidsville project, as well as reasonable and necessary costs caused by the suspension.  JA3875.  Section 5.16 of the interconnection agreement required Duke

---

[3] ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████ JA4468-4469.

17

to send an invoice to NTE for those costs, but Duke sent no such invoice until July 2020.[4]  JA3913-3918.  In summer 2019, Duke instead insisted that NTE could not suspend without making the full March, May, and (eventually) July security payments—more than $30 million—even though Duke sent no invoices for them prior to suspension and even though they were for future work, not pre-suspension work.  JA3865-3868, JA3878-3881, JA3894-3897.  NTE refused.

Duke used NTE's refusal to pay the advance security deposits as a pretext to terminate NTE's interconnection agreement in September 2019.  JA3894-3897. Duke did so with neither NTE's consent nor FERC's approval.  NTE's expert, former FERC Commissioner William L. Massey, opined that Duke's unilateral termination was unlawful twice over—it violated the text of the agreement and FERC regulations.  JA4448-4457, JA435 (Agreement § 2.3.3) ("no termination shall become effective until . . . the filing with FERC of a notice of termination of this [agreement], which notice has been accepted for filing by FERC").

---

[4] The district court incorrectly stated that "these allegedly due payments were ultimately invoiced to NTE in the Summer of 2019." JA4166 (citing JA3863-3868, JA3876-3881).  But those summer 2019 invoices were for the March and May 2019 security payments ($7 million in total).  Duke sent no invoices for Section 5.16 actual costs (which were less than $7 million) until July 2020.  JA3913-3918.

Worse, Duke knew that its unapproved termination was unlawful. Just a year earlier, Duke had sought FERC's approval to terminate another customer's interconnection agreement and had been denied. *See* JA4814-4815, JA5479-5489.

Worse still, leading up to the unlawful termination, Duke sent NTE several letters alleging breaches of the parties' interconnection agreement. *See* JA3865-3868, JA3878-3881, JA3894-3897 (letters). But Duke has since admitted that the allegations were false. For example, the letters falsely stated that Duke had previously sent NTE timely invoices for payment, when Duke had not. JA3866, JA3879, JA4166, JA4764-4766, JA6810. Duke's motivation for sending the false breach letters was clear— ███████████████████████████████████

JA6246. ████████████████████████████████████████████

████████████████████████████████████ JA6364.

Eventually, FERC agreed with NTE in May 2020 that Duke's unilateral termination of NTE's agreement was unlawful. JA562-564. But by then the damage was done. Duke's interference with NTE's transmission-access rights put a cloud over its viability in the market. JA4529. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████ JA4529. And in the meantime, Duke renewed its contract with Fayetteville in November 2019, while NTE's access to the wholesale market remained blocked. JA4164. As former Commissioner

Massey opined, ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ JA4448; *see also* JA4458.

### 3. Duke Undermined NTE To Customers, Investors, And Regulators

Duke took several additional measures to scare off NTE's customers and investors, disparage NTE before its regulators, and drain NTE's resources, ████████

████████████████████████████ JA5062 (internal Duke email).  On the same day Duke wrongfully terminated NTE's interconnection agreement, it filed a lawsuit against NTE making the false assertions of contract breach set forth above. JA4168.  Days later, Duke falsely posted on OASIS that Reidsville was "cancelled" and refused to take down that posting until FERC ruled (months later) that Duke's termination was unlawful.  JA1633-1634, JA7150, JA562-564.

Further, in 2019, Duke intervened in a proceeding before the North Carolina Utilities Commission ("NCUC") regarding the permit NTE needed to construct the Reidsville plant.  Duke falsely asserted to the NCUC (among other things) that NTE lacked customers, even though the City of Camden had already notified Duke that it was moving its business to NTE.  JA515-519. ████████████████████████

████████████████████████████ JA4624.

These actions worked as intended to undermine NTE before its customers, investors, and regulators.  One business partner informed NTE that "Reidsville

20

sounds like a good project…but we can't make any commitment until the interconnection issues are resolved."  JA843, JA6165.



JA7283.

JA4604, JA4754.[5]

## II.    Procedural History

### A.    Preliminary Proceedings

Duke sued NTE in North Carolina state court on September 6, 2019, asserting breaches of the Reidsville interconnection agreement and related claims.  JA4168. NTE removed and counterclaimed that Duke had monopolized, or attempted to monopolize, the wholesale energy market in the Carolinas, in violation of the Sherman Act, 15 U.S.C. § 2.  JA4168; JA347-416 (NTE's Third Amended Counterclaims).

The case was assigned to Senior Judge Mullen, then reassigned to Judge Bell on November 26, 2019.  On December 18, 2019, a partner from Judge Bell's former law firm, McGuireWoods LLP, appeared for Duke.  JA36.  That same day, citing a

---

[5] The district court neglected entirely the evidence that Duke had maligned NTE before various third parties, focusing only on whether NTE could identify a discrete customer who saw the OASIS posting.  JA4167, JA4191.

"conflict," the court reassigned the case, first back to Senior Judge Mullen and then to Judge Cogburn.  JA36.

On October 8, 2021—because Judge Cogburn developed a conflict— the case was reassigned to Judge Bell.  NTE moved for his recusal under the rule that a judge, once recused, cannot re-enter the case.  JA244.  On December 8, 2021, Judge Bell denied NTE's motion, claiming that his "prophylactic" withdrawal "did not reflect a considered 'recusal.'"  JA342-343; *see also* JA4212 (disclaiming any "once recused, always recused issue").

## B.    The Summary Judgment Ruling

On June 24, 2022, Judge Bell granted Duke summary judgment on NTE's counterclaims.[6]  JA64.  After reciting the elements of Section 2 monopolization— "(1) possession of monopoly power [in the relevant market] and (2) [willful acquisition or] maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," JA4169 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992))—it found a triable issue as to Duke's monopoly power but not as to whether Duke's conduct was anticompetitive.

---

[6] The parties settled Duke's claims and NTE's contract counterclaim.

### 1. Monopoly Power

The district court found that a reasonable jury could conclude that Duke has or is likely to achieve monopoly power in the relevant market given Duke's "durably high market share"—"at or approaching 90%"—"together with the realities of the structure of the relevant market." JA4169-4174.

