No. 22-2168

# In the United States Court of Appeals for the Fourth Circuit

---

NTE CAROLINAS II, LLC; NTE CAROLINAS II HOLDINGS, LLC; NTE ENERGY LLC; NTE SOUTHEAST ELECTRIC COMPANY, LLC; NTE ENERGY SERVICES COMPANY, LLC; AND CASTILLO INVESTMENT HOLDINGS II, LLC,

*Appellants,*

v.

DUKE ENERGY CAROLINAS, LLC; Duke Energy Progress, LLC; and Duke Energy Corporation,

*Appellees.*

---

On Appeal from the United States District Court for the Western District of North Carolina, Charlotte Division (No. 3:19-cv-515) (The Hon. Kenneth D. Bell)

---

## BRIEF OF APPELLEES

---

JASON D. EVANS
TROUTMAN PEPPER
HAMILTON SANDERS LLP
301 S. College St., 34th Floor
Charlotte, NC 28202
(704) 916-1502
jason.evans@troutman.com

DOUGLAS GREEN
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3000
dgreen@steptoe.com

JEFFREY B. WALL
MORGAN L. RATNER
DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellee Duke Energy Corporation is a publicly held corporation. Duke Energy Corporation has no parent corporation, and no publicly held corporation has 10 percent or greater ownership in Duke Energy Corporation.

Appellees Duke Energy Carolinas, LLC and Duke Energy Progress, LLC are owned by Duke Energy Corporation.

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES .....................................................5

STATEMENT OF THE CASE .........................................................5

    A.    Factual Background .........................................................5

        1.    NTE enters the market for wholesale electricity in North Carolina .........................................................5

        2.    NTE stakes its expansion on winning Fayetteville ..............7

        3.    Duke competes for and wins Fayetteville............................8

        4.    NTE fails to pay its bills under the Interconnection Agreement .......................................................................11

    B.    Procedural History .........................................................13

        1.    The district court denies NTE's recusal motion .................13

        2.    The district court rejects NTE's antitrust claims .............15

        3.    The parties settle Duke's contract claims...........................18

STANDARD OF REVIEW ...............................................................18

SUMMARY OF ARGUMENT..........................................................18

ARGUMENT ....................................................................................22

I.   NTE Failed To Produce Evidence That Duke Violated The Sherman Act ................................................................................22

A.   Duke's Cancellation Of The Interconnection Agreement
     Was Not An Unlawful Refusal To Deal.............................................24

B.   Duke's Fayetteville Bid Was Not Predatory.................................32

     1.   NTE cannot establish either element of a predatory-
          pricing claim ............................................................................32

          a.   NTE offered no evidence of below-cost pricing........33

          b.   NTE offered no evidence of recoupment...................40

     2.   NTE's claim is barred by the filed-rate doctrine...............43

C.   NTE Cannot Establish A Sherman Act Violation Without
     Demonstrating Specific Unlawful Conduct ..................................46

     1.   NTE cannot aggregate its claims to prove a Sherman
          Act violation.............................................................................47

     2.   Even in the aggregate, NTE has not demonstrated
          anticompetitive conduct .........................................................54

II. Judge Bell Did Not Abuse His Discretion By Denying NTE's
    Recusal Motion .......................................................................................59

    A.   Judge Bell Was Not Required To Recuse....................................60

    B.   Vacatur Would Not Be An Appropriate Remedy .......................63

CONCLUSION............................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.A. Poultry Farms, Inc.* v. *Rose Acre Farms, Inc.*,
  881 F.2d 1396 (7th Cir. 1989)................................................................40

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014) .................................................26, 28, 59

*Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*,
  910 F.2d 139 (4th Cir. 1990)................................................................54

*Arminak & Assocs., Inc.* v. *Saint-Gobain Calmar, Inc.*,
  789 F. Supp. 2d 1201 (C.D. Cal. 2011) ..............................................48

*Arnold* v. *Eastern Air Lines, Inc.*,
  712 F.2d 899 (4th Cir. 1983) (en banc)...............................................60

*Arsberry* v. *Illinois*,
  244 F.3d 558 (7th Cir. 2001)................................................................44

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).................................................................25, 27, 29

*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)......................2, 16, 20, 32, 33, 35, 36, 37, 38, 39, 40, 41, 50

*California Dental Ass'n* v. *FTC*,
  526 U.S. 756 (1999)..............................................................................57

*Christy Sports, LLC* v. *Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009)............................................................28

*City of Anaheim* v. *Southern Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992)..............................................................52

*City of Groton* v. *Connecticut Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) ...........................................................45, 47

*City of Kirkwood* v. *Union Elec. Co.*,
   671 F.2d 1173 (8th Cir. 1982) ..............................................................45

*Concord Boat Corp.* v. *Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ..............................................................36

*Continental Ore Co.* v. *Union Carbide & Carbon Co.*,
   370 U.S. 690 (1962)......................................................................50, 51

*Cost Mgmt. Servs.* v. *Washington Nat. Gas. Co.*,
   99 F.3d 937 (9th Cir. 1996)............................................................45, 46

*Eatoni Ergonomics, Inc.* v. *Research in Motion Corp.*,
   486 Fed. Appx. 186 (2d Cir. 2012) ......................................................48

*Essential Commc'ns Sys., Inc.* v. *American Tel. & Tel. Co.*,
   610 F.2d 1114 (3d Cir. 1979) ..............................................................45

*Greenville Publ'g Co., Inc.* v. *Daily Reflector, Inc.*,
   496 F.2d 391 (4th Cir. 1974)................................................................38

*Intergraph Corp.* v. *Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999) ......................................................47, 49

*In re Intuniv Antitrust Litig.*,
   496 F. Supp. 3d 639 (D. Mass. 2020)..................................................16

*It's My Party, Inc.* v. *Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016)..........................................................49, 59

*James* v. *O'Reilly*,
   2019 WL 1996919 (V.I. May 1, 2019) ................................................62

*Keogh* v. *Chicago & N.W. Ry. Co.*,
   260 U.S. 156 (1922)..............................................................................43

*Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*,
   748 F.3d 160 (4th Cir. 2014)..........................................................18, 51

*LePage's, Inc.* v. *3M*,
   324 F.3d 141 (3d Cir. 2003) ................................................................52

*Lifschultz Fast Freight, Inc.* v. *Consolidated Freightways Corp. of Del.*, 805 F. Supp. 1277 (D.S.C. 1992)....................................44, 45

*Liljeberg* v. *Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)....................................................................18, 63

*Loren Data Corp.* v. *GXS, Inc.*,
501 Fed. Appx. 275 (4th Cir. 2012)..................................26, 28, 29

*Louisiana Energy & Power Auth.* v. *FERC*,
141 F.3d 364 (D.C. Cir. 1998)..............................................42, 44

*Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................41

*MCI Commc'ns Corp.* v. *American Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983)...............................................34

*Moody* v. *Simmons*,
858 F.2d 137 (3d Cir. 1988) ...................................................60

*New York* v. *Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ..................................48, 51, 53

*New York* v. *Meta Platforms, Inc.*,
2023 WL 3102921 (D.C. Cir. Apr. 27, 2023) ........................26, 53

*Northeastern Tel. Co.* v. *AT&T*,
651 F.2d 76 (2d Cir. 1981) .....................................................49

*Novell, Inc.* v. *Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013)...........................................26, 30, 46

*Old Dominion Elec. Coop.* v. *PJM Interconnection, LLC*,
24 F.4th 271 (4th Cir. 2022) ..................................................44

*Otter Tail Power Co.* v. *United States*,
410 U.S. 366 (1973)............................................................30, 31

*Pacific Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................................................24, 26, 48, 52

*Pinney Dock & Transp. Co.* v. *Penn Cent. Corp.*,
   838 F.2d 1445 (6th Cir. 1988) ...................................................... 43, 44

*Professional Real Est. Invs., Inc.* v. *Columbia Pictures Indus.,*
   *Inc.*, 508 U.S. 49 (1993) ...................................................... 50

*Spirit Airlines, Inc.* v. *Northwest Airlines, Inc.*,
   431 F.3d 917 (6th Cir. 2005) ...................................................... 38

*Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986) ...................................................... 20, 43, 45

*St. Luke's Hosp.* v. *ProMedica Health Sys., Inc.*,
   8 F.4th 479 (6th Cir. 2021) ...................................................... 26, 28

*Stringer* v. *United States*,
   233 F.2d 947 (9th Cir. 1956) ...................................................... 60

*Swift & Co.* v. *United States*,
   196 U.S. 375 (1905) ...................................................... 51

*Tri-State Rubbish, Inc.* v. *Waste Mgm't, Inc.*,
   998 F.2d 1073 (1st Cir. 1993) ...................................................... 33

*United States* v. *Atwood*,
   941 F.3d 883 (7th Cir. 2019) ...................................................... 63

*United States* v. *Colgate & Co.*,
   250 U.S. 300 (1919) ...................................................... 24

*United States* v. *Davis*,
   801 Fed. Appx. 75 (4th Cir. 2020) ...................................................... 63

*United States* v. *DeTemple*,
   162 F.3d 279 (4th Cir. 1998) ...................................................... 62

*United States* v. *Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) (en banc) ...................................................... 49, 54

*United States* v. *O'Keefe*,
   128 F.3d 885 (5th Cir. 1997) ...................................................... 64

*Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)................................ 16, 19, 24, 25, 26, 27, 28, 29, 30, 31, 50

*Viamedia, Inc.* v. *Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020)...................................................................26, 49

*Virgin Atlantic Airways, Ltd.* v. *British Airways PLC*,
257 F.3d 256 (2d Cir. 2001) ...................................................................36

*Wai Man Tom* v. *Hospitality Ventures, LLC*,
980 F.3d 1027 (4th Cir. 2020).................................................................41

*Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312 (2007).................................................................................33

*William Inglis & Sons Baking Co.* v. *ITT Cont'l Baking Co.*,
668 F.2d 1014 (9th Cir. 1981)................................................................34

*Williamson* v. *Indiana Univ.*,
345 F.3d 459 (7th Cir. 2003).................................................................64

*ZF Meritor, LLC* v. *Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ..................................................................37

**Statutes:**

15 U.S.C. § 2 .........................................................................................13

16 U.S.C. § 824d ................................................................................7, 43

16 U.S.C. § 825l(b).................................................................................7

**Regulations:**

18 C.F.R. pt. 101..................................................................................42

18 C.F.R. § 37.6(a)...............................................................................55

18 C.F.R. § 385.206 .......................................................................7, 11, 43

18 C.F.R. § 385.211 .......................................................................7, 11, 43

18 C.F.R. § 385.214 ...................................................................7, 11, 43

61 Fed. Reg. 21,540 (May 10, 1996) .............................................6, 27

68 Fed. Reg. 49,846 (Aug. 19, 2003) ............................................6, 27

171 FERC ¶ 61,128 (2020)................................................................12

**Other Authorities:**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
    (4th ed. 2013) .......................................................34, 38, 51, 53

