No. 22-2168

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

NTE CAROLINAS II, LLC; NTE CAROLINAS II HOLDINGS, LLC;
NTE ENERGY, LLC; NTE SOUTHEAST ELECTRIC COMPANY, LLC;
NTE ENERGY SERVICES COMPANY, LLC; AND
CASTILLO INVESTMENT HOLDINGS II, LLC,

*Counterclaimants-Appellants*,

v.

DUKE ENERGY CAROLINAS, LLC, DUKE ENERGY PROGRESS, LLC, AND
DUKE ENERGY CORPORATION

*Counterclaim Defendants-
Appellees*.

———————

On Appeal from the United States District Court
for the Western District of North Carolina at Charlotte,
No. 3:19-cv-00515-KDB-DSC, Hon. Kenneth D. Bell

———————

**COUNTERCLAIMANTS-APPELLANTS' REPLY BRIEF**

———————

Derek T. Ho
Matthew J. Wilkins
Caroline A. Schechinger
Jonathan I. Liebman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Counterclaimants-
Appellants*

June 30, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................... 1

REPLY STATEMENT OF FACTS .......................................................... 3

    A.    Duke Ignores The Critical Evidence of Competitive Harm ................ 3

    B.    Duke Terminated The Interconnection Agreement Based On A Pretextual Payment Dispute .................................................. 3

    C.    Duke Misrepresents Key Aspects Of Its Deal With Fayetteville ........ 5

ARGUMENT ......................................................................................... 7

I.    THE EVIDENCE DEMONSTRATES UNLAWFUL EXCLUSION UNDER THE CORRECT LEGAL STANDARD ......................................... 7

    A.    Duke Does Not Dispute The Key Evidence of Exclusionary Conduct .......................................................................... 7

    B.    The District Court's Legal Analysis Was Wrong ................................. 9

II.    THE DISTRICT COURT MISAPPLIED REFUSAL-TO-DEAL AND EXCLUSIONARY-PRICING LAW ................................................. 15

    A.    A Reasonable Jury Could Find Duke's Refusal To Deal Unlawful ....................................................................... 15

    B.    A Reasonable Jury Could Find That Duke Engaged In Exclusionary Pricing ........................................................ 20

III.    JUDGE BELL'S REFUSAL TO RECUSE WAS NOT HARMLESS ......... 28

CONCLUSION ..................................................................................... 30

CERTIFICATE OF SERVICE ............................................................... 33

ii

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adderall XR Antitrust Litig., In re*,
   754 F.3d 128 (2d Cir. 2014) ...........................................................18

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
   910 F.2d 139 (4th Cir. 1990) ...........................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)...........................................................................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).............................................................. 12, 24

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) .........................................................23

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) .............................................. 11, 12

*City of Groton v. Conn. Light & Power Co.*,
   662 F.2d 921 (2d Cir. 1981) .................................................. 11, 12

*City of Mishawaka v. Am. Elec. Power Co.*,
   616 F.2d 976 (7th Cir. 1980) .........................................................11

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ......................................................23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).........................................................................10

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) ...........................................................27

*Credit Suisse Secs. (USA) LLC v. Billing*,
   551 U.S. 264 (2007).........................................................................17

iii

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
    486 F. App'x 186 (2d Cir. 2012) ....................................................11

*Energy Mktg. Servs., Inc. v. Columbia Gas Transmission Corp.*,
    639 F. Supp. 2d 643 (S.D.W. Va. 2009) .........................................19

*Essential Commc'ns Sys., Inc. v. AT&T Co.*,
    610 F.2d 1114 (3d Cir. 1979) .........................................................27

*FERC v. Elec. Power Supply Ass'n*,
    577 U.S. 260 (2016)........................................................................27

*Greenville Publ'g Co. v. Daily Reflector, Inc.*,
    496 F.2d 391 (4th Cir. 1974) .........................................................26

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ................................................... 12, 13

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988)........................................................................30

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012).....................................................17

*Lower Lake Erie Iron Ore Antitrust Litig., In re*,
    998 F.2d 1144 (3d Cir. 1993) ................................................. 27, 28

*M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992) .........................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................26

*McGahee v. N. Propane Gas Co.*,
    858 F.2d 1487 (11th Cir. 1988) .....................................................24

*MCI Commc'ns Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) .......................................................25

*Ne. Tel. Co. v. AT&T Co.*,
    651 F.2d 76 (2d Cir. 1981) ............................................................11

iv

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023)................................................................ 12, 18

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................ 14, 18

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).............................................................................7

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)...............................................................................17

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................................................10

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)................................................................................8

*Shell Oil Co. v. United States*,
    672 F.3d 1283 (Fed. Cir. 2012) ..............................................................30

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
    431 F.3d 917 (6th Cir. 2005) ..................................................................25

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
    476 U.S. 409 (1986)...............................................................................27

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
    8 F.4th 479 (6th Cir. 2021) ....................................................................18

*Stringer v. United States*,
    233 F.2d 947 (9th Cir. 1956) ..................................................................28

*Superior Prod. P'ship v. Gordon Auto Body Parts Co.*,
    784 F.3d 311 (6th Cir. 2015) ..................................................................25

*Swift & Co. v. United States*,
    196 U.S. 375 (1905)...............................................................................10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................14

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................ 15, 16, 17, 18, 19

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...............................................................18

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ................................................................23

*Ward v. Vill. of Monroeville*,
    409 U.S. 57 (1972)...............................................................................30

**STATUTE**

15 U.S.C. § 2 ................................................................... 7, 9, 13, 14, 17

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
    (4th ed. 2018).................................... 9, 13, 14, 15, 20, 21, 24, 28

Black's Law Dictionary (11th ed. 2019) ................................................29

