FILED:  November 26, 2024

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-2168**
**(3:19-cv-00515-KDB-DSC)**

———————

DUKE ENERGY CAROLINAS, LLC,

        Plaintiff – Appellee,

and

DUKE ENERGY CORPORATION; DUKE ENERGY PROGRESS, LLC,

        Counter-Defendants – Appellees,

v.

NTE CAROLINAS II, LLC; NTE CAROLINAS II HOLDINGS, LLC; NTE ENERGY, LLC; NTE SOUTHEAST ELECTRIC COMPANY, LLC; NTE ENERGY SERVICES COMPANY, LLC; CASTILLO INVESTMENT HOLDINGS II, LLC,

        Defendants – Appellants.

------------------------------

AMERICAN ANTITRUST INSTITUTE,

        Amicus Supporting Appellants.

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NORTH CAROLINA CHAMBER LEGAL INSTITUTE; DR. BENJAMIN ZYCHER; GEOFFREY A. MANNE; PROFESSOR RICHARD A. EPSTEIN; PROFESSOR DONALD J. BOUDREAUX,

        Amici Supporting Appellees.

---

### O R D E R

---

The court denies the petition for rehearing en banc.

A requested poll of the court failed to produce a majority of judges in regular active service and not disqualified who voted in favor of rehearing en banc. Judges Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Rushing, Heytens, Benjamin, and Berner voted to deny rehearing en banc. Judges Richardson and Quattlebaum voted to grant rehearing en banc. Chief Judge Diaz and Judge Wilkinson were disqualified.

Entered at the direction of Judge Niemeyer with the concurrence of Judge Thacker.

For the Court

/s/ Nwamaka Anowi, Clerk

NIEMEYER, Circuit Judge, in support of denying rehearing en banc:

Because this court's panel opinion, reported at 111 F.4th 337, concluded that numerous material facts were disputed and needed to be resolved before a court could determine Duke Energy Corporation's civil liability under § 2 of the Sherman Act for willfully maintaining monopoly power through anticompetitive conduct, en banc review now is not suitable. To draw legal conclusions from facts not yet established would be tentative and inefficient, amounting to a speculative use of judicial resources. My good colleague in dissent, however, does not even recognize that facts are disputed, nor does he acknowledge the critical ones presented by the plaintiff.

The facts asserted by NTE Carolinas, LLC, *if proved*, would show that Duke Energy engaged in a broad scheme of anticompetitive conduct that was designed to exclude NTE from the relevant market and thus to maintain its monopoly power, which, the district court concluded, was demonstrated by its 90% share of the market. The evidence that NTE presented showed that it cost Duke Energy 30% more to produce energy than it cost NTE and that Duke Energy recognized this fact. At an "all-hands" meeting, Duke Energy's wholesale power segment warned that Duke Energy's systems were "no longer competitive." As a result, NTE was increasingly able to persuade Duke Energy's wholesale customers to switch their source of energy from Duke Energy to NTE, with nine such customers leaving Duke Energy to purchase electricity generated by NTE at a new power plant. During the events at issue in this case, NTE began planning the construction of a second new plant, the Reidsville Energy Center, but to bring that plant online, NTE needed to attract the business of a large wholesale customer. To this end, NTE began

targeting the City of Fayetteville, North Carolina, one of Duke Energy's largest customers. Indeed, Fayetteville had been a Duke Energy customer for more than 100 years, and Duke Energy received approximately $100 million in annual net revenue from it. Internally, Duke Energy recognized the looming problem posed by NTE's relative efficiency and stated that it "need[ed] the NTE train to stop." NTE has pointed to testimony and documents indicating that, in response to NTE's competition, Duke Energy focused its attention specifically on NTE's proposed construction of the Reidsville plant, with which NTE planned to compete for Fayetteville's business.

Because NTE was an independent power producer that generated power at its plants but did not own its own transmission lines, it was dependent on transmission networks owned by other energy companies, such as Duke Energy. To facilitate access to such transmission lines, the Federal Energy Regulatory Commission ("FERC") requires utilities to share their transmission networks with competitors. Accordingly, Duke Energy did dutifully enter into a contract with NTE to provide the proposed Reidsville plant with access to its transmission network, which would enable NTE to serve customers such as Fayetteville.