First, a reasonable jury could conclude that Duke can "control prices above a 'competitive' price." JA4171. Duke "concede[d] that it was only after it faced significant competition from NTE that it offered to lower its price at [Fayetteville]." JA4171. The district court rejected Duke's argument that FERC regulations precluded a finding of market power: "as reflected in the price of Duke's renewed contract at [Fayetteville], the difference between the maximum price FERC would allow (at least [Fayetteville's] then existing rate) and a 'competitive' price can be substantial." JA4172.

Second, a reasonable jury could conclude that Duke can unlawfully exclude competitors. JA4172. As the district court observed, "there are only a limited number of customers up for renewal each year so the opportunities for new entrants are constrained," and "entering the market to generate and sell wholesale electricity takes considerable time and resources, including obtaining financing and regulatory approvals and then actually building a power plant." JA4172. Further, "FERC's regulatory role does not preclude the possibility that a jury could find that the

structure of the market can lead to the 'exclusion' of competitors." JA4172. The court faulted Duke for "narrowly focus[ing] on the FERC regulations that require the sharing of transmission lines (for fair compensation)," explaining that "the jury must look at market exclusion through a broader lens." JA4172.

### 2.    Anticompetitive Or Exclusionary Conduct

The district court nevertheless concluded that there was insufficient evidence to find that Duke had used its monopoly power unlawfully. JA4174-4192. The court acknowledged that "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern," because "the means of illicit exclusion, like the means of legitimate competition, are myriad." JA4175 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (per curiam)). And it recognized that the ultimate touchstone is whether the defendant's conduct has caused "anticompetitive effect[s]," thereby hurting consumers by raising price or reducing output or quality. JA4176 (quoting *Microsoft*, 253 F.3d at 58).

But the district court did not consider NTE's evidence that Duke's actions had anticompetitive effects. It also explicitly refused to consider whether, viewed as a whole, Duke's campaign against NTE was exclusionary. JA4176-4177. Instead, the court isolated the various aspects of Duke's overall campaign (the blend-and-extend pricing structure, termination of the interconnection agreement, and false

claims and statements against NTE) and tried to pigeonhole each into a discrete theory of liability (refusal to deal, predatory pricing, sham litigation, and defamation). Applying that compartmentalized framework, the court found no exclusionary conduct because none of Duke's actions, viewed separately, was an independent antitrust violation. As the court put it: "Adding up several instances of lawful conduct cannot total unlawful conduct. In simple mathematical terms, $0 + 0 = 0$." JA4176.

First, the district court held that Duke's termination of NTE's interconnection agreement without FERC's permission did not constitute an unlawful "refusal to deal" under *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). JA4177-4181. The court read *Trinko* as precluding refusal-to-deal liability where the prior course of dealing is not "voluntar[y]"—even if that course of dealing is indisputably *profitable*. JA4178. That holding doomed NTE because "FERC's regulatory scheme compels Duke to share its transmission systems with competitors." JA4178.

Second, the district court found that Duke's blend-and-extend pricing offer to Fayetteville—again viewed in isolation—did not constitute predatory pricing, based on the test articulated in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). Under *Brooke Group*, a plaintiff must allege pricing (1) "below an appropriate measure of . . . costs" and (2) a "dangerous probability[] of

recouping its investment in below-cost prices." *Id.* at 222-24.  While conceding that neither the Supreme Court nor the Fourth Circuit has specified a single, "appropriate" measure of costs, the district court held that "total average system costs" can never be an appropriate measure.  JA4185-4189.  Claiming that it was "undisputed that Duke's [Fayetteville] price contributed significantly to fixed costs above its variable costs," the court thus held that "Duke's price is not predatory under the antitrust laws."  JA4189.  In a footnote, the Court added that NTE failed to establish a probability of recoupment.  JA4189.  The court did not assess whether, as NTE had argued, the *structure* of Duke's conditional rebate was exclusionary.

Third, the district court concluded that none of Duke's actions to disparage NTE to its customers and investors was independently unlawful.  The court found that Duke's contract lawsuit—despite containing false allegations—did not satisfy the requirements for "sham litigation."  JA4166, JA4189-4190.  The court further found that Duke's false OASIS posting that Reidsville had been cancelled fell short of actionable defamation, because the evidence that a potential NTE customer had seen the posting was inadmissible hearsay.  JA4191; *see also* JA4108-4109.  Last, the court found that Duke's false statements to the NCUC did not amount to "an

26

unlawful exclusionary antitrust act" because NTE ultimately received the permit it sought, despite evidence of reputational harm to NTE.  JA4191-4192.[7]

NTE appealed.

## SUMMARY OF ARGUMENT

**I.**  The district court applied the wrong standard in concluding that Duke's conduct was not exclusionary as a matter of law.  It improperly compartmentalized various aspects of Duke's anticompetitive scheme and asked whether each one was independently unlawful.  Instead, under settled precedent, the court should have asked whether a reasonable jury could conclude that Duke's conduct, viewed as a whole, was exclusionary.  Under the correct legal standard, a reasonable jury could find exclusionary conduct here, given the multiple indicia of harm to competition. The evidence shows that Duke's conduct blocked NTE—a more efficient rival— from competing in the Carolinas wholesale energy market.  Duke did so in part by terminating a profitable interconnection agreement and extending a renewal offer to Fayetteville that was below cost.  As a result, consumers were deprived of a lower-

---

[7] The district court granted summary judgment on NTE's state-law claims on additional grounds not addressed in its analysis of the Sherman Act, including federal preemption, lack of "aggravating" circumstances (as to the termination of the interconnection agreement), and lack of proximate causation (as to the false OASIS posting, sham litigation, and Duke's intervention in the NCUC proceeding). JA4192-4199.  NTE's appeal is limited to its federal antitrust claims.

cost alternative to Duke's aged and inefficient power plants.  Those are hallmarks of exclusionary conduct.