Brief of United States as Amicus Curiae, *New York* v. *Facebook*,
    No. 21-7078 (D.C. Cir. 2022).................................................53

Daniel A. Crane, *Does Monopoly Broth Make Bad Soup?*
    76 Antitrust L.J. 663 (2010) .................................................51

FERC, *Energy Primer: A Handbook for Energy Market Basics*
    (Apr. 2020) .............................................................................42

Herbert Hovenkamp, *Federal Antitrust Policy* (1994) ....................45

Robert H. Lande, *Should Predatory Pricing Rules Immunize
    Exclusionary Discounts?*, 2006 Utah L. Rev. 863 (2006)............37

Fiona Scott Morton & Zachary Abramson, *A Unifying
    Analytical Framework For Loyalty Rebates*, 81 Antitrust
    L.J. 777 (2017) .......................................................................37

## INTRODUCTION

This is a contract dispute dressed up as an antitrust case. Duke and NTE both sell wholesale electric power in the Carolinas. Although the two firms compete in that market, only Duke has its own transmission network to reach customers. So NTE signed an Interconnection Agreement to access Duke's network, and NTE agreed to pay Duke nearly $60 million between 2017 and 2020. Shortly after they signed the contract, NTE and Duke competed to sell wholesale power to the same customer, the Fayetteville Public Works Commission, and Duke won. NTE then stopped paying Duke under the interconnection contract. In response, Duke did what any sensible business would do: it canceled the contract and sued NTE for the nearly $7 million owed. The parties later settled their contract dispute, and NTE confessed judgment on Duke's breach-of-contract claim.

From that routine commercial conduct, NTE tries to manufacture an antitrust suit in three ways. First, NTE claims (at 44-49) that Duke's cancellation of the Interconnection Agreement amounted to an unlawful refusal to deal. But Duke obviously did not refuse to deal with NTE. It contracted with NTE and ceased performing that contract *only after NTE stopped paying*. Duke was perfectly willing to deal; it was not willing to

provide its services for free.  NTE remarkably ignores that elephant in the room.  It complains that Duke "abandon[ed] a profitable deal" in order "to kill its only serious competitor," Br. 47, 49—but a deal is only profitable when the other party actually pays what it owes.

Second, NTE claims (at 49-55) that Duke unfairly competed to keep Fayetteville's business by engaging in predatory pricing.  According to NTE, Duke violated the Sherman Act when it gave Fayetteville a price break on its then-existing contract if Fayetteville would renew the contract.  Businesses do that all the time:  it is an accepted form of competition.  To show predatory pricing under the Supreme Court's seminal decision in *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), NTE had to show that (1) Duke set prices below its variable costs (meaning that it charged Fayetteville less than its cost to produce the additional electricity) and (2) Duke could recoup those losses by charging monopoly prices in the future once it had supposedly driven NTE out of the wholesale market.

As the district court explained, NTE had no evidence of either.  On pricing, Duke's rate break to Fayetteville meant that its profits on the contract dropped from $100 million to $60 million—but either way, Duke still far exceeded its costs to supply Fayetteville with electricity.  In other words,

Duke surrendered some, but not all, profit to retain a valued customer in the face of pressure from a rival. That is the essence of competition, not predatory pricing. On recoupment, NTE offered only a conclusory statement or two. And for good reason: Duke could not charge monopoly prices in the future because, under federal law, its rates must be based on its costs and approved by the Federal Energy Regulatory Commission. FERC's cost-based formula makes NTE's predatory-pricing allegation implausible, if not impossible.

Third, because NTE has no traditional antitrust claim, it tries its hand (at 30-44) at inventing a novel one. It strings together Duke's cancellation of the Interconnection Agreement, its bid for Fayetteville, and its breach-of-contract suit—and argues that Duke's broader "course of conduct" was unlawful. The problem is that each of those acts has its own legal test, and under those tests, Duke did not refuse to deal, engage in predatory pricing, or bring sham litigation. Simply put, no court has allowed antitrust plaintiffs to cobble together a series of lawful acts to prove monopolization. Regardless, even if aggregation were permitted, none of the underlying conduct here was itself anticompetitive. As the district court explained in its

thorough opinion, "[i]n simple mathematical terms, $0 + 0 = 0$." JA4176. This is a case of true zeroes, not compounding fractions.

In a last-ditch effort to salvage a vacatur of the judgment below, NTE briefly argues (at 55-58) that Judge Bell should not have heard this case. Upon joining the bench, Judge Bell adopted a prophylactic policy that he would not preside over cases for two years involving his former firm, McGuireWoods. Under that policy, this case was automatically and administratively transferred to another judge. As a result of recusals, however, the case was reassigned to Judge Bell years later, when McGuireWoods was no longer involved. Judge Bell therefore explained that there was no reason why he could not hear the case. NTE claims that once recused, always recused—but an administrative reassignment is not a considered decision to recuse. And even if it were, vacatur is not an appropriate remedy because Judge Bell had no actual bias and so his hearing the case did not harm NTE. The judgment below should be affirmed.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that NTE failed to produce evidence to support its federal antitrust claims.

2.    Whether the district court abused its discretion in determining that an earlier administrative reassignment of this case did not require a later recusal.

## STATEMENT OF THE CASE

**A.    Factual Background**

### 1.    NTE enters the market for wholesale electricity in North Carolina.

Duke sells wholesale electricity in the Carolinas.  It is a large energy utility with its own power plants and a large transmission network for transporting energy to its customers.  By contrast, NTE is a Florida-based "independent power producer," meaning that it operates its own power plants but relies on other firms' transmission lines to reach the market.  JA4160-4161.  In 2014, NTE decided to enter the wholesale electricity market in North Carolina by developing its first natural-gas power plant, the Kings Mountain Energy Center, and contracting with Duke to connect that plant to Duke's network.

Contracts like the one for transmitting electricity from Kings Mountain are the product of an extensive federal regulatory regime. The Federal Energy Regulatory Commission requires energy utilities like Duke that own transmission networks to provide access to power producers like NTE that do not. Specifically, utilities like Duke are required to provide competitors with open access to their transmission networks and to treat competitors' transmission needs no differently from their own. *See* 61 Fed. Reg. 21,540, 21,541 (May 10, 1996). FERC adopted those "open access" rules in 1996 to further "competition in the wholesale bulk power marketplace." *Id.*

To implement those regulations, FERC has developed a "single set of procedures" to ensure that independent power producers can connect to transmission networks and that utilities are fairly compensated for the costs associated with those connections. 68 Fed. Reg. 49,846, 49,848 (Aug. 19, 2003). FERC has also developed "a single, uniformly applicable [interconnection] agreement[]" that both parties must adhere to when connecting their infrastructure. JA525. Those standard agreements thus govern interconnection by power producers to utilities' networks.

FERC also regulates the prices that Duke may charge to its wholesale customers. FERC regulations require Duke to charge prices pegged to its costs. JA3465-3467. Duke must submit its contracts to FERC, which must reject rates that are not "just and reasonable." 16 U.S.C. § 824d; JA3465. Any interested party that believes Duke's rates are unreasonable has several options for challenging them before FERC, *see* 18 C.F.R. §§ 385.206, 385.211, 385.214, with the option of judicial review if it disagrees with the agency's decision, *see* 16 U.S.C. § 825l(b).

### 2.    NTE stakes its expansion on winning Fayetteville.

The Kings Mountain contract was never an issue. Duke provided NTE access to its network, even though NTE lured some customers away from Duke, and NTE paid what it owed. JA4618. A few years later, however, NTE decided to build a new power plant in Reidsville, North Carolina. JA4621-4622. NTE hoped that the Reidsville facility would serve as a hub for further expansion into North Carolina, and it aggressively marketed the facility to potential customers. *Id*.

In order to reach those customers, NTE again needed access to Duke's transmission network. In 2017, Duke and NTE executed an Interconnection Agreement for Reidsville. JA4162. That Agreement required Duke to

construct certain "interconnection facilities" and "network upgrades" to link Reidsville to its existing infrastructure.  JA575, JA5371.  Those upgrades would cost Duke more than $59 million, and NTE promised in the Agreement to reimburse Duke for those costs in installments between 2017 and 2020.  JA575.

After two years spent promoting Reidsville, NTE had signed up only three customers for the facility.  JA1810.  To make Reidsville viable, and to obtain additional funding from its lenders, NTE needed a contract with a large customer.  It focused on one:  the Fayetteville Public Works Commission.  JA604-605 (89:4-90:17).  The problem for NTE was that Fayetteville was already under contract with Duke.  Although that contract ran through 2032, it gave Fayetteville the right to terminate the agreement early in 2024.  JA4163.  NTE's hopes for the Reidsville facility thus hung on convincing Fayetteville to exercise that early-termination option and choose NTE instead.

### 3.    Duke competes for and wins Fayetteville.

That gamble did not pay off.  Rather than surrender Fayetteville's business, Duke decided to lower its prices and compete.  In 2019, it began negotiating a new deal with Fayetteville.  Under the original agreement,

-8-

Duke sold Fayetteville electrical power from its own power plants and also bought excess power produced by Fayetteville's power plant, which Duke could potentially sell to other customers. JA3462. To make its new offer more competitive, Duke agreed to sell electricity under the current contract at a lower rate, and to pay more for electricity from Fayetteville going forward. JA4164; *see* JA3463-3464, JA6613-6614.

That proposal made good economic sense for Duke. In a report to its Board of Directors, Duke's sales team explained that losing Fayetteville in 2024 would cost it $100 million in net profits per year, requiring Duke to raise costs on other customers to make up the shortfall. JA2819, JA6614. But by offering a discount to keep Fayetteville's business, Duke could keep $60 million of those profits and lessen the burden on other customers. *Id.*

Fayetteville considered Duke's offer alongside four others—including one from NTE—and brought in an independent consultant, GDS & Associates, to advise on the best option. JA1383, JA1291. GDS concluded that Duke's bid (labeled "DEP" below) offered the greatest advantages, including benefits that no other bidder could match:

Power Supply Advantages & Disadvantages

| Qualitative Elements | DEP | ▮▮▮ | NTE | ▮▮▮ | ▮▮▮ |
|---|---|---|---|---|---|
| **ADVANTAGES** | | | | | |
| Savings Prior to 2024 | X | | | | |
| Native Load Status | X | | | | |
| Fuel Diversity | X | X | | | |
| Fixed Price | | | | X | X |
| Term Flexibility (evergreen & 3 yr. notice) | X | | | | |
| Greater Butler-Warner Value | X | | | | |
| Low Supplier Credit Risk | X | | | | |
| Competitive Positioning (DEP) | X | | | | |
| **DISADVANTAGES** | | | | | |
| Legacy Costs (coal ash, decomm., etc.) | X | | | | |
| Regulatory Risks | X | | | | |
| Lack of Fuel of Diversity | | | X | | |
| Additional Transmission Risk | | X | | X | X |
| No Direct Generation Source | | | | X | X |
| High Supplier Credit Risk | | | X | | |
| PWC Rating Impact | | | X | | |

GDS Associates, Inc. ENGINEERS & CONSULTANTS          **Closed Session**          17

JA1383.   As GDS explained, "Duke relie[d] on multiple fuel sources, [including] nuclear, coal, natural gas, … renewables, [and] hydro facilities," which protected against "a shortage or price spike in any one of those fuel sources." JA1274; *see* JA1283.  Duke also had "low supplier credit risk," which Fayetteville considered "important" when evaluating bids.  JA1279, JA1383.