Robert H. Bork, *The Antitrust Paradox* (1978) .......................................7

Michael A. Carrier, *Sharing, Samples & Generics:  An Antitrust Framework*,
    103 Cornell L. Rev. 1 (2017).........................................................16

Eric R. Claeys, *The Telecommunications Act of 1996, the Takings Clause,
    and Tensions in Property Theory*, 22 Yale J. on Reg. 205 (2005)...............16

Fed. Trade Comm'n *Amicus Curiae* Br., *Mylan Pharms., Inc. v. Celgene
    Corp.*, No. 2:14-CV-2094 (D.N.J. June 17, 2014), 2014 WL 2968348........16

Robin C. Feldman & Mark A. Lemley, *Atomistic Antitrust*,
    63 Wm. & Mary L. Rev. 1869 (2022).....................................................9, 14

Chiara Fumagalli & Massimo Motta, *On the Use of Price-Cost Tests in Loyalty Discounts and Exclusive Dealing Arrangements: Which Implications from Economic Theory Should Be Drawn?*, 81 Antitrust L.J. 537 (2017) .............................................................................. 13

Robert H. Lande, *Should Predatory Pricing Rules Immunize Exclusionary Discounts?*, 2006 Utah L. Rev. 863 (2006) ............... 21, 22, 23

Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 Geo. Mason L. Rev. 1205 (2015) ......................... 13

Richard A. Posner, *Antitrust Law* (2d ed. 2001) ....................................... 7

*Tariff Vol. No. 3, Rate Schedule MR (Market Based Rate Tariff)*, FERC (2022), https://etariff.ferc.gov/TariffBrowser.aspx?tid=1615 ..................... 27

Willard K. Tom et al., *Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing*, 67 Antitrust L.J. 615 (2000) ................................................................................... 13, 24

Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test*, 73 Antitrust L.J. 413 (2006) ................... 22

## INTRODUCTION

Duke's brief shows why summary judgment was improper.  On its telling, Duke simply outcompeted NTE.  Duke "won" the Fayetteville renewal because Fayetteville preferred Duke's services; Fayetteville's decision was unconnected to Duke's conditional rebate, which induced Fayetteville to renew at rates far higher than NTE's.  Duke says NTE walked away from their interconnection agreement by stopping payment; NTE's nonpayment was unconnected to Duke's instructions to withhold payment until receiving Duke's invoices.  At every turn, Duke's account asks this Court to resolve genuinely disputed facts in its favor, violating basic summary-judgment principles.

Duke's tale simply omits key evidence that Duke excluded NTE on a basis *other than* the merits.  NTE was more efficient, with a cost structure well below that of Duke's aging and inefficient power-plant fleet.  Despite its superior efficiency, Duke's conduct—its termination of the interconnection agreement, its conditional rebate offer to Fayetteville, its disparagement of NTE to investors and regulators—combined to prevent NTE from entering the market, resulting in higher prices and loss of consumer choice for Carolinians.

To avoid the big picture, Duke asks this Court to adopt the district court's atomized legal analysis, which asks whether individual acts independently create

1

liability and then sums the liability associated with those acts—an analysis Duke says yields a "zero" here. Duke's brief takes significant liberties with the case law—ignoring inconvenient precedents and selectively quoting or mischaracterizing others. In reality, decades of Supreme Court and circuit precedent require a holistic analysis, not mathematical addition of liability for individual acts. And even if the Court were to look atomistically at individual acts, those acts satisfy the "conduct rules" set forth by applicable precedents, which Duke again misreads. Exclusion of a rival on a basis other than superior efficiency is not a "zero" but a paradigmatic case of anticompetitive conduct. NTE deserves a trial because ample evidence shows that occurred here.

Trial should not occur before Judge Bell, who should have remained recused. Duke cites no authority for its hair-splitting distinction between recusal and "administrative reassignment." Judge Bell recused himself due to a conflict—his former law partner represented Duke. The once-recused-always-recused rule is designed to protect NTE's right to a judge untainted by conflicts, even those from the past.

## REPLY STATEMENT OF FACTS

### A.    Duke Ignores The Critical Evidence of Competitive Harm

The central factual issue is whether Duke—an undisputed monopolist—harmed competition and consumer welfare by driving NTE out of the market.  Yet Duke's one-sided account ignores the record evidence that:  (1) NTE was a more efficient electricity supplier than Duke; (2) Duke drove NTE out of the market despite NTE's superior efficiency; (3) Duke charges supracompetitive prices in NTE's absence; and (4) Duke's confessed purpose was to achieve that very outcome. *See* NTE Br. 8-21, 38-43, 49-51.  Despite Duke's omissions, this Court on de novo review cannot disregard that evidence, which creates a genuine factual dispute on monopolization.  *See id.*; *infra* pp.7-9.

### B.    Duke Terminated The Interconnection Agreement Based On A Pretextual Payment Dispute

Duke mischaracterizes its payment dispute with NTE, which is the crux of Duke's alleged procompetitive justification.  Duke omits two key facts:  It *instructed* NTE in January 2019 not to make payments unless Duke sent invoices.  JA5891-5892 ██████████████████████████████████████████████████ ██████████████████████████  And Duke *sent no timely invoices* for the scheduled March and May 2019 installment payments.  NTE Br. 17.  NTE did not pay because it *obeyed Duke's instructions*.  *Id.*

3

Then, on May 15, 2019, NTE temporarily suspended the Reidsville project, as was its right. *See id.* Contrary to Duke's assertion (at 12), suspending did not require NTE to make the March and May 2019 installment payments. Those payments were *advances* for work Duke had yet to perform, regardless of Duke's actual costs. The Agreement specifies that, upon suspension, NTE only had to pay "reasonable and necessary *costs* which [Duke] (i) *ha*[*d*] *incurred* pursuant to this LGIA prior to the suspension and (ii) incurs in suspending such work." JA447 (emphasis added).