Nonetheless, as NTE showed, shortly after entering into that contract, Duke Energy undertook a course of conduct designed to frustrate or end it and thus undermine NTE's competitive effort, and it did so precisely because Duke Energy believed that it was at a "competitive disadvantage" in terms of efficiency that was "not going away soon." Duke Energy recognized that NTE was its "biggest threat" and that it needed to stop "the NTE

train." And NTE has presented evidence of numerous specific acts that Duke Energy took to that end, presenting evidence of the following acts, among others:

- Duke Energy manufactured a breach of the transmission line agreement with NTE and then, based on that breach, terminated the agreement, causing numerous anticompetitive impacts to NTE's planned Reidsville plant. Prior to the termination of the agreement, a Duke Energy official cheered, "breach! breach! punt em!" And "punt em" they did, as the sham breach adversely affected NTE's place in FERC's "Open Access Same-Time Information System," which directly affected its ability to succeed with the proposed Reidsville plant. NTE petitioned FERC to review Duke Energy's unilateral termination of the Reidsville interconnection agreement, and FERC issued an opinion concluding that the termination was indeed unlawful. But Duke Energy's conduct nonetheless delayed NTE's project by almost a year.

- Duke Energy also approached Fayetteville to make it an offer that NTE could not match even with its greater efficiency. The multi-faceted offer amounted in the aggregate to a $325 million discount for Fayetteville, which was unprecedented and which, NTE alleged, would amount to Duke Energy providing energy at a price *below its cost*. Duke Energy itself acknowledged that it expected to lose $100 million on the arrangement, but it planned to recoup those losses later by raising rates on other customers. While Duke Energy contended that its discount was merely legitimate price competition

and not predatory pricing, NTE's expert disagreed and concluded that the arrangement was predatory, creating a factual dispute.

- In addition, as part of its offer to Fayetteville, Duke Energy agreed to *quadruple* the price it paid Fayetteville to purchase excess energy from Fayetteville's old, inefficient Butler Warner Plant, even though that price was above the market rate. Duke Energy thus took a loss on such purchases to provide Fayetteville an additional benefit that NTE could not match.

- And when NTE submitted an application to the North Carolina Utilities Commission for a permit needed to construct the Reidsville plant, the type of application that rarely attracted outside involvement and was routinely granted, Duke Energy petitioned to intervene before the State Commission to assert falsely that NTE had breached the Reidsville interconnection agreement and to suggest that NTE would fail to meet its construction goals "apparently due to a lack of financing and insufficient wholesale customers to justify the need for [Reidsville]." At that time, however, Duke Energy knew that NTE had already won the business of some of Duke Energy's customers and was threatening to take one of its largest customers, Fayetteville, with its more efficient facilities.

NTE pointed to yet other actions by Duke Energy, as set forth in more detail in this court's panel opinion, and maintained that such conduct did not represent legitimate competition, but rather anticompetitive conduct.

While many of the facts that NTE advanced were undisputed, many were also disputed. If the disputed facts were to be proved at trial, it would become clear that what NTE proffered was not conduct that amounted to old-fashioned competition based on efficiency, better products, and better service. Rather, it was conduct expressly aimed at keeping NTE out of Duke Energy's market because NTE was concededly more cost-efficient — 30% more efficient, as Duke Energy recognized. When such conduct is carried out by an entity with monopoly power, it amounts to a violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

To succeed on its § 2 claim, NTE would have to satisfy two essential elements: (1) that Duke "possess[ed] . . . monopoly power in the relevant market," *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966), and (2) that it willfully acquired or maintained that power through anticompetitive conduct, as opposed to "as a consequence of a superior product, business acumen, or historic accident," *id*. at 571.

The first element is not at issue here, as Duke Energy does not challenge the district court's conclusion that a reasonable jury could find that Duke Energy has or was likely to achieve monopoly power in a relevant market, given its "durably high market share," which stands "at or approaching 90%." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 608 F. Supp. 3d 298, 315–17 (W.D.N.C. 2022). But the second element is at issue — whether Duke Energy maintained its power through anticompetitive conduct, *i.e.*, conduct intended to "exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (quoting R. Bork, *The Antitrust Paradox* 138 (1978)).

Of course, a monopolist does not violate § 2 by offering a superior product, service, or lower prices, as such conduct is procompetitive and thus increases consumer welfare. Rather, a monopolist violates § 2 when it "use[s] [its] monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

NTE has presented sufficient evidence to demonstrate that Duke Energy attempted to maintain or maintained its monopoly power through anticompetitive conduct, *i.e.*, conduct intended to exclude NTE on bases other than efficiency. Indeed, increased efficiency was a course that Duke Energy conceded it was unable to take, as its "competitive disadvantage" in terms of efficiency was "not going away soon." In short, the facts suggested by NTE's evidence, if proved, show a deliberately anticompetitive course of conduct that violates § 2 of the Sherman Act.