**II.**  The district court also erroneously analyzed individual elements of Duke's anticompetitive scheme.  In analyzing Duke's termination of the Reidsville interconnection agreement under the rubric of refusal-to-deal, the court incorrectly held that Duke could not be liable unless it had interconnected with NTE voluntarily and at a retail rate.  But those are indicia of profit-sacrifice—and thus anticompetitive intent—not necessary elements in their own right.  Here, the interconnection agreement with NTE was profitable to Duke, and its termination thus falls within the bounds of refusal-to-deal liability.  In analyzing Duke's renewal offer to Fayetteville under the rubric of predatory pricing, the court ignored the foreclosure effects of the conditional rebate structure, rejected an appropriate measure of costs, and ignored evidence that Duke's offer was below its marginal costs.  These errors also require reversal.

**III.**  Judge Bell's refusal to recuse was improper, because once a judge is recused, he is permanently recused.  That well-established principle protects fairness to the parties and the integrity of the judicial process.  This Court should thus reverse the summary-judgment ruling and remand to a new district judge for trial.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (en banc). Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). As the nonmovant, NTE is entitled

> to have the credibility of its evidence as forecast assumed, its version of all that is in dispute accepted, all internal conflicts in it resolved favorably to it, the most favorable of possible alternative inferences from it drawn in its behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Id.* (cleaned up).

The Court reviews "a judge's recusal decision for abuse of discretion." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 167 (4th Cir. 2014).

# ARGUMENT

## I.    A REASONABLE JURY COULD CONCLUDE THAT DUKE'S CAMPAIGN AGAINST NTE, VIEWED AS A WHOLE, WAS EXCLUSIONARY

### A.    The District Court Incorrectly Examined Duke's Numerous Anticompetitive Acts In Isolation, Rather Than As A Whole

The district court erred in concluding that NTE's evidence was inadequate to create a triable issue of fact as to whether Duke's conduct was exclusionary.[8]   It faltered at the threshold in holding (JA4176-4177) that "if none of the [individual] actions NTE alleges to be improper [is] actionable" independently, then they cannot be actionable together.   Requiring NTE to prove that at least one component of Duke's scheme was independently actionable under a preexisting, recognized category of exclusionary conduct was reversible error.   Under the correct legal standard, courts must analyze anticompetitive schemes holistically, not piecemeal, because a scheme as a whole may be anticompetitive even if no one component, taken alone, harms competition.   The Supreme Court, this Court's sister Circuits, and leading antitrust commentators have long agreed on this point, which is supported by economic reality and common sense.

---

[8] Monopolization and attempted monopolization overlap, requiring proof of monopoly power (or a substantial likelihood of obtaining such power) and anticompetitive or exclusionary conduct. *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147-49 (4th Cir. 1990).

**1.**  More than a century ago, the Supreme Court emphasized that the antitrust laws require courts to assess anticompetitive schemes holistically.  In *Swift & Co. v. United States*, 196 U.S. 375 (1905), the Court considered a multipart scheme to monopolize livestock markets.  The defendants, like Duke and the district court here, argued that each of "the several acts" comprising the scheme "[was] lawful" and so could not support a claim.  *Id.* at 396.  Justice Holmes, writing for a unanimous Court, disagreed, saying that "whatever we may think of [the constituent acts] separately . . . they are bound together as the parts of a single plan.  ***The plan may make the parts unlawful***."  *Id.* (emphasis added).  The "scheme as a whole" could therefore be "within reach of the law" even if the individual components were not.  *Id.*

The Supreme Court reinforced that holding in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962).  There, the plaintiff alleged five separate episodes of anticompetitive behavior.  *See id.* at 698.  In vacating judgment for the defendant, the Court chastised the court below for treating the plaintiffs' claims "as if they were five completely separate and unrelated lawsuits."  *Id.* at 698-99.  Instead, the Court counseled to give plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Id.* at 699.  That rule is important because the "character and effect of a [scheme] are not to be judged by dismembering it and

viewing its separate parts, but only by looking at it as a whole." *Id.* (internal quotation marks omitted); *accord United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (affirming judgment against monopolist for scheme that included multiple exclusionary "devices," including restrictive agreements, pricing practices, and acquisitions).

This rule is critical to the enforcement of Sherman Act § 2.  As the leading antitrust treatise put it:

> In a monopolization case conduct must always be analyzed "as a whole."  A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices.  Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim.

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7 (4th ed. 2018); *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) ("Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.") (internal quotation marks omitted).

**2.**  This Court's sister Circuits agree that monopolization claims require a flexible, holistic analysis.  In *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980), the Seventh Circuit considered a multipart anticompetitive scheme under Sherman Act § 2.  It rejected the defendant's

invitation to "consider each separate aspect of its conduct separately and in a vacuum." *Id.* The court acknowledged that, "[i]f [it] did, [it] might agree . . . that no one aspect standing alone is illegal." *Id.* Nevertheless, the court upheld the verdict against the defendant because "[i]t is the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor," not the individual components. *Id.*

Similarly, the en banc Third Circuit in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), affirmed a monopolization verdict over 3M's objections that each aspect of its alleged conduct should be reviewed individually. The court held that under *Continental Ore* the "relevant inquiry is the anticompetitive effect of 3M's exclusionary practices *considered together*." *Id.* at 162 (emphasis added); *see id.* ("As the Supreme Court recognized in [*Continental Ore*], the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.").

Likewise, in *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373 (9th Cir. 1992), the Ninth Circuit emphasized that "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* at 1376. Instead, a court must always "deal[] with what has been called the 'synergistic effect' of the mixture of the elements." *Id.* (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.

1981)).  The Ninth Circuit emphasized that the appropriate analysis does not entail

a "mathematical equation" in which the court analyzes individual acts separately and

then adds up fractional liability associated with those acts.  *Id.*  The pertinent inquiry

does not analyze the parts of a combined scheme separately, but instead assesses the

combined effects of the scheme as a whole.  *See id.*

The district court thought the Second Circuit's decision in *City of Groton*

supported its position, but it badly misread that case.  As *City of Anaheim* correctly

recognized, the *Groton* court judged it improper to assign fractional liability to

individual acts and assess whether "the sum of the fractions is one or more."  *City of*

*Groton*, 662 F.2d at 928.  However, *Groton* did not reject the teaching of *Continental*

*Ore*.  Rather, it went on to say that "[t]he proper inquiry is whether, qualitatively,

there is a 'synergistic effect.'"  *Id.* at 929 (quoting *Ne. Tel. Co. v. Am. Tel. & Tel.*

*Co.*, 651 F.2d 76, 95 n.28 (2d Cir. 1981) (emphasizing that courts must abide

"*Continental Ore*'s edict" to analyze a defendant's conduct holistically even when

"the logical presentation" of the case "require[s courts] to treat each" claim "of

anticompetitive conduct separately")).  Therefore, the Second Circuit "[v]iew[ed]

the [plaintiffs'] claims and proof as a whole as *Continental Ore* . . . require[s]."  *Id.*

at 935.  And although the Second Circuit decided that, on the facts before it, the

conduct as a whole did not amount to a violation of the Sherman Act, its analytical

approach demonstrates the legal error of the district court here.