By contrast, GDS did not identify "any power supply advantages for NTE's proposal."  JA1280, JA1383.  Instead, it identified several distinct disadvantages.  NTE planned to service Fayetteville from a single power plant (Reidsville), which meant it was unknown whether NTE could "secure additional supplies" if demand were "greater than they anticipated" or if

-10-

"there were problems with the plant." JA1280-1282. Similarly, NTE relied on a single fuel source (natural gas), which increased potential "cost volatility" for Fayetteville. JA1283; *see* JA1384. GDS also rated NTE as a high credit risk, and noted that choosing NTE could harm Fayetteville's own credit rating. JA1285-1286; *see* JA1383. NTE's bid was also more expensive. JA1384.

On May 24, 2019, Fayetteville and Duke signed a letter of intent for their renewed agreement. JA1391. Duke then submitted that agreement to FERC for review and approval, providing detailed information on the new rates. JA3490-3491. At that point, NTE had "at least three ways" to challenge Duke's rates if it thought they were unfair. JA4165. It could have filed a complaint with FERC, intervened in Duke's request to file its new rates, or protested the rate. *See* 18 C.F.R. §§ 385.206, 385.211, 385.214. NTE did not do any of those, and FERC approved Duke's rates in January 2020. JA3480-3482.

### 4. NTE fails to pay its bills under the Interconnection Agreement.

Meanwhile, NTE continued struggling to find new customers for Reidsville and began to miss payments under the Interconnection Agreement. It failed to make a $2.5 million payment due on March 1, 2019,

-11-

then missed a $4.5 million payment due on May 1, 2019. Two weeks later—and less than a month after Fayetteville considered NTE's proposal—NTE asked Duke to suspend the Agreement altogether to keep the bills from rolling in. JA4165-4166.

The parties' Agreement required NTE to pay Duke certain costs if it suspended the contract, including the $7 million that NTE had already failed to pay before the suspension. JA447. Duke tried for months to recover the money owed from NTE, including by submitting invoices for payment and by meeting with NTE to discuss the dispute. JA1707-1709, JA3855-3860. When NTE refused to pay, Duke terminated the Interconnection Agreement. Pursuant to FERC regulations, Duke posted notice of that "termination" to its Open Access Same-Time Information System (OASIS), which provides data on electric-power transmission. JA4166-4167.

NTE petitioned FERC for an order declaring that Duke should have "suspended" rather than "terminated" the Reidsville project, arguing that Duke could formally "terminate" only after obtaining FERC approval. 171 FERC ¶ 61,128, ¶ 8 (2020). FERC granted NTE's petition (with Duke's assent) in order "to remove uncertainty regarding the termination provisions in the" Interconnection Agreement. *Id.* ¶¶ 15, 27. FERC concluded that its

-12-

approval was required to terminate, but made clear that it was not addressing the merits of the parties' contract dispute. *Id.* ¶¶ 27, 29. The only thing that changed after FERC's order was that Duke switched the status of the Reidsville project in OASIS from "terminated" to "suspended." That status has not changed, and NTE has made no request to resume service. JA4167-4168.

### B.    Procedural History

In September 2019, after five months of not receiving the $7 million that NTE owed on the Interconnection Agreement, Duke sued NTE in North Carolina state court for breach of contract and other state-law claims. NTE removed the case to federal court and filed counterclaims, asserting that Duke had breached the contract; engaged in monopolization and attempted monopolization prohibited by the Sherman Act, 15 U.S.C. § 2; and violated state unfair-competition and unfair-trade-practices laws.

### 1.    The district court denies NTE's recusal motion.

When NTE removed its case to federal district court, it was initially assigned to Judge Mullen. It was then reassigned to Judge Bell a few months later. Before joining the bench, Judge Bell practiced at McGuireWoods LLP, and he had a "policy that all cases involving McGuireWoods would, as a prophylactic measure and for administrative

-13-

convenience, not be assigned to [him] for two years following the beginning of his judicial service." JA342-343. When a McGuireWoods partner entered an appearance for Duke in December 2019, the clerk's office reassigned the case to Judge Mullen, pursuant to Judge Bell's prophylactic policy. The case was then reassigned again to Judge Cogburn. When Judge Cogburn later recused himself based on a conflict, it was reassigned yet again to Judge Bell.

At that point, Judge Bell had been on the bench for more than two years, so his prophylactic policy no longer applied. In addition, McGuireWoods was no longer involved in the case. NTE nevertheless argued that Judge Bell could not hear the case because he had already "recused" and could not "reconsider" that decision. JA253-257. Judge Bell disagreed. He explained that the earlier reassignment to Judge Mullen "did not reflect a considered 'recusal' so as to invoke any 'rule' prohibiting assignment of a case to a judge following an earlier recusal in the same matter." JA343. Instead, it was the result of his policy meant "to avoid the need to even consider recusal in any particular case." *Id.* Judge Bell also explained that "the circumstances here do not in any way implicate the reasoning behind not permitting 'reconsideration' of recusals (*i.e.*, to avoid

the possibility of mischief)," as the case had been reassigned to him only after Judge Cogburn had recused. *Id.*

NTE also asserted that Judge Bell was required to recuse because a fair-minded observer would reasonably question his partiality. Judge Bell rejected that argument, writing that it was "wholly meritless and frankly raise[d] the strong suspicion that NTE's recusal motion is simply judge shopping." JA343-344.

### 2.    The district court rejects NTE's antitrust claims.

Duke moved for summary judgment. The district court denied summary judgment on Duke's contract claims, leaving those claims for trial. But the court granted summary judgment to Duke on NTE's antitrust counterclaims.

At the outset, the district court rejected NTE's argument that it could prove a Sherman Act violation "even if none of the alleged exclusionary acts are unlawful by themselves." JA4176. The court explained that NTE had pointed to no decision suggesting it was proper to aggregate lawful, competitive conduct. On the contrary, NTE's authorities reasoned that claims could be considered together only after a plaintiff had shown "at least one instance of conduct that is not protected from antitrust scrutiny."

JA4177 (quoting *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 680 (D. Mass. 2020)).  As the court explained, "adding up several instances of lawful conduct cannot total unlawful conduct.  In simple mathematical terms, $0 + 0 = 0$." JA4176.

The district court then considered NTE's specific antitrust claims, holding that each one failed as a matter of law.  First, the court held that Duke's decision to terminate the Interconnection Agreement was lawful.  It explained that NTE's allegations were "almost identical" to those rejected by the Supreme Court in *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-409 (2004), which involved a dispute over a federally regulated interconnection agreement in the telecommunications industry.  JA4179.  The court also determined that Duke had an obvious procompetitive reason for terminating the Interconnection Agreement: "NTE [had] stopped making payments under the contract."  JA4180-4181.

Second, the district court held that Duke did not engage in "predatory pricing" by winning Fayetteville's business.  Under the Supreme Court's decision in *Brooke Group Ltd.* v. *Williamson Tobacco Corp.*, 509 U.S. 209, 223-224 (1993), a predatory-pricing plaintiff must establish both below-cost pricing and a "dangerous probability" that the defendant can recoup the

losses in the future. The court determined that neither element was satisfied here: NTE did not put forward evidence showing that Duke's prices were below "a proper measure of … variable costs," or that Duke "would be able to charge improperly increased prices to other customers … to make up for 'losses' at [Fayetteville]." JA4188-4189. Because those findings were (doubly) sufficient to defeat NTE's predatory-pricing claim, the court did not resolve Duke's alternative argument that NTE's claim was also barred by the filed-rate doctrine, which prevents courts from second-guessing prices approved by a federal regulator. JA4184.

Finally, the district court resolved NTE's remaining grab-bag of antitrust claims, which challenged Duke's decisions—after Fayetteville chose it over NTE—to file a contract suit, to update the OASIS system to reflect the termination of the Interconnection Agreement, and to participate in state regulatory proceedings related to Reidsville's certification. Taking each claim in turn, the court held that Duke's contract suit was not "objectively baseless," JA4189 (citation omitted); its OASIS update was not actionable because there was no evidence that anyone saw the post, JA4190-4191; and Duke's statements to regulators did not harm NTE because the requested certificate was granted. JA4191.

### 3.     The parties settle Duke's contract claims.

On October 13, 2022, the parties settled Duke's contract claims. The stipulation of dismissal noted that the parties had "enter[ed] into a Settlement Agreement, as well as a related Promissory Note and Confession of Judgment provided by NTE to Duke in accordance with the obligations thereunder." JA4207. On appeal, all that remains are NTE's antitrust counterclaims.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment order de novo. *See Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citations omitted). "Summary judgment is appropriate where there is no genuine issue as to any material fact." *Id.*

This Court reviews the district court's denial of NTE's recusal motion "for abuse of discretion." *Kolon Indus. Inc.*, 748 F.3d at 167. The district court's decision not to recuse is subject to "harmless error" review. *Liljeberg* v. *Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988).

## SUMMARY OF ARGUMENT

I.     The district court correctly granted summary judgment to Duke on NTE's antitrust claims. Duke's decision to cancel the Interconnection Agreement after NTE stopped paying what it contractually owed was not a

"refusal to deal." And Duke's decision to lower its prices to win Fayetteville's business—while still making a substantial profit—was not "predatory pricing." Nor can NTE cobble together those failed claims and assert that Duke's various lawful, procompetitive actions were unlawful in some ill-defined combination.

A. NTE cannot maintain a refusal-to-deal claim based on Duke's decision to cancel the parties' contract after NTE stopped paying. The Supreme Court has instructed that refusal-to-deal claims are viable only when (i) the parties had a prior voluntary course of dealing and (ii) the alleged monopolist refused to sell its goods or services to a competitor at the same price it would sell to others. *See Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-409 (2004). NTE failed both prongs. Duke and NTE did not have a voluntary course of dealing, as Duke was compelled by FERC regulations to share its transmission network. And more fundamentally, Duke did not refuse to provide service to NTE; it *agreed* to provide service at a regulator-approved rate. Duke canceled the contract only when NTE failed to pay.