NTE told Duke that it would pay for those actual costs. JA3875. However, Duke was required to "invoice [NTE] for [these] costs." JA447. That provision—which Duke omits—is key: without that invoice, NTE owed nothing (and indeed had no way to know what it owed). Yet Duke sent no invoice until *July 2020*—a fact the district court plainly got wrong, *see* NTE Br. 18 n.4 (district court stated Duke invoiced NTE in summer *2019*), and which Duke again omits. By then, Duke had terminated the Agreement and sued NTE (September 2019)—not for past costs under § 5.16 but for the installment payments that were no longer owed once the Agreement was suspended. JA2768-2771. A reasonable jury could determine that Duke's termination was a pretext to exclude NTE and maintain its monopoly.

4

Finally, contrary to Duke's claim (at 47), the "Promissory Note and Confession of Judgment" merely acknowledges NTE's payment obligation under the parties' settlement. NTE settled without admitting liability. JA4207.

## C. Duke Misrepresents Key Aspects Of Its Deal With Fayetteville

In characterizing its offer to Fayetteville as a run-of-the-mill discount, Duke ignores the discount's conditional-rebate structure, which leveraged Duke's monopoly to exclude NTE despite its lower rates. *See* NTE Br. 49-51; *infra* pp.20-24. Relying on a presentation from Fayetteville's consultant, GDS,[1] Duke suggests (at 9-11) Fayetteville's renewal decision was independent of the conditional rebate. But that rebate was the first advantage GDS listed—a clear causal link between Duke's anticompetitive pricing structure and NTE's exclusion. JA1383 ("Savings Prior to 2024.").

The GDS presentation also highlights Duke's efforts to disguise the conditional rebate. As GDS noted, Duke's rebate included a sham lease agreement in which it vastly overpaid Fayetteville for excess power from its outdated, largely idle Butler-Warner Plant. JA1383 ("Greater Butler-Warner Value"); JA4416


; JA4419

; JA4418

---

[1] Duke cites no evidence that Fayetteville itself adopted GDS's views.

████████████ .  ████████████████████████████

████████████████     JA4414, JA4295-4296.

Duke also argues (at 56-57) that Fayetteville decided to renew with Duke in May 2019, before Duke terminated the Agreement. But the parties signed only a letter of intent ("LOI") in May. JA1391. The extension was not agreed until November 2019, two months after Duke unlawfully terminated NTE's Reidsville interconnection agreement. JA3894-3897, JA4164. Before November, Fayetteville remained free to walk away—and Duke knew it. JA6977 ████████████████

████████████████████████████████ . Duke's anticompetitive actions post-LOI—unilaterally terminating NTE's interconnection agreement despite having sought FERC's consent to terminate another customer's interconnection agreement, falsely posting publicly that Reidsville was "cancelled," and intervening in what is ordinarily a rubber-stamp state permit proceeding in an attempt to block the Reidsville plant—show that Duke believed NTE was still in the running.

6

## ARGUMENT

## I. THE EVIDENCE DEMONSTRATES UNLAWFUL EXCLUSION UNDER THE CORRECT LEGAL STANDARD

### A. Duke Does Not Dispute The Key Evidence of Exclusionary Conduct

Because Duke is undisputedly a monopolist, Sherman Act § 2 requires NTE to prove only that Duke acquired or maintained its monopoly through exclusionary conduct. Duke does not dispute that "[t]he key to" identifying "improper . . . exclusion is whether the exclusion was based on superior efficiency." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.33 (1985) (conduct is anticompetitive if "a firm has been 'attempting to exclude rivals on some basis other than efficiency'" (quoting Robert H. Bork, *The Antitrust Paradox* 138 (1978)); Richard A. Posner, *Antitrust Law* 194-95 (2d ed. 2001) (conduct is anticompetitive if "likely in the circumstances to exclude from the defendant's market an equally or more efficient competitor").

Duke also acknowledges (at 54) that "[i]n analyzing this issue, it is appropriate to examine the economic effects of the challenged conduct." *Advanced Health-Care*, 910 F.2d at 148. Quintessential anticompetitive effects include "reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). This follows from antitrust law's

7

fundamental goal:  protecting consumers.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979).

Yet Duke's brief ignores the factual questions on which its liability turns:

- Did Duke exclude an equally or more efficient competitor?

- Did Duke's conduct reduce output, increase prices, or reduce quality in the Carolinas wholesale energy market?

A reasonable jury clearly could answer these questions *yes.*

Abundant evidence shows that Duke excluded "an equally or more efficient competitor"—NTE—from the Carolinas wholesale energy market.  Duke's costs were 30% higher than NTE's.  JA1806, JA4484.  █████████████████████████

███████████████████████████████  JA4471-4472.  ████████████████

██████████████  JA5927.  ██████████████████████████████████████████

██████████████████████  JA5086.  Yet Duke's conduct scared off NTE's investors, killed the Reidsville project, deprived NTE of opportunities to compete, and drove NTE—the more efficient firm—out of the market.  A reasonable jury could readily conclude that was not competition on the merits.

Duke's brief also offers no sustained rebuttal to the evidence that NTE's exclusion resulted in reduced output, higher prices, and lower quality.  *See* NTE Br. 9-16, 38-42, 49-51, 54-55.  As for reduced output, but for Duke's actions, NTE's entry would have increased total market-wide output by at least Reidsville's 475

8

megawatt capacity. As for higher prices, it is undisputed that Fayetteville (i) was paying supracompetitive prices before Duke had to compete with NTE, and (ii) will be paying higher prices at the end of its current contract than it would have paid NTE. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ JA6751-6768, JA6848-6997. As for lower quality, customers have no choice now but to purchase from Duke's fleet of less efficient, dirtier plants. Those harms support a jury finding that Duke maintained, or attempted to maintain, its monopoly by unlawfully excluding NTE.