My colleague in dissent fails to address some of the most critical facts for determining § 2 liability, such as the undisputed fact that Duke Energy itself projected that its all-in costs were 30% higher than NTE's, thus making NTE more competitive. He fails to address NTE's evidence that Duke Energy manufactured NTE's supposed breach of the transmission line agreement, and, based on that breach, terminated it, a termination that FERC later found to be unlawful. Again, he fails to take account of the fact that Duke Energy offered Fayetteville a $325 million aggregate discount that Duke Energy projected would cause it a $100 million loss and that, NTE's expert witness explained in detail, was predatory, *i.e.*, below Duke Energy's costs. While he briefly mentions anticompetitive

malice, he also fails to address its inculpating power under a § 2 monopolization claim. Skirting these critical facts that, if proved, would show anticompetitive conduct, he instead cabins NTE's claims into two distinct narrower categories of refusal to deal and predatory pricing, arguing that under *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009), NTE's claim can only succeed if it satisfies one of those two bases. He notes that the *linkLine* Court found that the complaint in that case failed to state either of those two claims. And interpreting *linkLine* to hold that only refusals to deal and predatory pricing may establish a § 2 claim, he accuses the panel opinion of "[r]ejecting *linkLine*'s directives." *Post*, at 21. This position, however, cannot be supported by *linkLine* even in the least.

In *linkLine*, the plaintiffs alleged that a "price squeeze" brought about by conduct in two distinct markets was anticompetitive under § 2 of the Sherman Act. *See* 555 U.S. at 442. The plaintiffs explained in their complaint that the price squeeze was brought about by the defendant's setting a high price for the plaintiffs in a relevant *wholesale* market and an aggressively low price in a relevant *retail* market. *Id.* at 443, 449. The theory depended on the "interaction" of conduct in the two markets, and not the illegality of conduct in either market. *Id.* at 453.

The Supreme Court held "that the price-squeeze claims set forth in [the] complaint [were] not cognizable under the Sherman Act." *linkLine*, 555 U.S. at 456. The Court explained first that because the defendant had "no antitrust duty to deal with its rivals" in the wholesale market at all, it followed that the defendant was not required to offer the plaintiffs their "preferred" "wholesale prices." *Id.* at 450–51. Likewise, it found that the

9

defendant's conduct in the retail market (aggressive price reductions) also was not illegal. *Id.* at 451–52. From there, the Court explained why price-squeeze claims based on legal conduct in two distinct markets should not be recognized as a violation of § 2:

> Recognizing price-squeeze claims would require courts simultaneously to police both the wholesale and retail prices to ensure that rival firms are not being squeezed. And courts would be aiming at a moving target, since it is the *interaction* between these two prices that may result in a squeeze.

*Id.* at 453 (emphasis added). Thus, the Supreme Court did not suggest, as my colleague claims, that only illegal refusals to deal and predatory pricing could violate § 2. It addressed a unique claim in which the "independent competitive harm" from *price squeezes* could not be identified. *Id.* at 455.

This case is entirely different from *linkLine*; it does not depend on the "interaction" of conduct in two distinct markets. It is based on what the record indicates may have been deliberately anticompetitive conduct in the wholesale energy distribution market in the Carolinas — conduct that was not based on "superior product, business acumen, or historic accident." *linkLine*, 555 U.S. at 448 (quoting *Grinnell*, 384 U.S. at 570–71). NTE presented evidence that it was more efficient; that its efficiency allowed it to offer customers in the relevant market lower prices; and that, with its scheme, Duke Energy sought to eliminate that competition not with greater efficiency, but with deliberately anticompetitive conduct that was designed to exclude NTE from the market. This is a standard monopolization claim. *See Grinnell*, 384 U.S. at 570–71.

But, of course, as the case now stands, if NTE fails to carry its burden of proving the facts it advances in support of its claim, we will no longer have to review the sufficiency

of its § 2 claim.  Thus, at this point, it would only be speculative for an en banc court to review disputed facts to assess antitrust liability.  In these circumstances, en banc review, I submit, would be a wasteful use of limited judicial resources.  The court's vote in this case to deny en banc review is thus well justified.