**3.** The U.S. Department of Justice Antitrust Division has also repeatedly taken the position that anticompetitive schemes must be analyzed holistically. In *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), *appeal docketed*, No. 21-7078 (D.C. Cir. July 29, 2021), for example, the DOJ opined that "monopolization claims challenging the *combined effect* of acquisitions and other anticompetitive conduct" are appropriate because the appropriate question is "whether the evidence as a whole established the proscribed result"—*i.e.*, unfairly creating or maintaining a monopoly—"not whether particular acts did so in isolation." Brief of United States as *Amicus Curiae* Supporting Plaintiffs-Appellants at 10, *New York v. Facebook, Inc.*, No. 21-7078 (D.C. Cir. Jan. 28, 2022), 2022 WL 266802; *see* Brief of United States in Opposition to Summary Judgment at 20-21 & n.10, *United States v. Google LLC*, No. 20-03010 (D.D.C. Feb. 16, 2023), ECF No. 506 (Google's anticompetitive conduct comprised "mutually reinforcing" acts to be "viewed in light of each other and cumulatively," rather than "isolatedly viewed" as "discrete acts.").

**4.** Assessing monopolization claims holistically is also consistent with the Supreme Court's precedents regarding the flexible, holistic analysis under the "rule of reason." "The whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *NCAA v. Alston*,

141 S. Ct. 2141, 2160 (2021) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999)). Thus, the rule of reason does not permit the use of "rote checklist[s]" or "inflexible substitute[s] for careful analysis." *Id.*

The Supreme Court has long held that the rule of reason applies to Section 1 and Section 2 claims alike. In *Standard Oil Co. v. United States*, 221 U.S. 1 (1911), the Court found that Standard Oil had violated both Sections 1 and 2 of the Sherman Act. *Id.* at 74. In so holding, the Court declared it "obvious that the criteria to be resorted to in any given case for the purpose of ascertaining whether violations of [Section 2] have been committed is the rule of reason." *Id.* at 62.

In *United States v. American Tobacco Co.*, 221 U.S. 106, 180-84 (1911), the Court again applied the rule of reason, which it emphasized was "universal in its application," in finding that American Tobacco had violated both Sections 1 and 2. Nearly 80 years later, the Court described *Standard Oil* and *American Tobacco* as "endorsing the 'Rule of Reason' as the principal guide to the construction of the Sherman Act's general language," drawing no distinction between Section 1 and Section 2 claims. *California v. Am. Stores Co.*, 495 U.S. 271, 286 (1990); *see also Md. & Va. Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 463 (1960) ("[S]ections [1 and 2] closely overlap, and the same kind of predatory practices may show violations of [both].").

Other Circuits likewise apply the rule of reason's holistic analysis to Section 2 claims. *See, e.g., Microsoft*, 253 F.3d at 58-59; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463-65 (7th Cir. 2020); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015); *cf. Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 737 (9th Cir. 1979).

**5.** This Court's precedents likewise instruct that whether conduct is "exclusionary" within the meaning of Section 2 must be assessed under the totality of the circumstances. *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147-48 (4th Cir. 1990). That is: in analyzing whether "the exclusion was based on superior efficiency"—which is "[t]he key to distinguishing legal exclusion from improper, or predatory, exclusion"—"it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself." *Id.*; *see also M & M Med. Supplies*, 981 F.2d at 166-68.

This Court has also cautioned that the economic effects of anticompetitive actions must be viewed synergistically, for a series of anticompetitive actions may "cumulatively enable[] the defendants to exclude [competitors] from effectively competing." *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 290-91 (4th Cir. 2012); *see SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423-25 (4th Cir. 2015) ("Actions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances.").

\* \* \*

Whether one calls it "monopoly broth," a "synergistic" analysis, or the rule of reason—or prefers to disclaim "any particular catchy title for this analytical approach," *Viamedia*, 951 F.3d at 462—courts must analyze the alleged monopolist's conduct holistically for anticompetitive effects, not isolate each individual act as if it were disconnected from all the others.  The district court's contrary rule would impair the ability of antitrust enforcers and consumers to challenge complex anticompetitive schemes in this Circuit, enabling abusive monopolists to get away with "repeated and varied exclusionary practices" that cumulatively create significant anticompetitive harm.   Areeda & Hovenkamp ¶ 310c7.

### B.    A Reasonable Jury Could Conclude That Duke's Campaign Against NTE, Viewed As A Whole, Was Anticompetitive

Under the proper standard, a reasonable jury could readily conclude that Duke's course of conduct harmed competition by precluding NTE from the wholesale electric power market and, consequently, decreased consumer welfare by increasing prices and reducing consumer choice.

**1.**  The evidence, considered in the light most favorable to NTE, shows that Duke's actions operated synergistically to prevent NTE—Duke's more efficient rival—from competing for wholesale customers in the Carolinas.  Duke could not compete on price or quality because its plants were older, dirtier, and less efficient.

38

*See supra* pp. 10-11.  That is why Duke embarked on its multipronged campaign to block NTE from competing.  All the components of that campaign—blocking NTE from bringing its power to market, preventing it from competing for key customers, and maligning NTE before important audiences—were designed to derail the "NTE train," JA5733, and immunize its monopoly from having to face *any* competition for the foreseeable future.  A reasonable jury could certainly conclude that Duke was not competing on the basis of "superior efficiency" but rather preventing competition precisely because it *couldn't* compete on that basis.  *Advanced Health-Care*, 910 F.2d at 147; *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.33 (1985) (anticompetitive conduct occurs where "a firm has been 'attempting to exclude rivals on some basis other than efficiency'" (quoting Robert H. Bork, *The Antitrust Paradox* 138 (1978)).