B. Nor can NTE maintain a predatory-pricing claim based on Duke's winning the Fayetteville bid. There are two essential elements to a

successful predatory-pricing claim: (i) below-cost pricing and (ii) a "dangerous probability" of recoupment. *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-224 (1993). Again, NTE failed to establish either element. First, NTE offered no evidence of below-cost pricing. In economic terms, Duke's bid was above its "variable costs"—the uniformly accepted way to measure predatory-pricing claims—and was therefore procompetitive. In ordinary English, Duke stood to make $60 million in profits from its Fayetteville bid, which was plainly the right business decision. Second, NTE offered no evidence that Duke could recoup its losses by charging supra-competitive prices after supposedly running out its competitors. NTE barely mentions recoupment, citing an irrelevant portion of an expert report and a single line of deposition testimony. But that meager evidence is not enough to defeat summary judgment—particularly because FERC regulations make recoupment impractical (if not impossible) by capping Duke's prices.

In addition, the filed-rate doctrine independently bars NTE's predatory-pricing claim. That doctrine prevents antitrust plaintiffs from challenging prices that were already approved by an expert regulator. *See Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 422

(1986). Because FERC reviewed Duke's contract with Fayetteville, any judicial second-guessing of Duke's prices would inevitably conflict with FERC's judgments.

C.     As the district court recognized, NTE's antitrust claims fare no better when taken as a whole. Courts and commentators have uniformly rejected attempts to aggregate multiple lawful acts across different antitrust doctrines. That is because the Supreme Court has developed specific rules— like the two-part tests for refusals to deal and predatory pricing—that govern different types of antitrust claims. Those rules help to distinguish anticompetitive from procompetitive conduct. NTE cannot duck those settled doctrines by alleging multiple types of (lawful) conduct in the same complaint, and asserting that the whole is somehow greater than the sum of its parts.

In any event, even if this Court could aggregate acts that are lawful in isolation, that would not matter here. Undisputed record evidence shows that none of Duke's actions with respect to NTE or Fayetteville was remotely anticompetitive. At bottom, NTE claims that Duke refused to deal when it declined to provide its services for free; Duke predatorily priced by surrendering some profit to retain a valued customer; and Duke brought

-21-

sham litigation in which it actually prevailed. It is difficult to imagine a case less suited to a "course-of-conduct" theory. Whatever aggregation might mean in other cases, it does nothing for NTE here.

II.    The district court did not abuse its discretion in denying NTE's recusal motion. Although the clerk's office originally reassigned this case from Judge Bell as an administrative matter, that was not a considered recusal decision. NTE offers no reason why an administrative order from the clerk's office should later foreclose reassignment to a judge whose impartiality cannot reasonably be questioned. Regardless, even if Judge Bell was wrong to hear this case, vacatur would not be required. NTE has dropped any argument that Judge Bell was actually biased, and this Court reviews his summary-judgment decision de novo.

## ARGUMENT

### I.    NTE Failed To Produce Evidence That Duke Violated The Sherman Act.

On appeal, NTE presses two traditional but meritless Sherman Act claims. NTE first claims (at 44-49) that Duke's cancellation of the Interconnection Agreement amounted to an unlawful refusal to deal. But Duke obviously did not refuse to deal with NTE. It contracted with NTE for interconnection services, and ceased performing that contract *only after*

*NTE stopped paying.* Duke was perfectly willing to deal; it was not willing to provide its services for free. NTE pivots to claiming (at 49-55) that Duke's bid for Fayetteville was predatory pricing. But as the district court recognized, NTE had no evidence that Duke suffered losses on its Fayetteville bid or could recoup any such losses by charging monopoly prices in the future. As a matter of settled antitrust doctrine, NTE's claims fail.

So NTE tries its hand at a third claim that has not been recognized under the Sherman Act. NTE strings together Duke's suspension of the Interconnection Agreement, its bid for Fayetteville, and its breach-of-contract suit—and argues (at 30-44) that Duke's broader "course of conduct" was unlawful. The problem is that each of those acts has its own legal test, and under those tests, Duke did not refuse to deal, engage in predatory pricing, or bring sham litigation. NTE cannot cobble together a series of perfectly lawful (and procompetitive) acts and say the sum is somehow greater than the parts. That approach would dramatically expand Sherman Act liability with no discernible limiting principle. No court has ever adopted NTE's sweeping course-of-conduct theory, and this Court should not be the first.

### A.   Duke's Cancellation Of The Interconnection Agreement Was Not An Unlawful Refusal To Deal.

1.   Refusal-to-deal claims have long been disfavored.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pacific Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *United States* v. *Colgate & Co.*, 250 U.S. 300, 307 (1919)).  There are thus only "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability."  *Id.*  The Supreme Court defined those narrow circumstances in *Trinko*, which held that a refusal-to-deal plaintiff must establish both that (i) the plaintiff and defendant had a prior, voluntary relationship, and (ii) the defendant then refused to sell the plaintiff its goods or services at prices it offered to others.  *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004).

NTE comes nowhere close to satisfying that standard for refusal-to-deal liability.  Like the claim rejected in *Trinko*, NTE's claim lacks both features that the Supreme Court considered essential.  Duke and NTE did not have a voluntary course of dealing because federal law required that Duke provide interconnection services for NTE, and Duke did not then refuse to provide those services at profitable prices.  Rather, Duke canceled

the Interconnection Agreement after NTE failed to pay millions of dollars owed under the contract. This Court and other courts of appeals have uniformly held that such ordinary contract disputes between competitors do not give rise to refusal-to-deal liability.

a. In *Trinko*, the Supreme Court explained that the high-water mark for refusal-to-deal claims had been set in *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where the Court upheld a jury verdict against the owner of three ski resorts who had cut a competitor out of a "joint, multiple-day, all-area ski ticket." *Trinko*, 540 U.S. at 408. *Trinko* noted two unusual facts that made liability appropriate in *Aspen Skiing*. First, the defendant had "terminat[ed] a voluntary (*and thus presumably profitable*) course of dealing" with its rival, which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id*. at 409. Second, the defendant had been "unwilling[] to renew the [joint] ticket *even if compensated at retail price*"—meaning that it refused to sell to a rival something that it would have offered to anyone else. *Id.*

The *Trinko* Court distinguished *Aspen Skiing* from the claim before it, which alleged that a large telephone company was providing poor service to competitors that relied on its network. 540 U.S. at 404-405. As in this case,

the defendant in *Trinko* was required by federal law to provide those services, and was entitled to receive a "cost-based rate of compensation" in return. *Id.* at 402, 409. Because the plaintiff could not show that the telephone company would ever have dealt with its rivals "absent statutory compulsion" to do so, the Court held that it was not possible to discern whether the company's "regulatory lapses were prompted not by competitive zeal but by anticompetitive malice." *Id.* at 409.

Following *Trinko*, courts of appeals, including this one, have consistently required plaintiffs to establish both a voluntary course of dealing and a refusal to sell at profitable prices. *See Loren Data Corp.* v. *GXS, Inc.*, 501 Fed. Appx. 275, 283 (4th Cir. 2012); *see also New York* v. *Meta Platforms, Inc.*, 2023 WL 3102921, at *12-13 (D.C. Cir. Apr. 27, 2023); *St. Luke's Hosp.* v. *ProMedica Health Sys., Inc.*, 8 F.4th 479, 486-487 (6th Cir. 2021); *Viamedia, Inc.* v. *Comcast Corp.*, 951 F.3d 429, 456-458 (7th Cir. 2020); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014); *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1074-1075 (10th Cir. 2013) (Gorsuch, J.). They have adhered to that two-prong test to avoid "impos[ing] a duty to deal that [courts] cannot explain or adequately and reasonably supervise." *linkLine*, 555 U.S. at 452-453 (citing *Trinko*, 540 U.S. at 415).

NTE fails both prongs of the test articulated in *Trinko* and illustrated by *Aspen Skiing*. First, NTE and Duke never had a "voluntary" agreement; FERC regulations *compelled* Duke to provide NTE with access to Duke's transmission network. *See* 61 Fed. Reg. 21,540, 21,541 (May 10, 1996). In that respect, NTE's claim is indistinguishable from the claim in *Trinko*, in which the defendant likewise operated under "statutory compulsion" to deal with a rival firm. 540 U.S. at 409. As the Supreme Court explained there, such compulsion meant that "the defendant's prior conduct shed[] no light upon the motivation of its refusal to deal." *Id.*

Second, Duke did not refuse to deal with NTE at a price it offered to others. Duke and NTE agreed on a price, which federal regulations imposed. *See* 68 Fed. Reg. 49,846, 49,900-49,910 (Aug. 19, 2003); *see also Trinko*, 540 U.S. at 406. NTE has never introduced any evidence that Duke would have declined to provide interconnection services at the agreed-upon, regulator-approved price. Rather, Duke stopped dealing with NTE only when NTE stopped paying. That does not make Duke "unwilling[]" to deal with NTE "even if compensated at retail price," *Trinko*, 540 U.S. at 409 (emphasis omitted); it makes Duke unwilling to provide its services for free.

b.    Perhaps because ordinary contract disputes so obviously fail one or both prongs of the *Trinko* test, courts have consistently rejected efforts to convert such disputes into refusal-to-deal claims.  *See, e.g.*, *St. Luke's Hosp.*, 8 F.4th at 487-489; *In re Adderall XR Antitrust Litig.*, 754 F.3d at 135; *Christy Sports, LLC* v. *Deer Valley Resort Co.*, 555 F.3d 1188, 1196-1197 (10th Cir. 2009).  That should be especially true here, where NTE's refusal-to-deal claim would superimpose antitrust law on a comprehensive "regulatory structure designed to deter and remedy anticompetitive harm." *Trinko*, 540 U.S. at 412.  Nothing about the commercial nature of the parties' dispute, or the comprehensive nature of the federal regulatory scheme, suggests a need to weaken *Trinko*'s test in this context.

In fact, this Court turned away a similar refusal-to-deal claim in *Loren Data Corp.*, 501 Fed. Appx. 275.  There, a data-transfer business sued a competitor for not allowing it to use the competitor's network.  *Id.* at 277. The plaintiff brought the case after years of unsuccessful efforts to negotiate a contract between the two firms.  *Id.* at 277-278.  This Court rejected the refusal-to-deal claim, reasoning that the defendant "ha[d] not refused to deal" at all;  instead, it had "legitimate business justifications" for not

acceding to the plaintiff's proposed terms, including concerns about lower service quality on its network. *Id*. at 278, 283.