## B. The District Court's Legal Analysis Was Wrong

Duke's response (at 47) defends the district court's holding that, if no individual act was unlawful in isolation, Duke's course of conduct cannot be anticompetitive on the whole (i.e., 0 + 0 = 0). Duke argues that a holistic analysis applies to anticompetitive effects, but only *after* the court has determined that particular acts are unlawful. That approach contradicts longstanding precedent and would undermine § 2's flexibility to protect against the "varied exclusionary practices" monopolists use. Areeda & Hovenkamp ¶310c7; *see* Robin C. Feldman

& Mark A. Lemley, *Atomistic Antitrust*, 63 Wm. & Mary L. Rev. 1869, 1906-14, 1930-32 (2022) ("Feldman & Lemley").

1.     Duke asserts (at 3) that "no court" has allowed a "series of lawful acts to prove monopolization." Not so: *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905), and *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), held that independently lawful acts can combine to make an unlawful whole.

Duke tries (at 50-52) to circumscribe that holding to two "discrete contexts"—exclusive dealing and conspiracy. Its only Supreme Court authority is a "see also" citation to *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009). But *linkLine*—which never mentioned *Swift* or *Continental Ore*—did not silently overturn the Court's requirement of holistic analysis of monopolists' conduct. Rather, it analyzed a specific pricing strategy—a "price squeeze," 555 U.S. at 442, by a vertically integrated monopolist—that is irrelevant here. Moreover, contrary to Duke's contention (at 48), the Court did not reject the plaintiffs' argument that the two components of a price squeeze "should be considered together." The Court *did* consider the two components together, but found no evidence that the combination caused "independent competitive harm." 555 U.S. at 455.

10

Duke's assertion that no circuit precedent supports NTE is also inaccurate. Duke simply ignores *City of Mishawaka v. American Electric Power Co.*, which coined the term "monopoly broth." That court said it "might agree . . . that no one aspect" of the defendant's conduct "standing alone is illegal." 616 F.2d 976, 986 (7th Cir. 1980). Yet the court considered the conduct holistically (and found the defendant liable) because, in its now-famous words, "[i]t is the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor." *Id.*

Duke's reliance on the unpublished, nonprecedential decision in *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186 (2d Cir. 2012), ignores the Second Circuit's actual rule, expressed in *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981), which held that courts must analyze a defendant's conduct holistically to determine "whether, qualitatively, there is a 'synergistic effect'" among the various aspects of the defendant's conduct.[2]

Duke's cherry-picked language from *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), likewise distorts the Ninth Circuit's position. Yes, the Ninth Circuit cautioned that it is "much more difficult to find overall wrongdoing" if "all we are shown is a number of perfectly legal acts."

---

[2] *Northeastern Telephone* adopted the same standard, despite its fact-specific determination that the plaintiff lacked evidence for certain conduct. *Ne. Tel. Co. v. AT&T Co.*, 651 F.2d 76, 95 n.28 (2d Cir. 1981).

*Id.* But it specifically rejected the district court's "mathematical equation" approach and required an analysis of the "synergistic effect" of the conduct as a whole. *Id.* (quoting *Groton*, 662 F.2d at 929).[3]

Duke also misreads *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc). The Third Circuit did not consider 3M's conduct holistically only after finding separate acts—bundled rebates and exclusive contracts—unlawful. Rather, it reviewed—and approved of the jury's reviewing—both components together in determining whether 3M had engaged in unlawful conduct. *See id.* at 159 ("LePage's produced evidence that the foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices."); *id.* at 154 ("jury had before it evidence of the full panoply of 3M's exclusionary conduct, including both the exclusive dealing arrangements and the bundled rebates").

*LePage's* also highlights why rigid application of specific "conduct rules" is particularly unfit for this case. As in *LePage's*, NTE asserts anticompetitive conduct for which the Supreme Court has created no specific test—an exclusionary conditional rebate. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), does not address cases where the mechanism of exclusion is

---

[3] Contrary to Duke's suggestion (at 53), *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), did not offer any sustained analysis of this issue. *See id.* at 300 n.13.

pricing *structure*. That is why courts analyze cases involving conditional rebates and similar offers under the holistic rule of reason, not by applying rigid price-cost tests. *See LePage's*, 324 F.3d at 151-52, 162 ("Nothing in any of the Supreme Court's opinions in the decade since the *Brooke Group* decision suggested that the opinion overturned decades of Supreme Court precedent that evaluated a monopolist's liability under § 2 by examining its exclusionary, i.e., predatory, conduct."); NTE Br. 51-52 & nn.10, 12; Areeda & Hovenkamp ¶1807b.[4]

> **2.** Duke's proposed rule disserves § 2's objectives. As explained above (and as Duke acknowledges (at 54)), whether conduct is unlawful is inextricably intertwined with its effects. *See supra* pp.7-9. It thus makes no sense to limit the holistic analysis to effects but not conduct. *See* Areeda & Hovenkamp ¶310c7 ("conduct must *always* be analyzed 'as a whole'") (emphasis added).

Moreover, transforming the flexible monopolization standard into a series of rigid "conduct tests" would be disastrous antitrust policy. While courts have indeed

---

[4] *Accord* Chiara Fumagalli & Massimo Motta, *On the Use of Price-Cost Tests in Loyalty Discounts and Exclusive Dealing Arrangements: Which Implications from Economic Theory Should Be Drawn?*, 81 Antitrust L.J. 537, 564, 568-69 (2017); Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 Geo. Mason L. Rev. 1205, 1208-09 (2015); Willard K. Tom et al., *Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing*, 67 Antitrust L.J. 615, 636-38 (2000).