QUATTLEBAUM, Circuit Judge, with whom Judge RICHARDSON joins, dissenting from the denial of rehearing en banc:

This case raises at least two issues of "exceptional importance": (1) whether Sherman Act § 2 antitrust claims can be recharacterized to evade the Supreme Court's doctrinal tests, and (2) whether § 2 claims that fail such doctrinal tests can be amalgamated to create a sufficient claim. The Supreme Court has told us the answer to both questions is no. And since the Court's instruction, no court of appeals faced with these issues has entertained these prohibited theories. That is, until now. Unfortunately, the panel's decision, which will provide the framework for how our circuit reviews § 2 antitrust cases in the future, goes in the opposite direction. As a matter of law, it allows plaintiffs to recharacterize antitrust claims not only to evade the Supreme Court's clear tests, but also to amalgamate them into a "monopoly broth." Daniel A. Crane, *Does Monopoly Broth Make Bad Soup?* 76 ANTITRUST L.J. 663, 663 (2010). This new legal rule leaves us noncompliant with Supreme Court directives, isolated from our sister circuits and out of step with the leading antitrust scholarship. We should have reheard this matter en banc and affirmed the district court's order of summary judgment.

I.

For years, Duke was the dominant energy supplier in North Carolina.[1] But beginning around 2015, NTE, a Florida energy company, emerged as a threat to that position. NTE built a power plant in Kings Mountain, North Carolina that produced power more efficiently than Duke could. With this leg up, NTE began enticing customers away from Duke. Eager to expand, NTE began building another plant in Reidsville, North Carolina. But NTE's expansion faced two challenges.

First, Duke enjoyed decades-long contracts with big customers in North Carolina. NTE's best chance at one of these big customers was the City of Fayetteville, which could terminate its contract with Duke in 2024 if it gave notice by 2017. But Duke wasn't about to let Fayetteville go without a fight. Internal emails show that Duke realized it "need[ed] the NTE train to stop!" J.A. 5733. So Duke forestalled Fayetteville from issuing a request for proposals from Duke's competitors with a two-pronged offensive that would "provide[] value other competitors can't offer." J.A. 7297. First, Duke offered Fayetteville a $30kW-year discount on its existing Duke contract for 2021–2024, worth about $42 million. Second, Fayetteville has its own small, inefficient power plant from which Duke had bought energy since 2012. Duke offered to quadruple the price it paid for that energy. Fayetteville determined this proposal from Duke was a better deal than what it surmised NTE would offer. So, it stuck with Duke.

---

[1] This factual description is admittedly condensed to provide the background necessary for my opinion. The panel opinion ably describes the facts. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 344–351 (4th Cir. 2024).

The second challenge NTE faced was its reliance on Duke's transmission lines. Duke had its own lines to supply energy to customers. NTE did not. Fortunately for NTE, the Federal Energy Regulatory Commission required Duke to provide NTE access to its lines. Following those regulations, Duke entered into a contract with NTE under which NTE paid Duke to connect with Duke's energy transmission lines. But that solution to NTE's lack of transmission lines was short-lived.

In February of 2019, Duke emailed NTE saying that it was changing the payment program, such that NTE "should wait and send their payments per the instructions on the invoice, instead of just wiring it in" on March 1 per the contract's schedule. J.A. 5891–92. A few days later, internal Duke emails expressed Duke's hopes to "get [Fayetteville] wrapped up and [p]ut it to bed and ruin NTE's plans" for the Reidsville plant. J.A. 5906. When March 1 came, NTE had not received an invoice, so it did not pay Duke. By the time the next payment was due on May 1, Duke still had not sent an invoice, so NTE did not make that payment either. Two weeks later, NTE instructed Duke to suspend work on Duke's transmission lines to "create some flexibility" in its development of the plant. *Duke Energy*, 111 F.4th at 348. According to NTE, such suspensions are common, and the contract allowed for it, as long as NTE paid Duke "for all reasonable and necessary costs." J.A. 447. But from Duke's perspective, NTE's nonpayment and suspension breached the contract. Internal emails—"breach! breach! punt em!"—reveal Duke's delight at the perceived breach and the excuse it provided to kill the NTE Reidsville project. J.A. 6364. Duke sent NTE a letter saying NTE had breached the contract. While Duke claimed it had

sent the invoices before, Duke later admitted that that was untrue. But the upshot of all this was Duke's cancellation of NTE Reidsville's connection.