Indeed, Duke's internal documents refute any argument that Duke's maintenance of its monopoly is "a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co.*, 504 U.S. at 481.  ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Duke's management knew it could not "chase the price competition and earn a reasonable return." JA4888.  Because Duke could not compete on price and quality, its executives developed a strategy of preventing competition. ████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Such efforts fall within the heartland of exclusionary conduct. *See*, *e.g.*, Richard A. Posner, *Antitrust Law* 194-95 (2d ed. 2001) (practice is exclusionary if "likely in the circumstances to exclude from the defendant's market an equally or more efficient competitor"); Herbert Hovenkamp, *Exclusion and the Sherman Act*, 72 U. Chi. L. Rev. 147, 153-54 (2005) (same) (citing *LePage's*).[9]

**2.** The record here also contains *direct* evidence of consumer harm from Duke's actions. *See* Areeda & Hovenkamp ¶ 651a (conduct is exclusionary if it "produce[s] [consumer] harms disproportionate to any resulting benefits"); *Aspen Skiing*, 472 U.S. at 605 (noting relevance of "impact on consumers"). The Supreme Court has identified two, independent hallmarks of consumer harm: (1) evidence of actual or probable diminished quantity or quality of output, and (2) evidence of actual or probable supracompetitive prices. *See Brooke Grp.*, 509 U.S. at 237. The district court focused so myopically on trying to fit each component of Duke's

---

[9] Commentators and courts debate whether Section 2 more broadly condemns practices that exclude less efficient rivals from attaining scale needed to become equally efficient, or less efficient rivals that nonetheless constrain the monopolist's prices. But this Court need not address that here given the extensive evidence that NTE was *more* efficient than Duke.

conduct into a recognized doctrinal box that it lost sight of "the purpose of identifying these categories of conduct"—"to help determine the presence or absence of harmful effects"—and thus never considered the substantial evidence of both types of effects. *Viamedia*, 951 F.3d at 453 (internal quotation marks omitted).

First, the record reveals an actual or probable market-wide reduction in the availability of new, high-quality generation due to Duke's exclusionary conduct. NTE's burgeoning success in the Carolinas is evidence that wholesale consumers preferred NTE's product—cleaner, lower-cost energy—over power generated by Duke's older, less efficient plants. The efficiency advantage of NTE's plants over Duke's existing system allowed NTE's wholesale customers to pass their savings to individual retail customers, including rural, low-income residents. Duke's conduct thus deprived Carolina consumers of the ability to choose a superior product. That is classic competitive harm.

Second, there is significant evidence of "sustained supracompetitive pricing" flowing from Duke's exclusionary conduct. *Brooke Grp.*, 509 U.S. at 226. As the district court found, there is direct evidence that Duke has charged supracompetitive prices. *See* JA4171 ("Duke concedes that it was only after it faced significant competition from NTE that it offered to lower its price at [Fayetteville]."); JA4172 ("[A]s reflected in the price of Duke's renewed contract at [Fayetteville], the difference between the maximum price FERC would allow (at least [Fayetteville's]

41

then existing rate) and a 'competitive' price can be substantial.").  The record further shows that Duke will continue to charge supracompetitive prices in the future absent competition from its only serious competitor, NTE.  *See* JA4496 (citing internal document warning that "[i]f the environment remains as competitive as it is today," Duke "will also have to offer them alternative, more competitive solutions to retain the business" of existing customers).  In short, "[t]he anticompetitive consequences of [Duke's conduct] are apparent":  "Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107-08 (1984).

The district court, when analyzing Duke's monopoly power, correctly identified a cognizable threat of anticompetitive harm—yet it failed to perform the most fundamental analysis required to assess whether that harm has occurred:  a comprehensive evaluation of the "economic effects of [Duke's] conduct on consumers, competitors, and [Duke] itself." *Advanced Health-Care*, 910 F.2d at 148.  Had the district court performed the required analysis, it would have found that the record evidence of constrained output and supracompetitive prices, together with Duke's "indisputably high share of the market," JA4170, raises a triable issue as to whether Duke's conduct is exclusionary.

**3.**  The evidence of Duke's subjective anticompetitive intent, *see supra* pp. 11-13, 19-20, also supports a reasonable jury finding that Duke's actions were

exclusionary. *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) ("factfinder could also reasonably infer a specific intent to destroy competition" where "Defendants' officials frequently affirmed their stated goal of preventing [plaintiff] from entering the [relevant] market"); *see infra* p. 45 (discussing *Aspen Skiing*'s consideration of defendant's motive). The district court failed to view Duke's own words in the light most favorable to NTE when it interpreted them merely as "vivid rhetoric regarding [Duke's] intent to compete against NTE" using *legitimate* means. *See* JA4162. A jury could certainly conclude that those statements evinced a desire to *prevent competition*, not to engage in it. *See Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 398 (4th Cir. 1974) (reversing summary judgment in Section 2 case because "issue of intent should not have been resolved on summary judgment"); *accord ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 45, 52-53 (4th Cir. 1983), *on reh'g*, 742 F.2d 170 (4th Cir. 1984).

The district court's fundamental error was refusing to consider the overall effect of Duke's exclusionary scheme. Because there is ample evidence that Duke's anticompetitive acts worked together to perpetuate its monopoly, the court should have denied Duke summary judgment on NTE's Section 2 claims. *See M & M Med. Supplies*, 981 F.2d at 167-68 (reversing summary judgment because plaintiff was entitled to "the inference that the scheme . . . was an anticompetitive one" based on

43

all the evidence); *Conwood*, 290 F.3d at 788 (jury could credit evidence that defendant "engaged in a concerted effort, directed from the highest levels of a national monopoly, to shut [plaintiff] out from effective competition").

## II.   THE DISTRICT COURT ERRED AS A MATTER OF LAW IN REJECTING REFUSAL-TO-DEAL AND PREDATORY-PRICING LIABILITY

The district court compounded its basic legal mistake by erroneously analyzing the individual elements of Duke's anticompetitive scheme.