Duke's actions were even more justified here. Consistent with FERC regulations, Duke entered into a standard contract that allowed NTE to access Duke's network and required Duke to spend millions on new infrastructure. JA490. NTE thus had a right to access Duke's transmission network before the parties' contract dispute—including while both firms were competing for Fayetteville. Duke later canceled the contract, but only after NTE racked up millions of dollars in unpaid bills. JA4166-4167. Indeed, NTE later confessed judgment, JA4207, underscoring that Duke's contract claim was not some "sort of sham" to undercut NTE's competitive position. *Loren Data*, 501 Fed. Appx. at 283. In that contractual context, NTE identifies no court that has imposed (or allowed a jury to impose) refusal-to-deal liability.

2.    NTE dodges both the critical facts of this case and the district court's actual reasoning. It argues that the two prongs from *Aspen Skiing* and *Trinko*—"a prior, voluntary course of dealing and a retail price"—"are not necessary to prove an unlawful refusal to deal." Br. 48; *see* AAI Br. 18. According to NTE, the relevant question is instead whether a "'defendant's

-29-

refusal to deal was motivated solely by an anticompetitive intent,' based on 'all the facts and circumstances.'" Br. 48 (citation omitted). That is wrong on the law and irrelevant on these facts.

On the law, NTE cites no decision in the two decades since *Trinko* that has adopted a freewheeling "anticompetitive intent" test for claimed refusals to deal. *Trinko*, to be sure, was concerned with anticompetitive intent. 540 U.S. at 409. But the Supreme Court offered two specific guideposts for ferreting out such intent "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." 540 U.S. at 408. A voluntary course of dealing followed by a refusal to deal at a profitable price is what allows courts to separate the rare refusal-to-deal antitrust violation from the far more typical inability among competitors to settle on a deal that benefits them both. In short, those factors are not merely illustrative but rather are critical for distinguishing procompetitive from anticompetitive behavior. *Novell, Inc.*, 731 F.3d at 1073.

The only authority NTE cites for its novel position is *Otter Tail Power Co.* v. *United States*, 410 U.S. 366 (1973)—a case decided three decades before *Trinko*. To the extent *Otter Tail* is good law after *Trinko*, it is irrelevant for two reasons. First, *Otter Tail* involved a power company's

claim of antitrust immunity, which is not at issue here. *Id*. at 372-375. Second, that decision upheld a district court's finding that the company's *voluntary* "refusals to sell … were solely to prevent municipal power systems from eroding its monopolistic position." *Id*. at 378. *Otter Tail* was decided before FERC's compelled-sharing regulations, at a time when federal regulators "encourage[d] voluntary interconnections." JA4179; *see Otter Tail*, 410 U.S. at 374. It therefore offers no guidance on how to resolve cases, like *Trinko* and this one, where the plaintiff challenges compelled-sharing agreements between competitors.

In any event, NTE's "anticompetitive intent" test would not help it here. NTE contends that Duke's decision to cancel the Interconnection Agreement must have been anticompetitive because Duke stood to gain "short-term profits" and "infrastructure upgrades" from the Interconnection Agreement with NTE. Br. 49. But that is true only if NTE *actually paid its bills*. If NTE refused to pay, Duke stood to gain nothing. Again, NTE identifies no evidence in the record suggesting that Duke was unwilling to provide connection services if NTE had paid what it owed. In fact, NTE identifies only one part of the record that mentions the parties' contract, which notes that Duke "did not receive payments for March 1 or May 1."

-31-

JA6246. Without evidence that NTE paid under the contract, its claim collapses no matter how the refusal-to-deal theory is framed: a contract simply is not profitable when one side doesn't pay, and rational businesses can stop providing free services without any inference of anticompetitive intent.

### B.    Duke's Fayetteville Bid Was Not Predatory.

NTE next alleges (at 49-55) that Duke engaged in a predatory-pricing scheme to win the Fayetteville contract. As the district court recognized, that claim fails as a matter of antitrust law and basic economics. Predatory pricing requires a monopolist (i) to suffer voluntary short-term losses to drive out competitors, and then (ii) to raise prices high enough to recoup those losses and make supra-competitive long-term profits. NTE failed to produce evidence on either prong. It did not show that Duke suffered any losses on the Fayetteville bid or that it would be able to charge monopoly prices in the future. And even if NTE had made both showings, the filed-rate doctrine would still foreclose its claim.

### 1.    NTE cannot establish either element of a predatory-pricing claim.

The Supreme Court's seminal decision in *Brooke Group* established the modern test for predatory-pricing claims. 509 U.S. at 223-224. *Brooke*

*Group* recognized that, if the bar for predatory-pricing claims were set too low, then antitrust suits would harm consumers by "discouraging a price cut and forcing firms to maintain supra-competitive prices." *Id.* at 224. *Brooke Group* therefore identified two essential prerequisites for predatory-pricing claims. First, the plaintiff must show that a monopolist "reduces the sale price of its product … to below cost, hoping to drive competitors out of business." *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 318 (2007); *see Brooke Grp.*, 509 U.S. at 223-224. Second, the plaintiff must show a "dangerous probability" that the monopolist could "recoup[] its investment in below-cost prices" once it has forced competitors from the market. *Brooke Grp.*, 509 U.S. at 224. Those two "prerequisites are not easy to establish." *Id.* at 226. As the district court found, NTE failed to produce evidence on either one.

### a.    NTE offered no evidence of below-cost pricing.

i.    A price is low enough to be "predatory" only when there is no procompetitive reason to make the sale—that is, when the price is lower than the seller's costs. To perform that analysis, courts and commentators uniformly agree that the appropriate measure of cost focuses on "variable" costs, not "fixed" costs. *See, e.g., Tri-State Rubbish, Inc.* v. *Waste Mgm't,*

*Inc.*, 998 F.2d 1073, 1080 (1st Cir. 1993); *MCI Comm'ns Corp.* v. *American Tel. & Tel. Co.*, 708 F.2d 1081, 1119-1123 (7th Cir. 1983); *William Inglis & Sons Baking Co.* v. *ITT Cont'l Baking Co.*, 668 F.2d 1014, 1035-1036 (9th Cir. 1981); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 735 (4th ed. 2013).  Variable costs "vary with changes in output," and "typically include items such as materials, fuel, [and] repair and maintenance."  Areeda & Hovenkamp, *supra*, ¶ 735.  By contrast, fixed costs "do not vary with changes in output [and] would continue even if the firm produced no output at all." *Id.*

That well-established focus on variable costs reflects sound economic logic.  When a "business manager makes a decision to enter a new market," she "compar[es] anticipated additional revenues (at a particular price) with anticipated additional costs."  *MCI*, 708 F.2d at 1117.  At the time of that decision, fixed costs "are essentially irrelevant … since those costs are 'sunk' and unavoidable and are unaffected by the new" sales. *Id.*  As a result, "any individual sale that is sufficient to recover short-run costs is profitable, and may be *much more profitable than not making the sale at all*."  Areeda & Hovenkamp, *supra*, ¶¶ 739a & 741 (emphasis added).  For example, if a toy company can make an additional toy for $3 and sell it for $10, that will

normally be the profitable decision, regardless of whether the $7 profit is itself enough to cover the fixed, sunk costs of the company's existing toy factory.

Here, Duke's bid for Fayetteville was priced above Duke's variable costs—and was not even the lowest bid that Fayetteville received. JA1384. Duke's prior contract with Fayetteville generated roughly $100 million in profits to cover fixed costs. JA2819, JA4189, JA6614. After Duke offered a discount to keep Fayetteville as a customer, Fayetteville still "contribute[d] about $60 million a year to Duke's fixed costs" under the new contract. JA2819; *see* JA4488 (NTE's expert's opinion that Duke made a return on investment of 7.6%, even including fixed costs). If Duke had lost Fayetteville as a customer, by contrast, it would have lost not just the $40 million discount but the full $100 million—and that shortfall may have been passed to other customers. The modified contract could not have been unprofitable when it both exceeded variable costs and contributed to fixed costs.

ii.     In defending its claim of below-cost pricing, NTE does not meaningfully engage with *Brooke Group* or address the undisputed evidence showing that Duke profited by competing for Fayetteville.   Br. 49-55.

Instead, NTE raises three arguments that cannot be squared with settled law or the factual record before the district court.

(1)    NTE contends for the first time that this Court can ignore *Brooke Group* because "the *structure* of Duke's offer was exclusionary." Br. 50.  According to NTE, this case is different because Duke was lowering its rates on its current service as part of a bid to extend its contract.   In NTE's view, the variable-cost standard should not apply in cases that involve the renegotiation of an existing contract.  That argument is both forfeited and wrong.  NTE did not raise any argument below that *Brooke Group's* two-prong test would not apply to its predatory-pricing claim.  JA4383.  And in any event the argument defies basic economics.   Businesses offer discounts on existing services all the time to entice customers to renew agreements.  So long as the discounts are priced above variable cost, there is no reason to think they harm competition.  *See Virgin Atlantic Airways, Ltd.* v. *British Airways PLC*, 257 F.3d 256, 265-269 (2d Cir. 2001) (applying *Brooke Group* to an airline's volume-based "incentive agreements" for travel agencies and corporate customers); *Concord Boat Corp.* v. *Brunswick Corp.*, 207 F.3d 1039, 1060-1063 (8th Cir. 2000) (applying *Brooke Group* to an engine manufacturer's discounts to existing customers).

Unsurprisingly, NTE does not cite a single case suggesting otherwise. In fact, NTE cites only one decision, *see* Br. 51 n.10, which held that *Brooke Group* did not apply because the plaintiff had alleged exclusive dealing—a claim NTE did not (and could not) bring here. *See ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 269, 278-281 (3d Cir. 2012). Instead, NTE relies on law-review articles discussing "loyalty rebates," *i.e.*, "rebates to buyers that purchase at least a designated share of their requirements from the seller." Fiona Scott Morton & Zachary Abramson, *A Unifying Analytical Framework For Loyalty Rebates*, 81 Antitrust L.J. 777, 778 (2017); *see* Robert H. Lande, *Should Predatory Pricing Rules Immunize Exclusionary Discounts?*, 2006 Utah L. Rev. 863, 876-881 (2006) (hypothesizing tests for claims challenging discounts, none of which has been adopted by courts). But Duke's offer to Fayetteville was not a loyalty rebate. Nor did it have the characteristics that scholars have deemed problematic in other contexts, like a discount in one market meant to gain market power in a separate market or a discount tied to sales volume. *See* Lande, *supra*, at 870-873; Morton & Abramson, *supra*, at 780-781.

(2)    NTE next argues (at 52) that Duke's bid was predatory because "an average total cost measure[]," rather than a variable-cost measure, "can

-37-

establish predation." Put differently, NTE argues that unless a contract covers its share of Duke's total fixed costs, it can be predatory—even if, as here, it generated a $60 million profit. Here again, NTE offers no authority for that illogical standard. *See* Areeda & Hovenkamp, *supra*, § 741f (concluding that "[a]verage total cost measures of predation degenerate into nonsense"). It cites only one decision after *Brooke Group*, but that decision actually held that a plaintiff who "proves that the defendant's prices were below average *variable cost*" can "establish a *prima facie* case of predatory pricing." *Spirit Airlines, Inc.* v. *Northwest Airlines, Inc.*, 431 F.3d 917, 938 (6th Cir. 2005) (emphasis added). NTE points to no case—not even one—holding that predatory pricing should be measured by average total costs.