"develop[ed] considerably more specific rules for common forms of alleged misconduct," it remains axiomatic "that anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("the means of illicit exclusion . . . are myriad"). The flexibility of § 2 is critical to allow antitrust law to keep pace with new technologies, new business practices, and the creativity of monopolists and their lawyers. *See* Feldman & Lemley 1930-34.

Contrary to Duke's suggestion (at 51), the holistic analysis § 2 requires is flexible but not "freewheeling" because liability is properly conditioned on evidence "that the conduct in question was in fact part of a conscious scheme to monopolize a market." Feldman & Lemley 1934. That evidence—abundant here, *see* NTE Br. 11-13, 19-20—safeguards against the risk of deterring legitimate, procompetitive conduct. Feldman & Lemley 1933-34. Thus, if individual acts are all "part of the same scheme to perpetuate dominance or drive the plaintiff from the market … 'aggregation is appropriate.'" Areeda & Hovenkamp ¶310c7. Examining pieces of the scheme in isolation ignores the reality that "[a] monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices," each of which "in isolation might be viewed as de minimis

14

or an error in judgment"—i.e., lawful—but which together achieve the monopolist's anticompetitive end. *Id.*

## II.   THE DISTRICT COURT MISAPPLIED REFUSAL-TO-DEAL AND EXCLUSIONARY-PRICING LAW

Even if the Court were to adopt Duke's erroneous atomized analysis, reversal is warranted because the individual components of Duke's conduct are not "zeroes."

### A.   A Reasonable Jury Could Find Duke's Refusal To Deal Unlawful

Duke argues (at 26) that unlawful refusals to deal require "both a [prior] voluntary course of dealing and a refusal to sell at profitable prices." As to the former, Duke's position that prior voluntary dealing is an absolute prerequisite misreads the case law. As to the latter, Duke's argument (at 27) that it "stopped dealing with NTE only when NTE stopped paying" rests on disputed facts requiring trial.

**1.** A bright-line rule requiring prior voluntary dealing misreads *Trinko*. As Duke's brief acknowledges (at 25), *Trinko* explicitly stated that the significance of the prior voluntary course of dealing in *Aspen Skiing* was that it showed that the dominant ski resort had forgone a "*presumably profitable*" arrangement. *Verizon Commc'ns Inc. v. L. Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). Voluntariness was not an absolute prerequisite as such; it was evidence of the monopolist's "willingness to forsake short-term profits to achieve an anticompetitive

15

end." *Id*. Using *profit-sacrifice* as the touchstone, *Trinko* distinguished *Aspen Skiing* because Verizon was required by federal law to provide service at a "cost-based rate of compensation." *Id.*[5] Forgoing an *unprofitable* venture is a rational business decision that "tells us nothing about dreams of monopoly." *Id*.; *see also* Fed. Trade Comm'n *Amicus Curiae* Br. 11-14, *Mylan Pharms., Inc. v. Celgene Corp.*, No. 2:14-CV-2094 (D.N.J. June 17, 2014), 2014 WL 2968348 (voluntary-dealing requirement inconsistent with Supreme Court precedent); Michael A. Carrier, *Sharing, Samples & Generics: An Antitrust Framework*, 103 Cornell L. Rev. 1, 51 (2017) (same).

Thus, contrary to Duke's contention (at 27), the key point is that the FERC regulations mandating interconnection guaranteed Duke a profit in providing interconnection services. And the evidence shows that the Agreement guaranteed Duke millions of dollars in profit on the interconnection infrastructure because NTE would pay for it and Duke would own it. Sacrificing those profits does evince Duke's "dreams of monopoly," which are confirmed by the many internal Duke emails explicitly describing its efforts to knock NTE out of the market. Indeed,

---

[5] Eric R. Claeys, *The Telecommunications Act of 1996, the Takings Clause, and Tensions in Property Theory*, 22 Yale J. on Reg. 205, 214 (2005) (FCC interconnection "rate payments [are] at or below an incumbent's actual costs."); *see also Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 489 (2002).

16

terminating a profitable, federally mandated interconnection for pretextual reasons evinces far greater monopoly dreams than simply declining to continue a voluntary course of dealing.

Duke also has no compelling response to *Otter Tail*, which upheld § 2 liability for refusing to deal with municipal power distribution systems with which Otter Tail had no prior dealings *at all*. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 370-71 (1973). Duke argues (at 30-31) that *Otter Tail* is inapplicable here because it "was decided before FERC's compelled-sharing regulations." That misses the point: *Otter Tail* forecloses Duke's claim that refusal-to-deal liability can never be imposed absent a prior voluntary course of dealing.[6] Moreover, Duke does not dispute that the only difference between the FPC in 1973 and FERC now is that FERC now orders all parties to interconnect *ex ante*, while the FPC only did so if the incumbent provider refused to do so voluntarily. *See* NTE Br. 47-48. That difference is not dispositive under any reasonable reading.

Duke's lower-court citations (at 26) do not adopt its bright-line voluntary-dealing requirement. *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275 (4th Cir. 2012), did not endorse Duke's test. Rather, it rejected the plaintiff's claim because

---

[6] To the extent Duke suggests that *Trinko* overruled *Otter Tail*, that is wrong. *See Credit Suisse Secs. (USA) LLC v. Billing*, 551 U.S. 264, 271 (2007) (citing *Otter Tail* post-*Trinko*); *Trinko*, 540 U.S. at 410 (citing, not overruling, *Otter Tail*).

17

the defendant *had* entered into a business relationship, just not on terms the plaintiff wanted—there was no refusal to deal at all.