## II.

The same day it terminated NTE's connection, Duke sued NTE for breach of contract. NTE countersued for breach of contract, common law unfair competition, violations of North Carolina's Unfair and Deceptive Trade Practices Act and antitrust violations. The breach of contract claims all settled, and the district court determined both flavors of unfair competition were preempted by federal law. That left only NTE's counterclaim for violations of § 2 of the Sherman Act, for which NTE alleged several theories of liability. The most important theories for our purposes were (1) Duke's alleged refusal to deal with NTE based on the termination of NTE's connection to Duke's transmission lines and (2) Duke's alleged predatory pricing based on its efforts to obtain a renewed contract with Fayetteville.[2] *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 608 F. Supp. 3d 298, 318 (W.D.N.C. 2022), *vacated and remanded,* 111 F.4th 337 (4th Cir. 2024).

After discovery, Duke moved for summary judgment. The district court rejected Duke's argument that a reasonable jury could not find that Duke had monopoly power. *Duke Energy*, 608 F. Supp. 3d at 317. But it agreed with Duke that NTE had not shown a

---

[2] NTE also alleged Duke violated antitrust laws by filing this lawsuit (which it called a "sham lawsuit"), defamatorily posting that the Reidsville project had been "canceled," and intervening against NTE's request to renew its certificate of public convenience and necessity.

genuine dispute of material fact as to Duke's anti-competitive conduct. The court determined that none of NTE's claims were independently unlawful. *Id*. at 319–26. It held that no reasonable jury could find that Duke priced predatorily because NTE offered no evidence that Duke priced below its variable costs. *Id*. at 323–26. As for the refusal to deal theory, the court determined that refusal to deal claims of this variety "'should . . . be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms.'" *Duke Energy*, 608 F. Supp. at 320 (quoting *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)). Because FERC required Duke to share its facilities, the district court determined *Trinko* foreclosed this claim. *Id*. at 319–20. Finally, in a move the panel opinion rebukes, the district court rejected NTE's amalgamation theory. *Id*. at 319. It reasoned that "[a]dding up several instances of lawful conduct cannot total unlawful conduct. In simple mathematical terms, $0 + 0 = 0$." *Id*.

NTE then appealed to our court. After briefing and oral argument, the panel disagreed with the district court's analysis.

First, the panel embraced NTE's amalgamation theory. It concluded that the district court's rejection of that theory "dismember[ed]" NTE's claims. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024). The panel acknowledged that "when anticompetitive conduct is alleged to be typical predatory pricing [or] refusing to deal . . . the case law has developed tests for analyzing such claims." *Id*. at 354. But it insisted that "when a court is faced with allegations of a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories, its application of such specific conduct tests would prove too rigid."

16

*Id*. In such cases, the panel determined that "[a]ggregation is appropriate when individual acts are all part of the same scheme to perpetuate dominance or drive the plaintiff from the market." *Id*. at 355 (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7 (4th and 5th eds. 2024)) (cleaned up). As a result, the panel established a new rule for the Fourth Circuit—if an antitrust plaintiff alleges "complex" or "atypical" allegedly anticompetitive conduct that "do[es] not fit neatly within pre-established categories," courts must permit claims to go forward even if they flunk doctrinal antitrust tests. *Id*. at 354.

The panel then considered NTE's specific claims. As for predatory pricing, the panel opinion determined that the court did not have to "assess whether" the allegedly anticompetitive actions taken "amounted to a violation of § 2 under a strict predatory pricing theory." *Duke Energy*, 111 F.4th at 360. It reasoned that "the predatory pricing analysis cannot fully account for the more comprehensive conditions of Duke's offer." *Id*. at 357. The panel likened Duke's willingness to increase the price at which it bought power from Fayetteville plus its discount to the current contract to a package discount. *Id*. From there, it looked to the Third Circuit's opinion in *LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003). The *LePage's* court determined that 3M's "exclusive dealing practices" and "discount practices" wrested the case from the standard doctrinal test for predatory pricing.[3] *Id.* at 159. The *Duke* panel made the same move. It reasoned that because NTE

---

[3] The standard test for predatory pricing is pricing below cost before raising prices once competitors are driven off. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24 (1993).

challenged the overall structure of the deal, the standard doctrinal test for predatory pricing under *Brooke Group* did not apply. *Duke Energy*, 111 F.4th at 358–60. The panel concluded that the record contained a factual dispute as to whether the structure of Duke's Fayetteville offer was exclusionary, which was enough to vacate the summary judgment order. *Id.* at 360.