### A.   A Reasonable Jury Could Find Duke's Refusal To Deal Unlawful

The district court erred in concluding that Duke's termination of the Reidsville interconnection agreement could not constitute an unlawful refusal to deal because NTE did not prove that Duke terminated a prior "*voluntary* course of dealing" or "that Duke refused to provide its interconnection services at a 'retail' price." JA4180 (emphasis added).  Neither voluntariness nor a "retail" price is a necessary element of an unlawful refusal to deal.

**1.**  The district court's error rested on its misreading of *Aspen Skiing* and *Trinko*.  In *Aspen Skiing*, the parties operated adjoining ski mountain areas.  For years, they had issued joint, all-area ski tickets.  Then, suddenly, the defendant cancelled the joint-ticket venture.  The plaintiff offered the defendant a bigger share of the profits and even offered effectively to purchase the defendant's tickets at retail

price.  But the defendant refused to let the plaintiff do even that.  *See* 472 U.S. at 590-94.

In affirming the jury's verdict for the plaintiff, the Court described the key question as the "impact [of the defendant's conduct] on consumers and whether it has impaired competition in an unnecessarily restrictive way."  *Id.* at 605.  "If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."  *Id.* (footnote omitted) (quoting Robert H. Bork, *The Antitrust Paradox* 138).  The Court found that the record "comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival."  *Id.* at 610.

Particularly relevant here, the Court highlighted the defendant's willingness to forgo the profits associated with the joint venture:  "the evidence supports an inference that [the defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival."  *Id.* at 610-11; *see also id.* at 608 ("The jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor.").  As the Court's reasoning makes clear, it was the termination of a prior *profitable* course of dealing that supported the jury's conclusion that the defendant's behavior was exclusionary.

In *Trinko*, the Court reaffirmed *Aspen Skiing* and explained why Section 2 liability was established there: "The unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to *forsake short-term profits to achieve an anticompetitive end*." 540 U.S. at 409 (second emphasis added). As *Trinko* noted, the voluntariness of the prior course of dealing was evidence of its *profitability*, such that terminating the relationship demonstrated anticompetitive malice and effects. *Trinko* went on: "Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* The Court's reference to a "retail" price was not meant to make such a price a bright-line prerequisite to refusal-to-deal liability. Rather, it was further evidence of the defendant's "willingness to forsake short-term profits to achieve an anticompetitive end." *Id.*

*Trinko*'s application of the legal standard to the facts also highlights the district court's error. *Trinko* distinguished *Aspen Skiing* on the ground that the relevant statutory scheme required Verizon to connect to competing carriers' networks *at cost*. As the Court put it: "Verizon's reluctance to interconnect at the *cost-based rate of compensation* available under § 251(c)(3) tells us nothing about dreams of monopoly." *Id.* So *Trinko* did *not* hold that either voluntariness or a retail price is talismanic (much less both). *Trinko* reaffirmed that they are mere proxies

for profitability, because abandoning a profitable deal reveals that the defendant had the purpose and effect of excluding rivals for anticompetitive ends.

The Supreme Court's decision in *Otter Tail* reinforces that conclusion. There, the Court affirmed a jury verdict that Otter Tail had unlawfully refused either to sell or wheel (*i.e.*, transmit) wholesale power to newly established municipal power distribution systems. *Otter Tail*, 410 U.S. at 371-75. Those municipalities had previously purchased Otter Tail's distribution services before building their own competing distribution systems. *Id.* at 370. Once established, Otter Tail refused to sell power to them in the wholesale market. *Id.* at 371. Although Otter Tail had never dealt with those municipal distribution systems (voluntarily or otherwise), its "refusals to sell at wholesale or to wheel were solely to prevent municipal power systems from eroding its monopolistic position" and were therefore unlawful. *Id.* at 378.

The district court brushed aside *Otter Tail* (JA4179-4180) on the ground that the Federal Power Commission ("FPC"), FERC's predecessor, lacked the power to "require[ a monopolist] to share its transmission networks with competitors." But even at the time of *Otter Tail*, the FPC "ha[d] the authority to compel involuntary interconnections." 410 U.S. at 373. True, it could do so "[o]nly if a power company refuse[d] to interconnect voluntarily." *Id.* But given the FPC's compulsory threat, even non-mandated interconnections were not truly "voluntary." Indeed, the FPC

47

compelled interconnection for one of the municipal power systems in *Otter Tail*, *see id.* at 371, yet the Court still found Otter Tail's refusal to deal unlawful.  *See New York v. FERC*, 535 U.S. 1, 8 & n.6 (2002) (utilities' "control of transmission facilities gives them the power . . . to refuse . . . to deliver competitors' power on terms and conditions less favorable than those they apply to their own transmissions" even under FERC's modern regulatory regime).

Other authorities likewise recognize that a prior, voluntary course of dealing and a retail price are not necessary to prove an unlawful refusal to deal.  Areeda and Hovenkamp recognize that *Trinko* "did not categorically restrict the realm of unlawful refusals to situations in which the defendant had voluntarily established and later repudiated a course of dealing with the plaintiff."  Areeda & Hovenkamp ¶ 772d3; *see also id.* (*Trinko* left "open the possibility that 'anticompetitive malice' could be established by" other means.).  Moreover, the American Bar Association's model refusal-to-deal jury instruction does not require a prior, voluntary course of dealing.  Model Jury Instructions in Civil Antitrust Cases ABA-JI-CIVANTI 3.B.2 (Am. Bar. Ass'n June 2016).  The instruction instead requires juries to "decide whether defendant's refusal to deal was motivated solely by an anticompetitive intent" based on "all of the facts and circumstances."  *Id.*

**2.**  Here, a reasonable jury considering all of the facts could find that Duke terminated its interconnection agreement with NTE for anticompetitive ends.  First,

NTE has adduced evidence that, by terminating the interconnection agreement, Duke forsook millions of dollars in short-term profits, including infrastructure upgrades. *See supra* p. 16. After that infrastructure was in place, moreover, Duke would then provide transmission services to NTE at a FERC-approved rate that would guarantee a reasonable profit to Duke. By terminating the interconnection agreement, Duke forsook the profits it would receive from these transmission service revenues. Duke's "willingness to forsake" these "short-term profits" "reveal[s] a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409.