NTE also suggests that this Court rejected the variable-cost standard two decades before *Brooke Group*. Br. 52 (citing *Greenville Publ'g Co., Inc.* v. *Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir. 1974)). But *Greenville* did not establish any particular cost standard. Instead, it allowed a predatory-pricing claim to proceed to trial where, unlike here, the defendant allegedly set advertising rates for free shoppers' guides below "a level that could reasonably be expected to generate a profit." 496 F.2d at 398. The Court noted that the parties' evidence "present[ed] an issue of disputed fact" about

whether the defendant's advertising was profitable, *id.*, but the Court did not endorse any particular cost standard. And even if it had, it would not have survived *Brooke Group*.

(3)    Finally, NTE criticizes (at 54-55) the district court's conclusion that "NTE [did] not offer[] evidence or analysis of Duke's variable costs related to [Fayetteville]." JA4188-4189. But NTE's expert, Dr. John Morris, never attempted to distinguish variable costs from fixed costs. Instead, he ducked the issue by asserting that Duke's "average total costs and long-run marginal costs tend to converge." Br. 14 (citing JA4488-4489). Yet he offered *nothing* to support the notion that fixed costs and variable costs converged during the life of the Fayetteville contract. Nor did Dr. Morris explain how Duke was worse off in the short run for having won the Fayetteville bid.

NTE also faults the district court (at 55) for relying on Dr. Morris's testimony to conclude that Duke's contract with Fayetteville "contributed significantly to fixed costs above its variable costs." JA4189. But record evidence clearly showed that Duke could keep $60 million in profits by making its new, lower-priced bid to Fayetteville. JA2819, JA6613-6614. Given the choice between lower profits and no profits at all, Duke's bid was

obviously justified and procompetitive. In any event, NTE has the burden to establish predatory pricing, and it failed to identify any evidence showing that Duke's bid was priced below variable cost. JA4188-4189.

### b. NTE offered no evidence of recoupment.

NTE also failed to show that Duke would be able to charge supra-competitive prices in the future. Showing that short-term losses enabled long-term price hikes is critical to a predatory-pricing claim. *See A.A. Poultry Farms, Inc.* v. *Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989). The district court correctly determined that NTE had failed to produce any "evidence that [Duke] would be able to charge improperly increased prices to … make up for 'losses' at [Fayetteville]." JA4189. That conclusion independently forecloses NTE's predatory-pricing claim.

i.    NTE cites only two snippets of the record that supposedly show a "dangerous probability" of recoupment. *Brooke Grp.*, 509 U.S. at 224; *see* Br. 55. First, NTE points to expert testimony claiming that, once Duke won the Fayetteville bid, it would recoup profits by "shift[ing] the majority of the costs associated with the [Fayetteville] discounts" to its other customers. JA4422. That testimony is irrelevant to recoupment. Recoupment relates to *future* prices after a predatory-pricing scheme drives competitors from the

-40-

market, not price shifts while those competitors are still in the market. *See Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 588-589 (1986). To establish recoupment here, NTE needed evidence showing that Duke's successful bid for Fayetteville would prevent other energy producers from submitting competitive bids in the future. NTE's evidence about "shifting" some fixed costs under the revised Fayetteville contract had nothing to do with a post-competition world. In any event, just as Duke was indisputably better off having won the Fayetteville bid, Duke's other customers were better off because of Fayetteville's $60-million contribution to fixed costs.

Second, NTE cites a single line of deposition testimony in which its expert opined that Duke could charge "higher prices than offered by the competition" once its renewed contract with Fayetteville expired in 2032. Br. 55 (citing JA4663-4664). But "conclusory allegations" from NTE's expert are "insufficient to [defeat] summary judgment." *Wai Man Tom* v. *Hospitality Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

ii.    NTE's failure to support its claim with evidence is particularly glaring in light of the unique "market circumstances" that make recoupment extremely unlikely here. *Brooke Grp.*, 509 U.S. at 226. FERC regulations

-41-

require Duke to set prices based on its actual costs, which include "transmission facilities"; "expenses from the production, transmission, and distribution of electricity"; and "a fair return on capital." FERC, *Energy Primer: A Handbook for Energy Market Basics* 59-60 (Apr. 2020); *see* 18 C.F.R. pt. 101. That cost-based formula is expressly designed to prevent Duke from charging monopoly prices. JA4679 (65:21-66:7) (explaining that FERC rates are "bounded by monopoly rents"). Moreover, FERC's open-access rules require Duke to make its transmission network available to would-be competitors.

Both features make recoupment highly impractical. Even if Duke drove every competitor from the market, FERC's cost-based formula would prevent it from charging high enough prices to recoup its losses from a predatory-pricing scheme. And if Duke tried to raise prices anyway, FERC's open-access rules ensure that Duke "[would] be unable to prevent other potential competitors from transmitting power into the area." *Louisiana Energy & Power Auth.* v. *FERC*, 141 F.3d 364, 370 (D.C. Cir. 1998). This case illustrates the significance of those open-access rules, as Duke competed for Fayetteville against a number of competitors that were legally entitled to use Duke's transmission network—including both NTE

and a bank that did not even generate power itself but saw a market opportunity to buy and resell wholesale electricity.  JA1383, JA4081-4082.

### 2. NTE's claim is barred by the filed-rate doctrine.

a.    Even if the Court agreed with NTE's novel predatory-pricing theory, the filed-rate doctrine would independently bar NTE's predatory-pricing claim.  For more than 100 years, the filed-rate doctrine has foreclosed any claim that a "rate submitted to, and approved by, [a federal regulator] was the product of an antitrust violation."  *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421-422 (1986) (discussing *Keogh* v. *Chicago & N.W. Ry. Co.*, 260 U.S. 156, 162-165 (1922)).  That limitation stops courts from second-guessing the judgments of federal regulators, which consider a range of factors in addition to competition when setting appropriate rates.  *Pinney Dock & Transp. Co.* v. *Penn Cent. Corp.*, 838 F.2d 1445, 1457 (6th Cir. 1988).

NTE's predatory-pricing claim lies at the heartland of the filed-rate doctrine.  FERC reviewed Duke's contract with Fayetteville to ensure that its rates were "just and reasonable."  16 U.S.C. § 824d; JA4164-4165.  Although NTE could have participated in those administrative proceedings, it chose not to.  *See* 18 C.F.R. §§ 385.206, 385.211, 385.214; *see also Louisiana*

*Energy & Power Auth.*, 141 F.3d at 370 (addressing predatory-pricing concerns in judicial review of a FERC proceeding); JA3491-3492.  By nonetheless pursuing an antitrust action in federal court, NTE is "effectively challenging" FERC's regulatory scheme and inviting a conflict with the agency.  *Old Dominion Elec. Coop.* v. *PJM Interconnection, LLC*, 24 F.4th 271, 281 (4th Cir. 2022).

b.     NTE argued below that the filed-rate doctrine applies only to claims brought by customers, not competitors.  JA4182.  There is no good reason for that distinction.  When Congress has delegated to an agency the authority to consider and approve rates, the filed-rate doctrine prevents courts from interfering with the agency's expert judgment.  The doctrine's purposes—respecting Congress's delegation and avoiding conflict between the Judiciary and the Executive Branch—apply equally whether the plaintiff challenging the agency-approved rate is a customer, a competitor, or someone else.  *See Lifschultz Fast Freight, Inc.* v. *Consolidated Freightways Corp. of Del.*, 805 F. Supp. 1277, 1295-1296 (D.S.C. 1992).

That said, the issue implicates a long-running split among the courts of appeals.  Two courts of appeals have rejected NTE's competitor carve-out.  *See Arsberry* v. *Illinois*, 244 F.3d 558, 562 (7th Cir. 2001); *Pinney Dock,*

838 F.2d at 1457 (6th Cir.). Four others have signaled support for NTE's position, though only one did so after the Supreme Court's latest reaffirmation of the filed-rate doctrine. *See Cost Mgmt. Servs.* v. *Washington Nat. Gas. Co.*, 99 F.3d 937, 945 (9th Cir. 1996); *City of Kirkwood* v. *Union Elec. Co.*, 671 F.2d 1173, 1179 (8th Cir. 1982); *City of Groton* v. *Connecticut Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981); *Essential Commc'ns Sys., Inc.* v. *American Tel. & Tel. Co.*, 610 F.2d 1114, 1121 (3d Cir. 1979). Although this Court has never discussed the issue, it has affirmed a district-court decision that rejected NTE's proposed carve-out and applied the filed-rate doctrine to a competitor's claim. *See Lifschultz*, 805 F. Supp. at 1295-1296, *aff'd*, 998 F.2d 1009 (4th Cir. 1993).

The courts on NTE's side of the split offer two reasons for carving out competitor claims. First, they disagree with the filed-rate doctrine and believe it should be "narrowly tailored." *Cost Mgm't Servs.*, 99 F.3d at 946 (quoting Herbert Hovenkamp, *Federal Antitrust Policy* § 19.6 (1994)). But the Supreme Court expressly reaffirmed the doctrine in *Square D*, 476 U.S. at 420, and applying the filed-rate doctrine to competitors does not extend the doctrine one inch. Second, some courts see no incompatibility between competitor suits and rate regulation because "agenc[ies] generally

scrutinize[] rates to see if they are too high [and] much less frequently scrutinize[] tariff requests to see if the requested rates are too low." *Cost Mgmt. Servs.*, 99 F.3d at 946 (citation omitted). Whatever the merits of that distinction in other contexts, it does not apply to FERC. As discussed above, FERC's procedures do account for rates that are too low and permit competitors to petition the agency to challenge those prices. *See* pp. 41-43, *supra*.

### C. NTE Cannot Establish A Sherman Act Violation Without Demonstrating Specific Unlawful Conduct.

NTE argues that even if none of Duke's conduct was "independently actionable," the question is whether Duke's course of conduct "as a whole" was anticompetitive. Br. 30. That approach has been flatly rejected by every court to consider it. And for good reason. The Supreme Court has "develop[ed] specific rules for common forms of alleged misconduct"— including as relevant here, predatory pricing, refusals to deal, and sham litigation—out of a recognition that when conduct does not meet specific requirements, it is more likely to further competition than inhibit it. *Novell*, 731 F.3d at 1072. The Supreme Court's cases thus define when courts are to consider conduct anticompetitive or procompetitive. NTE cannot string

together a series of acts—all lawful in themselves under the relevant tests—
and claim that the whole is more than the sum of the parts.