In *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020), the plaintiff alleged facts similar to *Aspen Skiing*, including "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." But the court emphasized that these facts did not provide a "precise delineation of the requirements of a refusal-to-deal pleading" because "[a] case might present itself in which other factors . . . could plausibly support the inference that a refusal to deal is 'prompted . . . by anticompetitive malice.'" *Id.* (quoting *Trinko*, 540 U.S. at 409).

Duke's other cases are consistent with *Trinko*'s statement that the existence of a prior voluntary course of dealing is an *indication* of anticompetitive conduct rather than an indispensable element of a refusal-to-deal claim. *See St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (existence of a "voluntary . . . course of dealing" merely "inform[s]" the inquiry); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (noting that *Trinko* "does not purport to set out a 'test,'"; plaintiff's unusual duty-to-deal claim lacked "*any* of the particulars identified as significant by the *Trinko* Court") (emphasis added). Likewise, *Meta Platforms*, 66 F.4th at 305-06, and *Novell*, 731 F.3d at 1074-75, did

18

not consider—or foreclose—the possibility that termination of a legally mandated (but still profitable) course of dealing can give rise to liability.

**2.**     As to profitability, Duke does not deny that the Agreement—and FERC regulations—provided that Duke would earn a profit on its interconnection services. Rather, it claims that the arrangement became unprofitable once NTE refused to pay its bills.  As explained above (*supra* pp.3-4), however, Duke instructed NTE not to pay its bills until it received invoices, and then manufactured a payment dispute to exclude NTE from the market.  Because a reasonable jury could decide that Duke's proffered business justification was a pretext, it could also conclude that Duke in fact did refuse to provide interconnection services at profitable prices, with anticompetitive intent.

**3.**     Finally, Duke characterizes (at 28) NTE's complaint as a mere contract claim within FERC's exclusive province.  But the Federal Power Act explicitly preserves antitrust liability, and it does not purport to provide comprehensive remedies for anticompetitive conduct.  *See* NTE Br. 7-8.  The differences between the federal energy laws and FCC's "complex regime for monitoring and enforcement"—which made it an "effective steward of the antitrust function," *Trinko*, 540 U.S. at 401, 413—are stark.  *See Energy Mktg. Servs., Inc. v. Columbia Gas Transmission Corp.*, 639 F. Supp. 2d 643, 647 n.2, 652 (S.D.W. Va. 2009)

19

("FERC's authority to remedy anti-competitive behavior is decidedly less than the [FCC's] authority in *Trinko*" and energy markets lack "the same level of regulatory overlay . . . found in *Trinko*") (cleaned up). The FPA thus provides no basis to narrow refusal-to-deal liability or exempt Duke from its proper reach.

### B. A Reasonable Jury Could Find That Duke Engaged In Exclusionary Pricing

**1.** The district court erred by rejecting NTE's exclusionary pricing arguments under *Brooke Group*'s price-cost test because the *structure* of Duke's offer was exclusionary, not just the *price*. Duke's ██████████ strategy was structured to exclude competition by leveraging Duke's unique position as an incumbent monopolist. *See* JA4663-4664, JA4486, JA6977, JA7297. Because Fayetteville was locked into a long-term contract with Duke containing a *seven-year* notice period, only Duke could bundle a renewal offer with a retroactive discount on the remaining years of its existing contract. In this way, Duke's pricing scheme combined elements of below-cost pricing with a conditional, retroactive rebate that was exclusionary in its price level *and* its structure. *See* Areeda & Hovenkamp ¶1807b.

Duke's pricing scheme was doubly anticompetitive because of its plan to use its monopoly power and market-rate authority to raise prices on other captive ratepayers. *See* Areeda & Hovenkamp ¶247c ("[C]omplex tariff structures

20

permitting different prices to different market segments are common, and a frequent result is cross-subsidization; that is, high rates from one part of the regulated market are used to offset low rates in another part. Absent effective agency supervision, such a scheme can be used to exclude rivals from one portion of the market.").[7] Duke therefore did not need to wait to recoup its exclusionary discounting to bear fruit. *See* JA4421 ███████████████████████████████████████

███████████████████████████████.

Duke's scheme also obscured the magnitude of its discount. Retroactive discounts are particularly pernicious because they seek to "mask[] thinly disguised predatory pricing," but "would likely pass" a mechanistically applied "predatory pricing test." Robert H. Lande, *Should Predatory Pricing Rules Immunize Exclusionary Discounts?*, 2006 Utah L. Rev. 863, 872-74 (2006).

Duke's responses are unpersuasive. Duke first argues (at 36) that NTE forfeited any challenge to Duke's pricing structure, as opposed to the price level. But NTE's summary-judgment briefing and expert opinions relied on the structure of Duke's offer in contending it was exclusionary. *See* JA4383 ████████████

████████████████████████████████████████████████████████████

---

[7] Duke's *amici* economists ignore the heightened risk of "anticompetitively low rates by regulated firms," which "can be a much more significant problem than predatory pricing generally." Areeda & Hovenkamp ¶247c.

21

██████████████; NTE Br. 13-15 (discussing expert reports).  And Duke's summary-judgment reply addressed the point, though it invited the district court's error by asserting that such a challenge must always satisfy *Brooke Group*'s price-cost test.  *See* JA7322.  Moreover, exclusionary pricing is one *theory* for proving monopolization and attempted monopolization, not a separate *claim*.  As the nonmoving party, NTE deserves "the benefit of all favorable legal theories invoked by the evidence" on summary judgment.  *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (cleaned up).