The panel then turned to NTE's refusal to deal claim. Despite *Trinko*'s instruction that refusal to deal claims require voluntary engagement in a course of dealing as opposed to a regulatorily compelled relationship, the panel concluded that a jury could hold Duke liable for refusing to deal with NTE. *Id.* at 364. In reaching this conclusion, the panel determined that a jury could find Duke decided to give up short-term profits by ensnaring NTE in a manufactured breach of the contract, even though Duke was only sharing its transmission lines with NTE because FERC required it to. *Duke Energy*, 111 F.4th at 365.

But ultimately, the panel did not deny summary judgment on that basis. Instead, it excused itself on the grounds that amalgamation would make Duke's conduct liable in any event. *Duke Energy*, 111 F.4th at 366 ("And we need not determine, as a matter of law, whether, if those facts are believed, such conduct in isolation amounted to a § 2 violation under a refusal-to-deal theory of liability. Rather, we recognize NTE's claim that this conduct was but a part of a larger scheme.").[4]

_____

[4] Because the panel held as a matter of law that NTE need not satisfy the Supreme Court's clear rules for predatory pricing and refusing to deal claims, the alleged factual disputes my colleague describes in his opinion in support of denying rehearing en banc do not justify our denial of Duke's petition. That's because they are not material under the amalgamation theory the panel embraces. Had the panel vacated the district court's order
(Continued)

Duke moved for rehearing en banc. It first argued that the panel decision was infected by an openness to the combined effects of Duke's Fayetteville offer and the termination of the interconnection contract. Such openness, Duke maintained, is directly contrary to the Supreme Court's "repeated[] emphasi[s on] the importance of clear rules in antitrust law." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009). Second, Duke asserted that the panel's predatory pricing holding again flouted Supreme Court precedent by sidestepping the *Brooke Group* test for the sake of the offer's structure. Third, Duke insisted that under *Trinko* it was entitled to judgment as a matter of law on NTE's refusal to deal claim since Duke's relationship with NTE was not voluntary but instead compelled by FERC. We denied Duke's motion.

## III.

We should have reheard this matter en banc. Rehearing en banc is appropriate "to secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1). And we have said that "lower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law." *Manning v. Caldwell*, 930 F.3d 264, 282 (4th Cir. 2019). Besides being a question of exceptional importance under Rule

---

granting summary judgment to Duke because of genuine disputes of material fact under the Court's doctrinal tests, I agree rehearing en banc would be inappropriate. But that is not what it did. It held that even if NTE could not satisfy those tests at trial, it could still prevail under its theory that Duke's broader scheme was unlawful.

35(a)(2), this case also demands rehearing en banc because of the panel's violations of Supreme Court precedent.

Contrary to that precedent, the panel opinion establishes a framework for § 2 antitrust cases that permits both the recharacterization of claims to evade the Supreme Court's doctrinal tests and the amalgamation of § 2 claims that fail such doctrinal tests to create a sufficient claim.

Section 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2. The Act does not specify what types of activities are unlawful. But the Supreme Court has recognized that "clear rules" are important for antitrust law. *linkLine*, 555 U.S. at 452. To establish such rules, the Court has created doctrinal tests for common types of unlawful conduct. Relevant to NTE's claims, if a company is refusing to deal on the free market with its competitors, certain conditions must be met before the conduct may be considered unlawful. *See Trinko,* 540 U.S. at 408–10. Likewise, if a company is setting curiously low prices, certain conditions must be met before the conduct may be considered unlawful. *See Brooke Grp.*, 509 U.S. at 243.

What's more, the Supreme Court has commanded that these doctrinal tests be followed. In *linkLine*, the Court held that plaintiffs may not take claims that fail these tests, amalgamate them with a "course of conduct" label, and then cast aside the tests. 555 U.S.

at 457. After determining that the plaintiffs had not stated a refusal to deal claim or a predatory pricing claim, the Court rejected the plaintiffs' attempt to "alchemize them into a new form of antitrust liability never before recognized by this Court." *Id*. It described the claims as "an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level." *Id.* at 452. As the Court summed up, "[t]wo wrong claims do not make one that is right." *Id.* at 457.