Second, Duke's executives' own statements lay bare Duke's anticompetitive intent. Duke knew it could not compete with NTE on fair terms, ██████████ ████████████████████████████████████████████ JA5086. So it resolved to end that competition altogether. ████████████████ ████████████████████ JA6246, ██████████████████ JA5062. Clearly, a reasonable jury could conclude that Duke's goal was not to promote efficiency or obtain short-run profits, but to kill its only serious competitor. Excluding rivals based on something other than efficiency is the ultimate test for refusals to deal. *See supra* pp. 44-45 (discussing *Aspen Skiing*).

### B.   A Reasonable Jury Could Find That Duke Engaged In Exclusionary Pricing

The district court committed three errors in concluding that Duke's renewal offer to Fayetteville was not exclusionary: (1) ignoring the exclusionary nature of

Duke's conditional rebate structure; (2) holding that prices below average total costs but above average variable costs cannot constitute predatory pricing; and (3) disregarding NTE's evidence that Duke's prices were below both average total and marginal cost.

**1.** The court below ignored NTE's evidence that the *structure* of Duke's offer was exclusionary (in addition to being below cost). The key structural feature of blend-and-extend was massive discounts and rebates conditioned on a long-term renewal agreement with Duke even though NTE's rates in the renewal period—the only period NTE could bid for—were lower than Duke's. As NTE's expert opined, that condition has strong anticompetitive tendencies because it leverages Duke's monopoly position to "exclude more efficient competitors." JA4486; *see* Robert H. Lande, *Should Predatory Pricing Rules Immunize Exclusionary Discounts?*, 2006 Utah L. Rev. 863, 863-64 (2006) ("Unlike 'regular' discounts, . . . retroactive discounts have a strong exclusionary and anticompetitive potential.").

Precisely so here. Duke alone could offer a rebate under its existing contract; since it was charging supracompetitive prices, it could do so without even sacrificing its entire profit. JA4487-4488 (quoting Duke testimony). By conditioning that massive rebate on long-term contract renewal, Duke made it impossible for NTE to compete for that renewal business. Consequently, NTE's expansion plans were

thwarted even though it is a more efficient competitor, and Fayetteville wound up renewing at higher rates than if it had switched to NTE.  JA6224-6227.

The district court overlooked all of this because it was focused solely on exclusionary pricing *levels*.  But the exclusionary tendency of blend-and-extend does not arise only because the pricing *level* is below cost.  Similar to exclusive dealing or tying, the conditional nature of the discount on existing contract prices allows the incumbent to leverage its monopoly to force the customer to forgo a competitor's lower-cost offering.  Rigid price-cost tests are thus inapt, as courts and commentators have observed.[10]  Here, a jury could reasonably find Duke's conditional discount squeezed out NTE based not on a superior or lower-cost product but on the

---

[10] *See*, *e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 273-74, 277-79 (3d Cir. 2012) (applying rule of reason rather than price-cost test to long-term contracts with conditional rebates because "price itself was not the clearly predominant mechanism of exclusion"); Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 Antitrust L.J. 777, 798-99 (2017) ("price-cost tests that turn on profit sacrifice are poor instruments for assessing the anticompetitive tendencies of tactics that do not require such sacrifice"); Jonathan M. Jacobson, *Towards a Consistent Antitrust Policy for Unilateral Conduct* 6 (2009), https://www.wsgr.com/a/web/176/jacobson0209.pdf ("The issue with loyalty discounts is not the price level, as is the case with predatory pricing; the issue is the conditioning of the discount on partial or complete exclusivity.").

exploitation of its incumbent monopoly position.[11]  The district court's blinkered analysis was reversible error.[12]

**2.**  The district court also wrongly held that prices below "total average system costs" and above "marginal cost" or "average variable cost" can never suffice to prove predatory pricing.  JA4187-4188.  The Supreme Court has never endorsed one "correct" measure of costs for predatory-pricing liability.  *See Brooke Grp.*, 509 U.S. at 222 n.1.  However, authority in this and other Circuits establishes that average total cost measures can establish predation.

In *Greenville Publishing*, this Court considered predatory-pricing liability where the defendants argued (as Duke does here) that the proper measure of costs should exclude "fixed expenses."  496 F.2d at 397-98.  This Court disagreed, however, reversing summary judgment and concluding that "[t]he sum of th[e] evidence present[ed] an issue of disputed fact."  *Id.* at 398.

---

[11] To be clear, Duke's rebate does not indicate it could produce electricity more efficiently—the record shows NTE had lower costs.  Rather, Duke's rebate exploited its monopoly position and supracompetitive profits under the existing contract.

[12] *See also U.S. Philips Corp. v. Windmere Corp.*, 861 F.2d 695, 703 (Fed. Cir. 1988) (reversing summary judgment where district court's predatory-pricing analysis "took too narrow a view of the kind of evidence that will support" monopolization); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 938, 951-53 (6th Cir. 2005) (reversing summary judgment because district court wrongly found "the cost issue to be determinative").

Other Circuits have stated that average total costs can be an appropriate measure. The Eleventh Circuit has held that average total costs are *the* presumptive benchmark in predatory pricing cases. *See McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1500 (11th Cir. 1988). And three Circuits hold that average total costs can establish predation, especially when combined with evidence of exclusionary intent. *See, e.g., Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 938, 946 (6th Cir. 2005) (pricing "below average total cost" can be predatory, and courts should also look to factors such as the existence of "barriers to entry"); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1035-36 (9th Cir. 1981) (same); *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1346 (8th Cir. 1987) (same).

These cases rightly reject "rigid adherence to a particular cost-based rule" and instead recognize that the "ultimate standard" is whether prices have a "tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *William Inglis*, 668 F.2d at 1035. Here, there is ample evidence that Duke's pricing did just that: Duke offered such a massive discount that NTE could not win the Fayetteville contract even though it produced power more efficiently. The district court erred in categorically rejecting an average total costs measure and ignoring the evidence that Duke's cut-rate pricing

53

and conditional discounting allowed Duke to squeeze out NTE and maintain its monopoly position.