This Court, however, does not need to reach that question.  Even
assuming that individual acts can be lawful in isolation and yet taken
together can be anticompetitive, that is not this case.  This is truly a case, as
the district court explained, in which "0 + 0 = 0."  JA4176.  NTE has
essentially cobbled together three complaints:  (1) a refusal-to-deal allegation
*where Duke actually provided services until NTE stopped paying*, (2) a
predatory-pricing allegation *with no evidence of below-cost prices or
recoupment*, and (3) a sham-litigation allegation *where NTE confessed
judgment on Duke's breach-of-contract claims*.  It is difficult to imagine a
more meritless antitrust case, or one less suited to a "course-of-conduct"
theory.  This is a case about true zeros.  Whatever aggregation might be
permitted in other cases, it does nothing for NTE here.

### 1.   NTE cannot aggregate its claims to prove a Sherman Act violation.

a.   To succeed in an antitrust suit, a plaintiff must identify actual
anticompetitive conduct.  That is true even when the plaintiff alleges
"interrelated and interdependent" acts.  *Intergraph Corp.* v. *Intel Corp.*,
195 F.3d 1346, 1367 (Fed. Cir. 1999) (citing *City of Groton*, 662 F.2d at

-47-

928-929). If "alleged instances of misconduct are not independently anticompetitive, … they are not cumulatively anticompetitive either." *Eatoni Ergonomics, Inc.* v. *Research in Motion Corp.*, 486 Fed. Appx. 186, 191 (2d Cir. 2012); *see New York* v. *Facebook, Inc.*, 549 F. Supp. 3d 6, 48 (D.D.C. 2021) ("If a unilateral refusal (or refusals) is to be part of [a] larger scheme, it must in itself be unlawful."), *aff'd*, 2023 WL 3102921 (D.C. Cir. Apr. 27, 2023); *Arminak & Assocs., Inc.* v. *Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1211 (C.D. Cal. 2011). Accordingly, courts evaluate antitrust suits by considering each allegation of unlawful conduct in turn.

The Supreme Court's decision in *Pacific Bell Telephone Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009), is instructive. The plaintiffs there competed with AT&T to provide internet service but relied on AT&T's network to reach its customers. They alleged that AT&T had violated Section 2 of the Sherman Act through a "price squeeze": AT&T had raised the price for access to its network while cutting its own retail price for internet service. The Supreme Court rejected the plaintiffs' argument that those two acts should be considered together. Instead, it examined whether there was a duty to deal in the wholesale market or predatory pricing in the retail market, and found neither. *Id.* It thus held that the plaintiffs had

alleged "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level." *Id.* at 450-452.

Countless antitrust decisions, including some of the most significant monopolization precedents, follow the same course. *See Northeastern Tel. Co.* v. *AT&T*, 651 F.2d 76, 96 (2d Cir. 1981) ("[A] new trial is ordered to enable Northeastern to prove without resort to evidence of conduct that we have found not to have been anticompetitive that appellant[] violated the Sherman Act."); *United States* v. *Microsoft Corp.*, 253 F.3d 34, 58-78 (D.C. Cir. 2001) (en banc) (evaluating five allegedly unlawful acts separately and refusing to consider a "course of conduct" argument); *see also Viamedia, Inc.*, 951 F.3d at 453; *Intergraph Corp.*, 195 F.3d at 1366-1367. The reason for this approach is straightforward: "the purpose of antitrust law is to penalize anticompetitive practices, not competitive success." *It's My Party, Inc.* v. *Live Nation, Inc.*, 811 F.3d 676, 690 (4th Cir. 2016).

Here, NTE is arguing that a single predatory bid led to the loss of Fayetteville's business, that a single decision to cancel the Interconnection Agreement cut off its access to the wholesale electricity market, and that a single contract dispute inhibited its ability to attract customers. Each of those allegations is subject to a well-established legal test that separates

procompetitive from anticompetitive conduct. *See Trinko*, 540 U.S. at 408-409 (refusal-to-deal); *Brooke Grp.*, 509 U.S. at 222-224 (predatory-pricing); *Professional Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (sham litigation). Having flunked those tests, NTE cannot get a different result by adding together acts that are deemed procompetitive and are independently lawful.

b.    NTE points to no case holding that independently lawful acts may be aggregated into an antitrust violation. Instead, NTE dedicates pages of its brief (at 32-38) to a series of cherry-picked quotes and decisions that must be read in context. *See also* AAI Br. 5-6.

i.    NTE first points (at 31) to two types of recognized antitrust claims—exclusive dealing and conspiracy—that often involve multiple related acts. For exclusive dealing, for instance, a local brewery might cut off a rival's ability to compete by entering into exclusive contracts with twenty different hops suppliers. Although no individual agreement would involve a substantial share of the market, all of the contracts might add up to an actionable antitrust claim. *See, e.g.*, *Continental Ore Co.* v. *Union Carbide & Carbon Co.*, 370 U.S. 690, 699 (1962) (holding that court should consider whether a series of exclusive-dealing contracts foreclosed plaintiff's access to

the market); *Kolon Indus.*, 748 F.3d at 175-176.  Conspiracy is similar.  In *Swift & Co.* v. *United States*, 196 U.S. 375, 396 (1905), the Supreme Court held that it was appropriate to consider whether the various acts of defendants alleged to be part of a long-running conspiracy were "elements of [a single] scheme."

In those discrete contexts, allegedly anticompetitive acts are inherently similar and related:  they may add up to foreclose a single market or reveal a single conspiracy.  Here, by contrast, Duke's bid for Fayetteville, its cancellation of the Interconnection Agreement, and its breach-of-contract suit are not intrinsically related acts that can be added up to some single, recognized type of antitrust violation.  They implicate different antitrust doctrines, each subject to its own established test and each requiring a plaintiff to put forth different kinds of evidence.  As a result, "there is no cardinal unit in one that can be added to any unit in another to produce a meaningful sum."  Areeda & Hovenkamp, *supra*, § 310c2.  Courts and commentators have thus consistently rejected the notion that decisions like *Continental Ore* or *Swift* support a freewheeling aggregation theory.  *See, e.g.*, *Facebook, Inc.*, 549 F. Supp. 3d at 47-48; Daniel A. Crane, *Does*

-51-

*Monopoly Broth Make Bad Soup?* 76 Antitrust L.J. 663, 666-669 (2010); *see also linkLine*, 555 U.S. at 450-452.

ii. NTE next points (at 33) to decisions that it says aggregated the anticompetitive effects of multiple acts—but only after holding that those acts *were unlawful*. In *LePage's, Inc.* v. *3M*, 324 F.3d 141, 155-159 (3d Cir. 2003), for example, the Third Circuit held that a manufacturer violated the Sherman Act by offering bundled rebates that were structured to cut off a rival's access to potential buyers and by entering into exclusive-dealing arrangements with major customers. After finding that both of those acts were individually unlawful, the court then "considered together" the "anticompetitive effect" of those unlawful acts. *Id.* at 162. But NTE cannot rely on the combined effects of Duke's actions without establishing that those actions were *unlawful* in the first place. Otherwise, its novel aggregation theory risks punishing procompetitive conduct with a significant market effect.

NTE's other authorities illustrate that very point. In *City of Anaheim* v. *Southern Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992)—which considered a price-squeeze claim before the Supreme Court rejected such claims in *linkLine*—the Ninth Circuit stated that it may be appropriate to consider

the "synergistic effect" of different *unlawful* acts. *Id.* at 1376. The court made clear that if, by contrast, "all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing." *Id.* Similarly, the leading antitrust treatise explains that a "fact finder should be permitted to consider the entire sum of *unlawful* exclusionary practices," but cautions that "care must be taken lest … illegality be inferred from procompetitive conduct." Areeda & Hovenkamp, *supra*, § 310c7 (emphasis added).

NTE also relies on a recent amicus brief by the Department of Justice, which took the position that "multiple *anticompetitive* acts can work synergistically" to harm competition. Brief of United States as Amicus Curiae at 9, *New York* v. *Facebook*, No. 21-7078 (D.C. Cir. 2022) (emphasis added). Notably, both the district court and the D.C. Circuit have now rejected the government's position in *Facebook*. *See* 2023 WL 3102291, at *8 n.13; 549 F. Supp. 3d at 47. In any event, the government argued that Facebook's individual acts were themselves anticompetitive, and that they should be judged as a whole based on their combined effect. U.S. C.A. Br. 9. That is very different from this case, where Duke's individual acts were lawful under settled Supreme Court precedent.

iii.  Finally, NTE relies on a number of decisions stating uncontroversial principles of hornbook antitrust law.  Br. 35-37.  It notes that courts assess monopolization claims under a flexible rule of reason, which balances procompetitive benefits against anticompetitive harms, *Microsoft*, 253 F.3d at 59; and that courts "examine the economic effects of the challenged conduct" when deciding whether it is anticompetitive, *Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990).  True enough.  But none of those cases endorses aggregating lawful, procompetitive conduct to prove monopolization.  And none of those cases says that courts should throw out time-tested legal doctrines any time a plaintiff alleges multiple anticompetitive acts in its complaint.

### 2.  Even in the aggregate, NTE has not demonstrated anticompetitive conduct.

a.  Even if this Court could aggregate a vague category of lawful-but-anticompetitive behavior into a new type of antitrust violation, that would not be warranted here.  As the district court recognized, "NTE was not the victim of an unlawful competitive process."  JA4192.   Instead, Duke had clear procompetitive reasons for each action challenged by NTE, and its actions did not cause anticompetitive effects.

-54-

None of NTE's "alleged instance[s]" of "exclusionary antitrust conduct" was remotely anticompetitive. JA4192. Taking NTE's five allegations in turn:

- Duke competed for Fayetteville by lowering its prices. Its bid was high enough to be profitable, but low enough to prevail. JA4188-4189.

- Duke canceled the Interconnection Agreement after NTE requested to suspend the contract and after Duke spent months trying to recover the money NTE owed. JA4180-4181.

- Duke brought a meritorious contract claim to recover the money owed, and NTE confessed judgment on that claim. JA4189-4190, JA4207.

- Duke reported the status of the Reidsville project, as required by FERC regulations. *See* 18 C.F.R. § 37.6(a). After a clarification from FERC, Duke promptly updated its terminology from "terminated" to "suspended"—and NTE has not sought to lift that suspension since. JA4190-4191.

- Duke intervened in state regulatory proceedings after NTE filed a petition related to Reidsville that "failed to disclose … that NTE … defaulted under the [Interconnection Agreement]." JA517; *see* JA101.

The first, second, and third are exactly what one would expect from a business competing on the merits and then attempting to get paid for services rendered. The fourth and fifth (which NTE barely mentions on appeal) are exactly what one would expect from a business seeking to navigate federal and state regulatory schemes.