Duke next argues (at 36-37) that a challenge to a conditional rebate must still satisfy *Brooke Group*.  But *Brooke Group* involved no such challenge.  And as explained above (*supra* pp.12-13), courts post-*Brooke Group* have refused to apply price-cost tests to other forms of exclusionary pricing.  Duke cites no contrary authority.  Likewise, insisting on proof of recoupment makes little sense in this context.  *See* Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test*, 73 Antitrust L.J. 413, 424 (2006) ("[S]hort-run profit sacrifice also is not necessary for conduct to be exclusionary because the anticompetitive gains from exclusionary conduct sometimes can be reaped immediately."); Lande, 2006 Utah L. Rev. at 877-78 ("[T]here should not be a recoupment requirement in the[] cases [involving pricing schemes that do not

22

require short-term profit sacrifices to be successful] because the exclusion achieved under these discounts can be costless for the firm undertaking the practices."); *cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 n.21 (9th Cir. 2008) (no recoupment test in the bundled discounting context because it is not "analytically helpful to think in terms of recoupment of a loss that did not occur").

Duke also argues (at 36) that the structure of its offer to Fayetteville was not exclusionary because "[b]usinesses offer discounts on existing services all the time to entice customers to renew agreements." But its own cases reflect that conditional discounts violate the antitrust laws if they have exclusionary effects. In *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1045, 1049, 1059-60 (8th Cir. 2000), the court considered that a firm's above-cost conditional discounts could lead to the unjustifiable exclusion of competitors. And in *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001), the court considered that an incentive agreement could be "coercive" and support antitrust liability. The literature also supports that retroactive discounting schemes warrant different analysis from ordinary rebates designed to incentivize new purchases. *See, e.g.*, Lande, 2006 Utah L. Rev. at 864-65 ("retroactive discounts have a strong exclusionary and anticompetitive potential" and "[t]here is no reason to believe that a policy appropriate for forward-looking discounts is appropriate for retroactive

23

discounts"); Areeda & Hovenkamp ¶749a (price-cost tests "need not apply in cases where the behavior has a significant nonprice exclusionary element , . . . the appropriate focus in these cases is not on whether the price was below cost, but whether the challenged practice as a whole is unreasonably exclusionary"); Tom et al., 67 Antitrust L.J. at 636-37 ("[T]he structure of a manufacturer's prices can be improperly exclusionary, even if each individual element in the structure is above the relevant measure of costs.").

2.    In any event, reversal is warranted because a reasonable jury could conclude that Duke charges "below an appropriate measure of . . . costs" and has "a dangerous probability[] of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 222-24.

Duke undisputedly priced below average total costs. Duke's assertion (at 38) that "no case—not even one—hold[s] that predatory pricing should be measured by average total costs," is (yet again) inaccurate. *See* NTE Br. 53 (citing law of four circuits). Duke again ignores inconvenient precedent, failing even to acknowledge *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1496, 1500-01 (11th Cir. 1988), which held that prices above marginal costs but below average total costs can establish predation when combined with intent evidence. Contrary to Duke's suggestion, *Brooke Group* did not resolve the proper measure of costs, and none of

24

the four circuits has held that it abrogated their preexisting precedents.  Indeed, the Sixth Circuit has twice reaffirmed its pre-*Brooke Group* burden-shifting test, which permits liability based on prices below average total costs.  *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 938 (6th Cir. 2005) ("[i]f the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden"; "burden shifts to the defendant" to justify the prices if "the plaintiff proves that the defendant's prices were below average variable cost"); *accord Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 319 (6th Cir. 2015).  Duke's selective quotation (at 38) omits half of the test.  These cases recognize that inflexible, below-marginal-cost rules create "false negatives" by requiring courts to disregard other strong evidence of exclusionary intent and effects.

A reasonable jury also could conclude that Duke priced below marginal costs. In the utility industry, all costs are marginal in the long run, as Dr. Morris opined, NTE Br. 14-15, and as Duke's own case—*MCI Communications Corp. v. AT&T Co.*, 708 F.2d 1081, 1114-23 (7th Cir. 1983)—recognizes.  Accordingly, as Dr. Morris and *MCI Communications* agree, *long-run* incremental cost, which includes both fixed and variable costs, is an appropriate benchmark.[8]  NTE's expert calculated that Duke's new offer to Fayetteville was beneath its long-run incremental costs.

---

[8] Duke's *amici* economists take no account of *MCI* or industry economics.

JA4488-4489.  That admissible opinion creates an expert dispute on highly technical cost-allocation that is for the factfinder to resolve.  *See Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 397-98 (4th Cir. 1974); NTE Br. 54.

Duke's arguments that NTE has failed to establish a reasonable probability of recoupment are unpersuasive.  The question raises factual issues for trial.  First, Duke dismisses (at 40-41) the evidence of cost-shifting to other ratepayers as "irrelevant" because recoupment concerns "prices after a predatory-pricing scheme drives competitors from the market, not price shifts while those competitors are still in the market."  But Duke's cross-subsidization *would* take place *after* driving NTE out of the market.  Regardless, Duke's ability to recoup costs at the expense of other ratepayers illustrates its pervasive monopoly power.  That its path to "recovering . . . later monopoly profits" is less "speculative" than in other schemes hardly *immunizes* it from predatory-pricing liability.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).

Second, Duke dismisses (at 41) NTE's evidence that Duke would recoup monopoly profits by charging supracompetitive prices as a "conclusory allegation[.]"  But it is hardly speculative that Duke, upon driving its only viable competitor from the market, will resume its "[my] way or the highway" pricing practices.  JA2204-2205.  Indeed, under Duke's conditional rebate, Duke will

*already* charge higher prices than NTE had offered during the renewal period of the contract, even before that contract's expiry.