But they do to the panel. Rejecting *linkLine*'s directives, the panel casts the tests for refusal to deal and predatory pricing aside because, according to the panel, they are "too rigid" for conduct that is "complex or atypical." *Duke*, 111 F.4th at 354. But those tests aren't options for lower courts to use only in run-of-the-mill cases. They are requirements, even if rigid and even for complex cases. As I have said before, "Supreme Court precedent is not like the green vegetables on a buffet line that we can simply pass by for more dessert." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 148 (4th Cir. 2022) (Quattlebaum, J., concurring).

The panel decision's squishy reasoning will produce the very uncertainty the Supreme Court's clear rules were designed to eliminate. Antitrust claims are almost always factually complex. It is hard to imagine how good and creative lawyers will not use this new rule to broadly expand antitrust liability. That's exactly what has happened in this case. Consider the panel's treatment of predatory pricing. For good reason, antitrust law does not prohibit low prices. That's because lower prices are generally good for consumers, not bad. The lone exception is predatory pricing, which has two elements—pricing below cost, and a reasonable probability the monopolist firm will recoup its losses by jacking up

prices after its below-cost prices have driven off competitors. *See Brooke Grp.*, 509 U.S. at 222–24. Duke insists that NTE cannot pass this test because Duke's offer to Fayetteville was not below its costs. Rather than addressing this essential issue, the panel side-steps it, agreeing with NTE's characterization of Duke's Fayetteville offer not as a predatory pricing claim, but as an exclusionary "structure" claim. According to the panel, "only Duke could provide a discount on pre-2024 prices," and this *structure* of the offer rendered it anticompetitive. 111 F.4th at 358. But it wasn't the *structure* of the deal that made Fayetteville pick it; it was the dollars it saved the city. And almost any alleged anticompetitive pricing will be part of some economic or contractual structure. The fact that Duke's preexisting relationship allowed it more ways to save Fayetteville those dollars does not, under Supreme Court precedent, relieve NTE of its duty to satisfy the predatory pricing test.

Importantly, the Supreme Court has rejected efforts to avoid doctrinal tests when the facts are not picture-perfect fits. In *Trinko*, the defendant sometimes "failed to fill" its rivals' orders "at all," while other times it only failed to fill its rivals' orders "in a timely manner" or "after filling those for its own local phone service." *Trinko* 540 U.S. at 404–05. The Court described the plaintiffs' alleged theory as one of "insufficient assistance in the provision of service to rivals." *Id.* at 410. Thus, it was not literally a refusal to deal, but rather a lackluster reluctance to deal. And crucially, the Court determined that distinction made no difference. It analyzed all this conduct under the familiar refusal to deal test. *Id.* It did not avoid the standard test just because the facts were not neat and tidy.

Despite that guidance, the panel permits what *Trinko* and *linkLine* reject. It relieves NTE of the burden to show that Duke's transmission line relationship with NTE was voluntary and not compelled by FERC regulations. The panel insists it "need not determine, as a matter of law, whether,"—if Duke's termination of the Reidsville Transmission Agreement was intended to achieve anticompetitive ends—"such conduct in isolation amounted to a § 2 violation under a refusal-to-deal theory of liability." *Duke Energy*, 111 F.4th at 366. If that is true, what is the point of its analysis which cites *Trinko* and other Supreme Court refusal to deal decisions? The panel sets out its analysis admitting that Duke's alleged conduct "somewhat resembles a refusal to deal." *Id*. at 337. But it never ultimately applies the Court's refusal to deal test, instead concluding that the only thing that matters is amalgamation. The problem is that we have seen facts that "somewhat resemble[] a refusal to deal" somewhere before—*Trinko*, where the Court nevertheless applied the doctrinal test. This case is no different; at least, it shouldn't be.

Not only does the panel deviate from Supreme Court precedent, but it improperly claims support for its amalgamation approach from three sources. First, the panel relies on the Supreme Court's *Continental Ore Company v. Union Carbide & Carbon Corporation,* 370 U.S. 690 (1962) decision. According to the panel, *Continental Ore*—issued almost 50 years before *linkLine*—justifies its amalgamation theory. But why would we grasp for this decision when the Court recently came to the exact opposite conclusion? Besides, *Continental Ore* doesn't even provide the support the panel suggests. As the Federal Circuit has explained, in "*Continental Ore* the Court held that the factual components of a case should be viewed together, not the pieces of legal theory . . . *Continental Ore* did not hold

. . . that the degrees of support for each legal theory should be added up." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366–67 (Fed. Cir. 1999) (cleaned up).