**3.** The district court further erred by failing to construe the factual record in the light most favorable to NTE.

First, the district court ignored NTE's evidence that Duke's prices were, considering the discount, below *marginal* costs. *See supra* pp. 14-15 (describing Dr. Morris's opinions). NTE emphasized this point repeatedly—yet the district court improperly ignored the record evidence. ███████████████████████████

███████████████████████████████████████████████████████

████████████████████ JA4060, JA4063 ("Duke's offer to Fayetteville was below marginal cost" and "average system cost" in the wholesale energy market equates to "below marginal cost" pricing); *see also Greenville Publ'g*, 496 F.2d at 397-98 (dispute as to the proper "method of cost accounting" presented "an issue of disputed fact" inappropriate for summary judgment); *Spirit Airlines*, 431 F.3d at 945; *William Inglis*, 668 F.2d at 1036, 1038.

Second, the district court mischaracterized Dr. Morris's deposition testimony as conceding that Duke's Fayetteville renewal pricing "contributed" $90 million "towards fixed costs above variable or marginal costs." JA4189. ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



**4.** Finally, the district court erred in stating (in a footnote) that a reasonable jury could not find a dangerous probability of recoupment. JA4189. NTE marshalled substantial evidence that Duke anticipated recouping the losses to Fayetteville—upon driving its only viable competitor out of the market—by charging supracompetitive prices. JA4414-4422; JA4663-4664 (Duke planned to recoup its costs through cross-subsidization and charging an even "higher price than offered by the competition" once the renewed contract expired); *see supra* pp. 7-8 (FERC regulations do not preclude supracompetitive prices).

## III.   THE DISTRICT COURT'S REFUSAL TO RECUSE WARRANTS VACATUR AND REMAND TO A DIFFERENT JUDGE

For the reasons above, the grant of summary judgment should be reversed. Because Judge Bell improperly refused to recuse, this Court should remand to a new district judge for trial. Moreover, Judge Bell's erroneous refusal to recuse is an independent ground to vacate the summary judgment.

### A.   Judge Bell's 2019 Recusal Required His Recusal In 2021

Once recused, a judge is "*out of service* insofar as that particular case is concerned" and "should take no action which would possibly affect the outcome of [the] case." *Arnold v. E. Air Lines, Inc.*, 712 F.2d 899, 904-05 (4th Cir. 1983) (en banc) (per curiam).  This "once-recused, always recused" rule is consistent across the Circuits.  *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1037 n.14 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 487 (2022); *United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997); *El Fenix de P.R. v. M/Y JOHANNY*, 36 F.3d 136, 141 (1st Cir. 1994); *Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir. 1988); *Stringer v. United States*, 233 F.2d 947, 948 (9th Cir. 1956); 13D Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3550 (3d ed. Apr. 2022 Update).  Judge Bell thus should have recused in 2021, because he had recused in 2019 when his former firm appeared for Duke.

Judge Bell claimed his 2019 withdrawal "did not reflect a considered 'recusal'" but was merely a "prophylactic measure" "to avoid the need to even consider recusal in any particular case" involving his prior firm.  JA342-343.  But a decision not to sit for a case because of a potential conflict of interest is the very definition of a recusal.  *See Recusal*, Black's Law Dictionary (11th ed. 2019) ("Removal of oneself as judge or policy-maker in a particular matter, especially because of a conflict of interest.").  Tellingly, Judge Bell offered no authority

supporting his distinction. Indeed, Judge Bell himself observed that "a judge has 'as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require.'" JA338. His decision not to sit was a recusal, plain and simple.

Regardless, the "once recused, always recused" rule admits no exceptions for supposedly "prophylactic" recusals. Indeed, even *erroneous* recusals are subject to the "no takebacks" rule. *See O'Keefe*, 128 F.3d at 891 ("Once a judge recuses himself from a case, the judge may take no action . . . even when the recusal is improvidently decided."); *El Fenix*, 36 F.3d at 141-42 ("no authority for" the proposition that "an improvident recusal order may be revisited by the recused judge"). This rule "safeguards not only the litigants' constitutional entitlement to an unbiased adjudication, . . . but [also] the public's perception of the integrity of the judicial process." *Id*. at 142 n.7.

### B.   Judge Bell's Refusal To Recuse Requires Remand To A New District Judge

The appropriateness of vacatur depends on a harmless-error analysis that considers (1) the risk of injustice to the parties, (2) the risk that denying relief will prejudice future cases, and (3) the risk of undermining public trust in judicial processes. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988). Here, Judge Bell's refusal to recuse was not harmless error. It creates the very appearance of impropriety that the recusal statute, 28 U.S.C. § 455(a), was intended

to prevent. And that appearance is exacerbated by the district court's numerous errors of law in ruling for his former law firm's client and his former law partner. Upholding that decision would be unfair to NTE and undermine public confidence in the judiciary. *Cf. Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 495-96 (5th Cir. 2022) (ordering reassignment where the trial judge "pre-judged the case . . . from the outset" and "candidly revealed his disdain for antitrust law and antitrust plaintiffs").

## CONCLUSION

This Court should reverse the order granting summary judgment to Duke and remand to a new judge for trial. Alternatively, it should vacate the summary judgment order and remand to a new judge for reconsideration.

## REQUEST FOR ORAL ARGUMENT

NTE respectfully requests oral argument. Given the complexity and record-intensive nature of this appeal, and the presence of important questions regarding the interpretation of the Sherman Act, oral argument would assist the Court's consideration.

March 13, 2023

Respectfully submitted,

*/s/ Derek T. Ho*

Derek T. Ho
Matthew J. Wilkins
Caroline A. Schechinger
Jonathan I. Liebman*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Admitted only in New York;
supervised by members of the firm

*Counsel for Counterclaimants-Appellants*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __22-2168__    **Caption:** __NTE Carolinas II, LLC v. Duke Energy Carolinas, LLC__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___12,932___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
___Microsoft Word 2016___ [*identify word processing program*] in
___Times New Roman 14-point___ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) __Derek T. Ho__

Party Name __NTE Carolinas II, LLC et al.__

Dated: __March 13, 2023__

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 13, 2023, I electronically filed the foregoing Opening Brief for Counterclaimants-Appellants with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Derek T. Ho*
Derek T. Ho