Moreover, none of that conduct "operated synergistically" to cause anticompetitive effects. Br. 38. NTE claims to have suffered harm because Duke "block[ed] NTE from bringing its power to market, prevent[ed] it from competing for key customers, and malign[ed] NTE before important audiences." Br. 39. But the record does not support any of that. Duke did not prevent NTE from "bringing its power to market," as the cancellation of the Interconnection Agreement arose from *NTE's own* decision to stop work on the interconnection project for Reidsville—a decision NTE argued had nothing to do with its failed Fayetteville bid a few weeks earlier. JA4165. Nor did Duke "prevent [NTE] from competing," as NTE had full access to Duke's transmission network at the time it competed for Fayetteville's business. As for Duke's supposed "malign[ing]," the district court found that "there is no evidence" that Duke's initial incorrect terminology about the Reidsville suspension "was in fact heard or read by a third party." JA4190-4191.

At bottom, NTE's plans for Reidsville were dashed by its failure to win Fayetteville's business. Although NTE accuses Duke of engaging in various conduct *after* Fayetteville decided to stick with Duke, none of those supposedly anticompetitive acts had anything to do with the viability of

-56-

Reidsville.  JA4189-4191.  As a result, there is no basis in the record for concluding that Duke's actions caused anticompetitive effects—even if this Court could add up discrete lawful conduct and unrelated failed antitrust claims.

b.    NTE next asks this Court to infer that Duke's conduct was "exclusionary" based on "direct evidence of consumer harm from Duke's actions" and "evidence of Duke's subjective intent."  Br. 40, 42.  NTE cannot rely on vague assertions about consumer harm or anticompetitive intent to evade the Supreme Court's well-established legal tests designed to measure those very same things.  *See* pp. 47-50, *supra*.  Regardless, nothing in the record shows that Duke harmed consumers or intended to monopolize.

NTE contends that consumers have been harmed because "the record reveals an actual or probable market-wide reduction in the availability of new, high-quality generation."  Br. 41.  But NTE apparently just means that *NTE is generating less power* than it would have if it had won Fayetteville's business.  *See id.*  That argument is frivolous.  After two companies compete, there will always be a loser that commands less of the market than it did before.  Antitrust law is concerned with the market overall, *see California Dental Ass'n* v. *FTC*, 526 U.S. 756, 776-778 (1999), not the fortunes of a single

company.  The "relevant market" in this case is "the market for wholesale power."   JA4160.   NTE has identified no evidence that output in that relevant market has decreased.  It cannot simply point to its own declining fortunes and assert consumer harm.

NTE also claims that there is "significant evidence" of higher prices because the record shows that Duke charged higher prices *before* competing against NTE.  Br. 41.  That is irrelevant to whether the challenged actions here are harming consumers now.  On that front, NTE points to no evidence showing that prices in the wholesale-electricity market are higher today than before the allegedly anticompetitive scheme.  And if prices fell *after* Duke and NTE started competing, that only reinforces that the price Duke charged for Fayetteville was part of a competitive process, not an anticompetitive scheme.

As a last-ditch effort to prop up its claim, NTE tries to show that Duke operated with bad intent.  It points to a handful of combative or frustrated comments by Duke employees regarding NTE, the Reidsville project, or the parties' dispute over the Interconnection Agreement.  Br. 11-13, 19-20.  But even if those comments were relevant, they show only that Duke was gearing up to compete with NTE on the merits, JA5388, or was unhappy with NTE's

failure to pay under the contract, JA6246. None of those statements suggests that Duke intended to engage in unlawful practices to prevent competition.

*   *   *

NTE is obviously dissatisfied with Duke's competition for Fayetteville and demand to be paid under the Interconnection Agreement. But "competitive success" is not illegal, *It's My Party*, 811 F.3d at 690, and "business disputes [do not] implicate the antitrust laws simply because they involve competitors." *Adderall Litig.*, 754 F.3d at 135. The district court correctly applied those familiar principles to reject NTE's Sherman Act claims.

## II. Judge Bell Did Not Abuse His Discretion By Denying NTE's Recusal Motion.

NTE alternatively requests vacatur on the ground that the district judge erroneously declined to recuse. Br. 55-58. It contends that Judge Bell should have recused because the clerk's office previously reassigned the case to one his colleagues, before it was eventually reassigned back to him. That administrative reassignment does not foreclose a judge from making a considered decision not to recuse. And even if Judge Bell somehow abused his discretion by declining to recuse, vacatur is not an appropriate remedy

-59-

because Judge Bell had no actual bias and so his decision to hear the case did not harm NTE.

### A.    Judge Bell Was Not Required To Recuse.

NTE hangs its hat on a supposedly uniform rule that once a judge recuses from a case, she may never again participate for any reason.  Br. 56.  NTE is right that some courts hold that "once a judge has disqualified himself, he or she may enter no further orders in the case."  *Moody* v. *Simmons*, 858 F.2d 137, 143 (3d Cir. 1988).  Other courts, however, hold that there may be "instances where a judge disqualifying himself could resume direction or even decide the issues," such as when a recusal was based on a mistaken view of the facts.  *Stringer* v. *United States*, 233 F.2d 947, 307 n.2 (9th Cir. 1956).  Contrary to NTE's suggestion (at 56), this Court has never decided that issue.  In *Arnold* v. *Eastern Air Lines, Inc.*, 712 F.2d 899, 904 (4th Cir. 1983) (en banc), the question was how to count a recused judge when calculating whether a majority of "active judges" had voted to take a case en banc.  *Arnold* had nothing to do with whether the recused judge could later participate in the case.

Regardless of whether the prior-recusal rule is correct, there is no reason for the Court to address it here.  After this case was first assigned to

Judge Bell, it was immediately reassigned by the clerk's office to Judge Mullen in light of Judge Bell's "administrative decision that no cases involving McGuireWoods," his former law firm, "would be assigned to him." JA343.  Judge Bell implemented that policy "for two years following the beginning of his judicial service … so that the issue of recusal related to McGuireWoods *simply did not have to be addressed*."  JA342-343 (emphasis added).  The case was then reassigned back to Judge Bell only when a colleague later recused.

At that point, Judge Bell performed a considered recusal analysis and issued a decision declining to recuse.  His rationale was simple:  his two-year prophylactic policy no longer applied, and the earlier reassignment of the case did not trigger any need for recusal.   The initial administrative reassignment was meant to sidestep "the issue of recusal," JA343; it did not resolve the very question it avoided.

NTE argues that recusal means any "decision not to sit for a case." Br. 56.   But it points to no court that has treated a prophylactic, administrative reassignment the same as a considered decision to recuse. And that result would serve no practical purpose.  The prior-recusal rule prevents parties from "remov[ing] from the record any evidence of

disqualification" so that its preferred judge can continue to hear the case. *James* v. *O'Reilly*, 2019 WL 1996919, at *7 (V.I. May 1, 2019). Judge Bell's decision to hear this case was not based on any gamesmanship by Duke. No one could have anticipated that Judge Cogburn would recuse due to a conflict, JA43, or that the case would be randomly reassigned to Judge Bell. Applying the prior-recusal rule here would accomplish only one thing: it would render judges powerless to revisit administrative reassignments managed by court staff.

As Judge Bell explained, there is a very important consideration on the other side of the ledger: a judge's "strong duty to sit when there is no legitimate reason to recuse." JA338 (citation omitted). Disqualifications on the basis of "unsupported, irrational, or highly tenuous speculation [would] set the price of maintaining the purity of appearance too high [and] would allow litigants to exercise a negative veto over the assignment of judges." *United States* v. *DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998) (citation omitted). That is what NTE is seeking here. The prior-recusal rule prevents litigants from *keeping* a particular judge they prefer, yet NTE wants to use the rule as a means of *vetoing* a particular judge they do not

prefer.  Either way, the concerns with gamesmanship and judge-shopping remain the same.

### B.    Vacatur Would Not Be An Appropriate Remedy.

Even if Judge Bell should have recused on a technicality, a judge's failure to recuse does not automatically trigger vacatur.  *See Liljeberg*, 486 U.S. at 864.  "In determining whether a judgment should be vacated," this Court "consider[s] the risk of injustice to the parties or in other cases and the risk of undermining the public's confidence in the judicial process." *United States* v. *Davis*, 801 Fed. Appx. 75, 78 (4th Cir. 2020).  Those factors cut decisively against vacatur here.

First, there is no risk of injustice to NTE.  This is not a case where Judge Bell made discretionary judgment calls that are subject to deferential review in this Court.  *See, e.g.*, *United States* v. *Atwood*, 941 F.3d 883, 885 (7th Cir. 2019) (Barrett, J.) (noting the potential for injustice in criminal sentencing cases because the law "leaves ample room for discretion").  NTE's antitrust claims were resolved on summary judgment, and will be reviewed by this Court de novo.  NTE is hardly prejudiced when it will "receive[] a full review by an impartial panel" of the summary-judgment

record.  *Williamson* v. *Indiana Univ.*, 345 F.3d 459, 464-465 (7th Cir. 2003);

*see United States* v. *O'Keefe*, 128 F.3d 885, 892 (5th Cir. 1997).

Second, any technical error would hardly undermine confidence in the

judiciary.  Judge Bell has no personal or financial interest in any party.

Indeed, NTE has correctly abandoned its previous argument that a fair-

minded observer would reasonably question Judge Bell's partiality because

McGuireWoods briefly participated in the case.  JA257-260.  NTE instead

argues that Judge Bell's decision to hear the case created an "appearance of

impropriety … that is exacerbated by the district court's *numerous errors of

law* in ruling for his former law firm's client and his former law partner."

Br. 57-58 (emphasis added).  That argument gives away NTE's game:  NTE

thinks Judge Bell should have recused because he ruled against it.  But

whether the court was right on the merits should have nothing to do with

recusal.  The only question is whether these proceedings undermine the

public's confidence in the judicial process, and the obvious answer to that

question is no.

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

_/s/ Jeffrey B. Wall_

JASON D. EVANS                    JEFFREY B. WALL
TROUTMAN PEPPER HAMILTON          MORGAN L. RATNER
SANDERS LLP                       DANIEL J. RICHARDSON
301 S. College St., 34th Floor    SULLIVAN & CROMWELL LLP
Charlotte, NC 28202               1700 New York Avenue, NW
(704) 916-1502                    Washington, DC  20006-5215
jason.evans@troutman.com          (202) 956-7500
                                  wallj@sullcrom.com

DOUGLAS GREEN
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3000
dgreen@steptoe.com

MAY 12, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, Jeffrey B. Wall, counsel for appellees and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is proportionately spaced, has a typeface of 14 points or more, and contains 12,987 words.

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL

MAY 12, 2023

## CERTIFICATE OF SERVICE

I, Jeffrey B. Wall, counsel for appellees and a member of the Bar of this Court, certify that, on May 12, 2023, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*s/ Jeffrey B. Wall*
JEFFREY B. WALL

MAY 12, 2023