Lastly, Duke contends (at 41-42) that recoupment is infeasible because FERC would prevent any price increases. But FERC has preapproved Duke's wholesale rates (giving Duke "market-based rate authority"), *Tariff Vol. No. 3, Rate Schedule MR (Market Based Rate Tariff)*, FERC (2022) (preapproving rates negotiated by Duke and its wholesale customers), https://etariff.ferc.gov/TariffBrowser. aspx?tid=1615 (emphasis added), and lacks jurisdiction over its retail rates, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 279 (2016).

**3.** Finally, the filed-rate doctrine does not foreclose NTE's claim. This Court should adopt the majority rule, which, as Duke acknowledges (at 44-45), holds the filed-rate doctrine inapplicable to competitors' claims.[9] Applying the filed-rate doctrine to suits between competitors does not advance the doctrine's purpose: the "prevention of unjust discrimination" in pricing among a utility's *customers*. *Square D*, 476 U.S. at 417; *Essential Commc'ns Sys., Inc. v. AT&T Co.*, 610 F.2d 1114, 1121 (3d Cir. 1979) ("if [providers] were free to depart from filed tariffs, the

---

[9] Duke inaccurately asserts (at 45) that "only one" appeals court has reaffirmed this principle since *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986). *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1161 (3d Cir. 1993); *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 945 (9th Cir. 1996).

27

prohibition against discrimination *among customers* could be evaded") (emphasis added). Finding Duke liable for its exclusionary pricing would not change *customers*' rates; Duke would just be liable to NTE for antitrust damages.

Moreover, the doctrine was never designed to insulate monopolists from private antitrust enforcement by competitors. *See Lake Erie*, 998 F.2d at 1161 ("competitors are not the intended beneficiaries"). And applying the filed-rate doctrine to competitors would force FERC into an antitrust enforcement role it is not designed or well-equipped to fill. *See supra* pp.19-20; *see also* Areeda & Hovenkamp ¶247c (agreeing with the majority rule).

## III.   JUDGE BELL'S REFUSAL TO RECUSE WAS NOT HARMLESS

As Duke's authority recognizes (at 60), "once having disqualified himself for cause, . . . it was incurable error for the district judge to resume full control." *Stringer v. United States*, 233 F.2d 947, 948 (9th Cir. 1956). Duke's attempts to defend this "incurable error" fail.

1.     Duke erroneously claims (at 60-61) that "[a]fter this case was first assigned to Judge Bell, it was immediately reassigned by the clerk's office to Judge Mullen." Actually, the case was not reassigned until December 18, more than three weeks after Judge Bell was first assigned on November 26, 2019. JA36.

28

**2.**      Duke argues (at 60) un-recusal is acceptable if the earlier recusal "was based on a mistaken view of the facts."  Even if so, Duke identifies no factual mistake.  No one disputes that one of Judge Bell's former law partners appeared for Duke.  JA339, JA342-343.

**3.**      Duke suggests (at 60-61) that Judge Bell never actually recused because he did not "perform[ ] a considered recusal analysis" at that time.  But a "recusal" is "[r]emoval of oneself as judge or policy-maker in a particular matter, especially because of a conflict of interest." *Recusal*, Black's Law Dictionary (11th ed. 2019).  Regardless of what analysis he performed, Judge Bell's action perfectly fits the definition:  he stopped presiding because, as the docket entry reflects, he had a "conflict."  JA36.

**4.**      Duke incorrectly suggests (at 61-62) that Judge Bell's 2019 recusal was not actually a recusal because "court staff" made the reassignment.  This ignores that court staff entered the reassignment pursuant to a policy "Judge Bell implemented." *Id*.  A recusal is no less a recusal because court staff effects it at the judge's direction.

**5.**      Duke argues (at 63-64) that vacatur is inappropriate "[e]ven if Judge Bell should have recused."  For starters, the decision below should be reversed

29

because it misapplied antitrust law and summary-judgment standards. Because Judge Bell should not have un-recused, he should not preside over the trial.

Judge Bell's failure to recuse also independently justifies vacatur. Duke's two arguments for harmlessness under *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), are unpersuasive.

First, the risk of injustice to NTE here is clear. Summary judgment after years of litigation and millions of dollars in costs and fees ruined NTE's business. It was entitled to the protections of the prior-recusal rule for that critical decision. Duke's suggestion (at 63-64) of per se harmlessness for rulings subject to de novo review is "untenable." *Shell Oil Co. v. United States*, 672 F.3d 1283, 1294 (Fed. Cir. 2012) (rejecting that rule); *see also Ward v. Vill. of Monroeville*, 409 U.S. 57, 61 (1972).

Second, denying vacatur does risk "undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. From the public's perspective, Judge Bell recused himself due to a "[c]onflict," JA36, yet reassumed control and then ruled for his former law partner's client, JA43. Vacatur would prevent justifiable public doubt about the integrity of the judicial process.

## CONCLUSION

This Court should reverse and remand to a new judge for trial, or vacate and remand to a new judge for reconsideration.

30

June 30, 2023                          Respectfully submitted,

                                       /s/ Derek T. Ho
                                       Derek T. Ho
                                       Matthew J. Wilkins
                                       Caroline A. Schechinger
                                       Jonathan I. Liebman
                                       KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.
                                       1615 M Street, N.W., Suite 400
                                       Washington, D.C. 20036
                                       (202) 326-7900
                                       dho@kellogghansen.com

                                       *Counsel for Counterclaimants-
                                       Appellants*

31

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __22-2168__      **Caption:** __NTE Carolinas II, LLC v. Duke Energy Carolinas, LLC__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. <u>See</u> Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____6,498____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
Times New Roman 14-point _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) __Derek T. Ho__

Party Name __NTE Carolinas II, LLC et al.__

Dated: __June 30, 2023__

## CERTIFICATE OF SERVICE

I hereby certify that, on June 30, 2023, I electronically filed the foregoing Counterclaimants-Appellants' Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Derek T. Ho*
Derek T. Ho

33