Second, the panel relies on the Third Circuit's *LePage's* decision. But that reliance is misplaced for two reasons. One, the decision has been roundly criticized for muddying the waters of antitrust rules that the Supreme Court has sought to clear. "As the bipartisan Antitrust Modernization Commission recently noted, the fundamental problem with the *LePage's* standard is that it does not consider whether the bundled discounts constitute competition on the merits, but simply concludes that all bundled discounts offered by a monopolist are anticompetitive with respect to [] competitors who do not manufacture an equally diverse product line." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 899 (9th Cir. 2008) (cleaned up); *see Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 273 (6th Cir. 2015) ("The Ninth Circuit's analysis in *Cascade Health* is more compelling than that of the Third Circuit in *LePage's.*"); Bruce H. Kobayashi, *The Economics of Loyalty Discounts and Antitrust Law in the United States* (Geo. Mason U. Sch. of L., Working Paper No. 05-26) [https://perma.cc/4T4C-2ESM].

Two, *LePage's* predates *linkLine.* And, since *linkLine* rejected this sort of "alchemiz[ing]," no court of appeals has dared to embrace this now-forbidden theory. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the sake of accuracy, precision, and analytical clarity, we must evaluate Mylan's allegedly exclusionary conduct separately."), *cert. denied sub nom. Sanofi-Aventis U. S., LLC v. Mylan, Inc.*, 143 S. Ct. 1748 (2023); *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 Fed. App'x 186, 191 (2d Cir. 2012) ("Because these alleged

instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either."). That is, until now. With the panel's decision, we have elected to chart our own path in conflict with the Supreme Court and all our sister circuits that have addressed these issues post-*linkLine*.

Third and finally, the panel claims that Phillip Areeda and Herbert Hovenkamp's leading antitrust treatise supports its decision. It doesn't. The panel cites this treatise for the proposition that "conduct must always be analyzed 'as a whole.'" *Duke Energy*, 111 F.4th at 355 (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7). In the part of the treatise the panel references, Areeda and Hovenkamp advocate amalgamating individual actions which together satisfy an announced § 2 category, just as the Federal Circuit explained in *Intergraph*. They do not support amalgamating individual actions which, together, do not satisfy an established doctrinal category. In fact, they reject the panel's reasoning. Aggregation is improper, according to Areeda and Hovenkamp, where there is no "dominant conduct causing the plaintiff's injuries" that is independently "found unlawful" under a recognized § 2 category. Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7. The panel finds no unlawful conduct under a recognized § 2 claim. Yet it permits NTE's claims to escape summary judgment.

In sum, the panel's decision defies recent Supreme Court precedent, ignores our sister circuits, rests on a maligned and outdated Third Circuit decision and misreads the leading antitrust scholarship. We should have reheard this case en banc and rejected this amalgamation theory of § 2 liability.

IV.

The panel makes much of the evidence NTE produced of Duke's anticompetitive intent. I

do not quarrel with the assessment of that evidence. Indeed, I understand how that evidence

of anti-competitive intent could raise concerns. But under the law, Duke's intent matters

only if its conduct violated a recognized antitrust claim. *United States v. Microsoft Corp.*,

253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]n considering whether the monopolist's conduct on

balance harms competition and is therefore condemned as exclusionary for purposes of §

2, our focus is upon the effect of that conduct, not upon the intent behind it."); *Novell, Inc.*

*v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) ("Were intent to harm a

competitor alone the marker of antitrust liability, the law would risk retarding consumer

welfare by deterring vigorous competition."). As explained, Duke's conduct does not

violate any such claim. So, its intent—no matter how abhorrent—does not create a genuine

dispute of material fact on NTE's § 2 claims. And we must not let subjective discomfort

with Duke's intent distract us from the Supreme Court's objective tests for § 2 liability.

V.

To be sure, Duke used hardball business tactics. And perhaps North Carolinians

would be better off with NTE than with Duke. But that is not what Fayetteville thought.

And the law neither requires nor permits us to substitute our business judgment for

Fayetteville's. Yet the panel's decision to do just that conflicts with the Supreme Court's

*linkLine* and *Trinko* decisions. It also establishes a nebulous rule that will lead to

26

uncertainty, contrary to the Supreme Court's "repeated[] emphasi[s on] the importance of clear rules in antitrust law." *linkLine,* 555 U.S. at 452.

I respectfully dissent from our denial of rehearing en banc.